STEVE ELZINGA
Oregon Bar No. 123102
SHERMAN, SHERMAN, JOHNNIE & HOYT, LLP
693 Chemeketa St. NE
Salem, OR 97301
Telephone: 503-364-2281
steve@shermlaw.com

Attorneys for Plaintiffs
PEOPLE NOT POLITICIANS OREGON,
COMMON CAUSE, LEAGUE OF WOMEN
VOTERS OF OREGON, NAACP OF
EUGENE/SPRINGFIELD, INDEPENDENT
PARTY OF OREGON, and C. NORMAN
TURRILL

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| PEOPLE NOT POLITICIANS OREGON, COMMON CAUSE, LEAGUE OF WOMEN VOTERS OF OREGON, NAACP OF EUGENE/SPRINGFIELD, INDEPENDENT PARTY OF OREGON, and C. NORMAN TURRILL,<br><br>               Plaintiffs,<br><br>     v.<br><br>BEVERLY CLARNO, OREGON SECRETARY OF STATE,<br>                              Defendants. | Case No. 20-1053<br><br>**COMPLAINT** |

1
COMPLAINT (*People Not Politicians, et al. v. Secretary of State*)
1386660

## NATURE OF ACTION

1. This action arises out the challenges faced by People Not Politicians (PNP) as it has attempted to qualify an initiative for the November 2020 ballot in the midst of the COVID-19 Pandemic ("the Pandemic"). PNP proposes to amend the Oregon Constitution to provide for the establishment of an independent redistricting commission to draw Oregon's electoral maps for the State Senate, State House and U.S. House of Representatives. Toward that end, PNP filed Initiative Petition 57 ("Initiative") on November 16, 2019. People Not Politicians, Initiative 2020-057 (Or. 2019). Since the Initiative was filed and People Not Politicians was cleared to begin signature gathering, however, the Pandemic has gripped our state and country.

2. In response, all levels of the government have issued social distancing requirements that preclude the interpersonal contact necessary to gather sufficient signatures to qualify the Initiative for the November General Election ballot using traditional means. While Oregon does not require signature gathering to take place only in-person, social distancing requirements during this pandemic dramatically limited People Not Politicians' ability to engage in the interpersonal contact traditionally necessary to collect the number of signatures required to qualify for the November 2020 ballot.

3. In an attempt to overcome this unprecedented barrier, PNP embarked on a novel signature gathering campaign that relies almost exclusively on mail and downloadable petition signature gathering methods. Despite these herculean alternative efforts, PNP has not (to date) been able to gather the required number of signatures to qualify for the ballot by the deadline specified by Oregon law. PNP has requested that the Secretary of State adjust both the signature requirement and deadline to account for the exceptional circumstances of the pandemic and the

public health restrictions effectively banning traditional signature-gathering methods for the entirety of PNP's signature-collection period. The Secretary of State refused to adjust its pre-Pandemic requirements to adjust for the barriers to PNP's democratic participation that arose during the pandemic.

4. Accordingly, Plaintiffs bring this as-applied challenge to Oregon's threshold and deadline for signature gathering to qualify for the November General Election ballot.

## PARTIES

5. Plaintiff People Not Politicians Oregon (PNP) is a Petition Committee formed pursuant to Or. Rev. Stat. § 260.118. PNP's address is 960 Broadway St. NW, Suite 5, Salem, OR 97301. PNP drafted and filed the Initiative and is advocating for it to qualify for the November ballot and for its ultimate passage. PNP is responsible for circulating the initiative for signature and otherwise qualifying it for the ballot. The interests PNP seeks to protect in this action, in addition to the ability to place the initiative on the ballot, relate to the voting rights of all Oregonians, including its supporters and funders, and these interests are germane to PNP's purpose.

6. Plaintiff Common Cause was founded by John Gardner in 1970 as a nonpartisan "citizens lobby" whose primary mission is to protect and defend the democratic process and make government accountable and responsive to the interests of ordinary people, not merely to those of special interests. Common Cause is one of the Nation's leading democracy organizations and has over 1.1 million members nationwide and 35 state organizations. Common Cause has been a leading advocate of reforms designed to make redistricting a fairer, less

partisan, and more transparent process. This work has included drafting ballot initiatives, leading campaigns to pass reform, and engaging in litigation to end gerrymandering nationwide.

7. Plaintiff League of Women Voters of Oregon (LWVOR) is a grassroots, nonpartisan political organization that encourages informed and active participation in government. LWVOR's purposes are to influence public policy through education and advocacy on a wide range of democracy issues, including redistricting reform. LWVOR also works to encourage active and informed participation in government and to increase understanding of major policy issues. The League seeks to empower citizens to understand governmental issues and to participate in the political process.

8. Plaintiff Eugene/Springfield NAACP (NAACP) is a grassroots nonprofit organization located at 330 High St, Eugene, OR 97401. The mission of NAACP is to ensure the political, educational, social, and economic equality of rights of all persons and to eliminate race-based discrimination. The organization's primary activities include implementation of education programs and events for public awareness and community building. The NAACP also coordinates institutional collaborations to increase cultural inclusion in all areas. NAACP believes that the process of redistricting creates the foundation to all other policy making and that a redistricting process that eliminates or minimizes the role of Oregonians of diverse backgrounds does not serve our state. NAACP is dedicated to ensuring that every Oregonian can participate in our political processes, regardless of race, zip code, socioeconomic status or level of formal education. NAACP is a member of the Executive Committee for PNP and is similarly dedicated to qualifying the Initiative for the November ballot, including asking their members to sign the petition, soliciting volunteers to help with signature gathering activities, and providing community education about the Initiative.

9.      Plaintiff Independent Party of Oregon ("IPO") has more than 122,000 members and is the largest third party, by share of registered voters, in any state in the United States. IPO focuses on promoting policies to decrease partisanship, to support election reforms, and to increase transparency in state and local government. IPO believes that redistricting reform, like that introduced in the Initiative, can make Oregon more responsive to the needs of voters and the public good. IPO is a member of the Executive Committee of PNP and dedicates considerable volunteer time and resources to working to qualify the Initiative for the November ballot.

10.     Plaintiff C. Norman Turrill is a Chief Petitioner for Initiative Petition 57. He has been a resident of the State of Oregon since 2001 and a member of the League of Women Voters (LWV) since the 1970s. He has engaged in ballot measure signature-gathering campaigns for decades. Turrill was planning to circulate petitions in support of IP 57 as he has in previous campaigns, by approaching people in the streets, in high-traffic public locations and at large public gatherings, with petitions on clipboards. However, Turrill falls into a part of the population that is most vulnerable to serious health repercussions if he contracts the coronavirus that causes COVID-19 disease. The Stay Home restrictions did not allow him to circulate the petition and collect signatures in public in support of IP 57. Turrill personally signed the petition and if the petition fails, he will be unable to vote for an initiative that he enthusiastically supports.

11.     Defendant Beverly Clarno is the Oregon Secretary of State and is named as a Defendant in her official capacity. Secretary Clarno is the chief elections officer in the State of Oregon and is charged with receiving filed petitions and determining the sufficiency of signatures. Or. Const. art. IV, § 1, cl. 4(a); Or. Rev. Stat. § 246.110.

## JURISDICTION AND VENUE

12. This is a civil rights action that raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

13. This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because this action arises under the U.S. Constitution and seeks equitable and other relief for the deprivation of constitutional rights under color of state law.

14. This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

15. This Court has personal jurisdiction over Defendant, who is sued in her official capacity. Secretary Clarno is a state official who works in Salem, Oregon.

16. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendants are State officials working in Oregon. A substantial part of the events giving rise to these claims occurred and continue to occur in this District, making venue also proper under 28 U.S.C. § 1391(b)(2).

## FACTUAL BACKGROUND

### A. The Initiative

17. On November 12, 2019, Plaintiff filed a prospective initiative petition pursuant to Or. Rev. Stat. § 250.045. If enacted, the Initiative will amend the Oregon State Constitution to provide for an independent citizens redistricting commission to draw electoral districts for the Oregon House, Senate, and U.S. House of Representatives. The commission would be composed of twelve Oregonians who are free from conflicts of interest and represent the diversity of the

6

state. The commission would be charged with holding public hearings and providing for public input and required to draw maps in compliance with strict mapping criteria. *See* Initiative Petition 2020-057 (Or. 2019).

18.   On December 5, 2019 sponsorship signatures were submitted for verification pursuant to Or. Rev. Stat. § 250.045. These signatures were collected over a 10-day period from November 25 through December 4, 2019, which included the Thanksgiving holiday, through a signature gathering firm that used in-person, on- the-street petition circulators. Pursuant to Or. Rev. Stat. § 250.045, no more than 2000 sponsorship signatures could be collected. On December 20, 2019, the Secretary of State verified 1,656 signatures submitted by PNP and began the ballot title draft process pursuant to Or. Rev. Stat. § 250.065 and Or. Rev. Stat. § 250.067

19.   On March 27, 2020, the Oregon Supreme Court approved the final ballot title for Initiative Petition 57.

20.   On April 9, 2020, the Secretary of State approved Initiative Petition 57 for circulation. PNP immediately began the process of gathering signatures electronically but did not begin in-person signature gathering because of the stay-at-home orders in place in Oregon, and the need to protect voters, volunteers and paid signature gatherers from potentially contracting the virus.

21.   On March 27, 2020, Becca Uherbelau and Emily McClain filed a complaint in Circuit Court of the State of Oregon for the County of Marion alleging that Oregon Secretary of State Bev Clarno erroneously determined that Initiative Petition 57 complied with the procedural requirements of the Oregon Constitution. Complaint, *Uherbelu v. Clarno,* No. 20CV13939 (Or. Cir. Ct. Mar 27, 2020). This matter is currently pending.

22.     Pursuant to the Oregon Constitution, the number of signatures to be collected on a petition to place a constitutional amendment initiative on the ballot is eight percent of the total number of votes cast for candidates for Governor in the most recent election in the state. Or. Const. art IV, § 1, cl. 2(c). For the 2020 election cycle, this requires a petition to garner 149,360 signatures from qualified voters to get on the ballot. The Secretary of State is responsible for receiving the petitions and verifying the signatures of voters on the petition. Or. Rev. Stat. § 250.105.

23.     The Oregon Constitution also mandates that a petition must be filed at least four months in advance of the election the initiative is meant to be voted on, which is July 2, 2020 for this election cycle. Or. Const. art IV, § 1, 2(e). If a petition fails to garner the adequate number of signatures to be placed on the ballot in the current election cycle, proponents of the initiative are required start the signature process again from the beginning for the next election cycle. Unger v. Rosenblum, 362 Or. 210, 223 (2017).

### B.     The Pandemic

24.     The Pandemic has resulted in a near total cessation of public activity in Oregon. This necessary public health action is the result of the adoption of guidance by the federal government, adherence to legal directives issued by the Governor of the State of Oregon, as well as general public attitudes in response to an unprecedented global pandemic.

#### 1.     Effects of the Pandemic on National Policy

25.     On January 30, 2020, the World Health Organization declared that the novel coronavirus (COVID-19) constitutes a Public Health Emergency of International Concern. Over the next two months, President Donald Trump, Congress, and the Centers for Disease Control

implemented various emergency declarations and public health guidance, including suggested restrictions for communities on the size of social gatherings, social distancing guidelines intended to reduce interpersonal contact, suggested guidelines on how to protect oneself from contracting Covid-19 and how to protect others if one became infected, and clear guidance to listen and follow the instructions of state and local officials.

### 2. Effects of the Pandemic on Oregon State Policy

26. Nearly simultaneously with the federal government, Oregon Governor Kate Brown issued an escalating series of Executive Orders aimed at protecting public health through the curtailing of public activities and in-person gatherings of unrelated individuals. These Executive Orders, while necessary for public health purposes, severely limited public gatherings that play a central role in signature gathering efforts.

27. On March 7, 2020, Oregon Governor Kate Brown issued Executive Order No. 20-03, declaring a State of Emergency pursuant to ORS 401.165 *et seq* finding that the novel infectious coronavirus has created a threat to public health and safety, and constitutes a statewide emergency under ORS 401.021(1). The Executive Order established that the state of emergency shall exist for sixty days unless extended or terminated by the Governor.

28. On March 12, 2020, Governor Brown issued Executive Order No. 20-05 Prohibiting Large Gatherings Due to Coronavirus (Covid-19) Outbreak in Oregon. The Executive Order banned gatherings larger than 250 people and ordered the statewide closure of K-12 schools. The Executive Order applied to community, civic, public, leisure, faith-based, and sporting events, concerts, conventions, fundraisers, and any similar events or activities if a minimum of three feet of space cannot be maintained between participants.

29. On March 17, 2020, Governor Brown issued Executive Order No. 20-07 Prohibiting On-Premises Consumption of Food or Drink and Gatherings of More Than 25 People. This Executive Order further restricted public movement, required additional social distancing measures, and bans all public gatherings of 25 or more people.

30. On March 23, 2020, Governor Brown issued Executive Order No. 20-12 Stay Home, Save Lives: Ordering Oregonians to Stay at Home, Closing Specified Retail Businesses, Requiring Social Distancing Measures for Other Public and Private Facilities, and Imposing Requirements for Outdoor Areas and Licensed Childcare Facilities. This Executive Order established mandatory social distancing requirements of at least six feet from any person who does not live in same household, with violations subject to penalties described in ORS 401.990. The order includes no end date, stating that it will remain in effect "until terminated by the governor."

31. On May 1, 2020, Governor Brown signed Executive Order No. 20-24, extending the state of emergency in response to Covid-19 for an additional 60 days through July 6, 2020.

32. On May 14, 2020, Governor Brown issued Executive Order No. 20-25: A Safe and Strong Oregon: Maintaining Essential Health Directives in Response to COVID-19, and Implementing a Phased Approach for Reopening Oregon's Economy. This order established criteria counties would have to meet before being allowed to move to a phased reopening of businesses and other facilities along with permitting gatherings of gradually increasing number of individuals in those counties.

33.     On May 18, 2020, Baker County Circuit Court judge Matthew Shirtcliff suspended Governor Brown's Executive Order. The Oregon Supreme Court issued a stay on the same day blocking Judge Shirtcliff's order pending its own resolution of the case.

34.     On June 12, 2020, the Oregon Supreme Court reversed Judge Shirtcliff and upheld Gov Brown's Stay-Home executive order. *Elkhorn Baptist Church v. Brown*, 366 Or. 506 (2020).

35.     By June 19, 2020, Oregon's three most populous counties–Multnomah, Washington, and Clackamas–were granted Phase I reopening status. Aside from Lincoln County, which is also a Phase I county, all other Oregon counties have been granted Phase II status. Phases I and II of Oregon's gradual reopening, and thus restrictions that currently apply to the entire state, mandate physical distancing of at least six feet and significant restrictions on large gatherings.

### 3.     Signature-gathering during the pandemic.

36.     Following the rise of the COVID-19 Pandemic, state and local public health restrictions have largely barred the conduct and strategies on which pre-Pandemic signature collection typically relied.  Under normal circumstances, signatures are gathered through a variety of methods, all of which rely on extensive in-person contact. Signature gatherers go out into public spaces, such as markets, public transportation nexuses, and other highly-trafficked areas. Signature gatherers approach strangers with a clipboard, petitions forms, pens, and campaign paraphernalia.  The signature collection process typically requires signature gatherers to speak one-to-one with potential voters in close physical proximity. If a registered voter agrees to sign the petition form, the volunteer hands them the clipboard, the petition form, and a pen.

The volunteer may also give the voter campaign literature and paraphernalia. Naturally, this interaction involves passing items back and forth between the volunteer and voter. Volunteers repeat this type of interaction—in spaces far closer than six feet apart—with at least tens of voters in a typical canvassing "shift." This is exactly the type of activity Pandemic public health restrictions have prohibited.

37. The disruption of normal signature-collecting methods extends beyond social-distancing restrictions. Through shelter-in-place orders, Oregonians have been ordered under penalty of law to stay at home. Restaurants, government buildings, schools, and other establishments where Plaintiffs would traditionally have been able to gather signatures have been closed or access has been sharply limited. People also are prohibited from gathering in parks and other areas in substantial numbers. Even if traditional signature gathering methods were currently legally permissible, they would run counter to public health concerns and potentially pose risks to PNP's signature gatherers and potential voters.

38. Although Oregon does permit campaigns to mail petitions to voters for signature and permits voters to download, print, and sign petitions and then mail them back, these are typically used as supplemental signature gathering methods and do not produce the same number of signatures as quickly or efficiently as in person signature gathering. See *Meyer v. Grant*, 486 U.S. 414, 422 (1988) (striking down a prohibition against the use of paid petition circulators and calling direct one-on-one communication "the most effective, fundamental, and perhaps economical avenue of political discourse").

39. Accordingly, given the Pandemic's widespread disruption of the activity on which traditional signature gathering depends during the entirety of the period during which PNP was

authorized to collect signatures, it is implausible that PNP will be able to gather the required number of signatures or meet the signature submission deadline.

### 4. Oregon and other states have taken action to protect political speech in light of COVID-19

40. Oregon and other states, recognizing the Pandemic's extraordinarily disruptive effect on normal life, have taken affirmative steps to adjust their regulations and procedures to help protect and ensure continued political participation.

41. Typically, Oregonians can participate in public meetings in a variety of ways, including by attending meetings in person and providing in person testimony. Due to the pandemic, on April 15, 2020, Governor Brown issued an Executive Order requiring that public meetings in the state make available a method for the public to attend the meeting at the same time that it occurs, whether by telephone, video, or other electronic means. Or. Exec. Order No. 20-16 (Apr. 15, 2020).

42. Other jurisdictions in the United States have also taken steps to protect political speech during the Pandemic, including changing the rules for elections and initiatives. For example, sixteen states have either postponed their primary elections in response to the pandemic or moved their election to vote-by-mail, including Alaska, Connecticut, Delaware, Georgia, Hawaii, Indiana, Kentucky, Louisiana, Maryland, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, West Virginia and Wyoming. Nick Corasantini & Stephanie Saul, <u>16 States Have Postponed Primaries During the Pandemic. Here's a List.</u>, N.Y. Times (May 27, 2020), https://www.nytimes.com/article/2020-campaign-primary-calendar-coronavirus.html.

43. Additionally, several courts have granted relief in light of the impact of COVID-19 on signature gathering across the United States. A Virginia state court granted a preliminary injunction and ordered a reduction in the number of signatures needed for candidates to enter Virginia's primary election from 10,000 to 3,000. The court found that "the circumstances as they exist in the Commonwealth of Virginia and across the United States are not normal right now," and that the regulations requiring the signatures were not narrowly tailored because they "do[ ] not provide for emergency circumstances, like those that currently exist." *Faulkner v. Va. Dep't of Elections*, No. CL 20-1456, slip op. at 3 (Va. Cir. Ct. Mar. 25, 2020).

44. For candidates seeking access to the ballot in Massachusetts, the Massachusetts Supreme Judicial Court ordered a reduction in signature requirements by 50%, an extension of the deadline for filing signatures, and allowing electronic over wet-ink signatures. The court found that "these extraordinary times of a declared state of emergency arising from the COVID-19 pandemic create an undue burden on prospective candidate's constitutional right to seek elective office." *Goldstein v. Sec'y of Commonwealth*, 142 N.E.3d 560, 564 (Mass. 2020).

45. A federal court in Arkansas granted a motion for preliminary injunction made by the plaintiffs to allow collecting signatures outside of previous in-person requirements. *Miller v. Thurston*, No. 5:20-CV-05070 (W.D. Ark. May 26, 2020).

46. In Nevada, a federal court granted a preliminary injunction that extended the deadline for submitting a complete petition in light of the pandemic. The court agreed with the plaintiffs, finding that "as plaintiffs have no chance of getting their initiative on the ballot without an extension, their First Amendment rights have been violated." *Fair Maps Nevada v. Cegavske*, No. 3:20-cv-00271, slip op. at 27 (D. Nev. May 29, 2020).

47. A federal court in Michigan granted a motion for preliminary injunction that lowered the signature requirement to place an initiative on the ballot and delayed the deadline to file initiative petitions. The court determined that "the reality on the ground for Plaintiff and other candidates is that state action has pulled the rug out from under their ability to collect signatures." *SawariMedia LLC v. Whitmer*, No. 20-CV-11246, slip op. at 6 (E.D. Mich. June 11, 2020).

48. A Michigan state court suspended a ban on using signatures that are more than 180 days old. *Fair and Equal Michigan v. Benson*, No. 20-000095-MM (Mich. Ct. Cl. Jun. 10, 2020).

49. The 7th Circuit granted an extension of the petition submission deadline for third party candidates and lowered the number of required signatures. *Libertarian Party of Illinois v. Cadigan*, No. 20-1961 (7th Cir. June 21, 2020).

50. PNP approached the Oregon Secretary of State to request accommodations similar to those described above given the challenges faced by PNP, through no fault of its own, during the authorized signature collection period. Specifically, PNP requested that Oregon's signature submission deadline during this unique time be extended until August 17 and the 2018 threshold for referenda (58,789) be adopted as the most appropriate basis of demonstrating sufficient support in light of the pandemic-related orders prohibiting in-person signature gathering.

51. The Secretary of State refused PNP's request and made no adjustment to its pre-Pandemic requirements to account for the current exceptional circumstances and burdens on signature-gathering activities.

## CAUSE OF ACTION

### COUNT I – Undue Burden on Ballot Access and Rights to Freedom of Speech and Association Under the First and Fourteenth Amendments to the U.S. Constitution

52. Plaintiffs reallege and incorporate by reference all prior paragraphs as though fully set forth herein.

53. The First Amendment and Fourteenth Amendment to the United States Constitution secure the rights of Oregonians to speech and political expression free from government interference or hinderance. Circulation of petitions is core protected speech. *Prete v. Bradbury*, 438 F.3d 949, 961 (9th Cir. 2006); see also *Meyer v. Grant*, 486 U.S. 414, 420 (1988).

54. Regulations and restrictions on the right to vote and engage in political expression is assessed under the sliding-scale standards established by *Anderson v. Celebrezze*, 460 U.S. 780 (1984) and *Burdick v. Takushi*, 504 U.S. 428 (1992). If a severe burden on these rights are established, then strict scrutiny applies. *See, e.g.*, *Harper v. Virginia Board of Elections*, 383 U.S. 663 (1966).

55. The challenged restrictions, Oregon's pre-Pandemic signature count requirement and submission deadline as applied to PNP during the Pandemic and related public health orders, impose a severe burden on the Plaintiffs' First and Fourteen Amendment rights by making it nearly impossible to place the initiative on the ballot.  This severe burden earns strict scrutiny for the challenged regulations under the *Anderson*/*Burdick* standard. *Angle v. Miller*, 673 F.3d 1122, 1133 (9th Cir. 2012).

56. Defendant's maintenance of both the pre-Pandemic number of signatures required as well as the deadline for submitting signatures cannot survive strict scrutiny in light of the

government regulations in response to the COVID-19 pandemic. The requirements as applied to PNP are not narrowly tailored to further a compelling government interest.

57. Moreover, Defendant has no compelling interest in effectively barring the Initiative from appearing on the ballot. The Defendant's interest in ensuring that the Initiative has enough verified public support before appearing on the ballot can be accomplished through less restrictive means.

58. Requiring the Initiative to be submitted for verification with 149,360 signatures by July 2, 2020 will likely unnecessarily preclude the Initiative from appearing on the ballot. More time can—and should be—allotted to collect and verify signatures and the signature threshold should be lowered to ensure Plaintiffs' right to engage in political speech is sufficiently protected. Doing so will not compromise the government's interest in ensuring that only verified initiatives are included on the ballot or that sufficient support for the initiative exists to place it on the 2020 ballot. Even if more time is allotted to gather the required signatures, the Defendant and her employees in the Secretary of State's office will have sufficient time to verify the Initiative. And even if fewer signatures are required to be submitted for verification, the Defendant and her employees will still be able to confirm the significant voter support for placing the matter on the ballot.

59. Absent relief from this Court, Plaintiffs will suffer irreparable harm. Plaintiffs have no adequate remedy at law. If the court does not order relief, Plaintiffs will be prevented from engaging in constitutionally protected speech in violation of the First and Fourteenth Amendments. In addition, Plaintiffs will be unable to place before the voters an option to change

how redistricting is conducted prior to the redistricting process that takes place only once each decade.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

1. Declare that the application of Oregon Constitution Art. IV §§ 1(2)(e) and 1(4)(a), and all related laws, rules, or policies, as applied to the Initiative violates the U.S. Constitution by unduly burdening the initiative process.

2. Declare that the application of Oregon Constitution Art. IV § 1(2)(c), and all related laws, rules, or policies, as applied to the Initiative violates the U.S. Constitution by unduly burdening signature gathering efforts in support of the Initiative.

3. Enjoin enforcement of signature submission and verification deadlines, and all related laws, rules, or policies, as applied to the Initiative.

4. Enjoin enforcement of signature totals requirement, and all related laws, rules, or policies, as applied to the Initiative.

DATED:  June 30, 2020                                SHERMAN, SHERMAN, JOHNNIE & HOYT, LLP

By:   s/ Steve Elzinga
STEVE ELZINGA, OSB No. 123102
Attorneys for Plaintiffs
PEOPLE NOT POLITICIANS OREGON, COMMON CAUSE, LEAGUE OF WOMEN VOTERS OF OREGON, NAACP OF EUGENE/SPRINGFIELD, INDEPENDENT PARTY OF OREGON, and C. NORMAN TURRILL