STEVE ELZINGA
Oregon Bar No. 123102
SHERMAN, SHERMAN, JOHNNIE & HOYT, LLP
693 Chemeketa St. NE
Salem, OR 97301
Telephone: 503-364-2281
steve@shermlaw.com

Attorneys for Plaintiffs
PEOPLE NOT POLITICIANS OREGON,
COMMON CAUSE, LEAGUE OF WOMEN
VOTERS OF OREGON, NAACP OF
EUGENE/SPRINGFIELD, INDEPENDENT
PARTY OF OREGON, and C. NORMAN
TURRILL

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### EUGENE DIVISION

| | |
|---|---|
| PEOPLE NOT POLITICIANS OREGON, COMMON CAUSE, LEAGUE OF WOMEN VOTERS OF OREGON, NAACP OF EUGENE/SPRINGFIELD, INDEPENDENT PARTY OF OREGON, and C. NORMAN TURRILL,<br><br>       Plaintiffs,<br><br> v.<br><br>BEVERLY CLARNO, OREGON SECRETARY OF STATE,<br>       Defendants. | Case No. 20-01053-MC<br><br>**PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND MEMORANDUM IN SUPPORT** |

## MOTION

Plaintiffs move for a Temporary Restraining Order enjoining Defendant from enforcing those portions of Art. IV §§ 1(2)(c), 1(2)(e), and 1(4)(a) of the Oregon Constitution, Oregon Revised Statutes §§ 250.105(3)-(4), and all associated laws, administrative rules, and policies requiring the submission of at least 149,360 signatures by July 2, 2020 in order to place Plaintiffs' initiative on the 2020 general election ballot in Oregon.

Plaintiffs request an expedited hearing and relief on or before July 2, 2020.[1]

---

[1] Should the state agree that Plaintiffs are not waving any rights or arguments if signatures are not filed/accepted on July 2, then a hearing the week of July 6 would be agreeable to Plaintiffs.

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND MEMORANDUM IN SUPPORT
1386651 (*People Not Politicians, et al. v. Beverly Clarno, Secretary of State*)

# TABLE OF CONTENTS

**PAGE**

MOTION ......................................................................................................................... 2

I.      INTRODUCTION ................................................................................................. 8

II.     STATEMENT OF FACTS .................................................................................... 9

        A.      The Initiative Coalition and Goals ........................................................ 9

        B.      The state's Pandemic-related restrictions on signature gathering ........................ 11

        C.      PNP's extraordinary signature-gathering efforts despite state restrictions
                on signature gathering .......................................................................... 13

        D.      Oregon's Secretary of State recognized the need to modify other elections
                processes in light of COVID-19 ........................................................... 14

        E.      Numerous Courts in other states have modified election requirements to
                protect political rights in light of COVID-19 ....................................... 16

III.    ARGUMENT ....................................................................................................... 19

        A.      Plaintiffs are likely to succeed on the merits of their claims because, as
                applied during the Pandemic-related government restrictions on Plaintiffs,
                Oregon's signature-gathering requirements violate Plaintiffs' First
                Amendment rights ................................................................................. 20

                1.      As applied during the Pandemic-related government restrictions on
                        Plaintiffs, Oregon's signature-submission deadline restricts one-on-
                        one communication between petition circulators and voters. .................. 21

                2.      As applied during the Pandemic-related government restrictions on
                        Plaintiffs, Oregon's signature threshold and signature-submission
                        deadline both make it less likely that proponents will be able to
                        garner the signatures necessary to place an initiative on the ballot .......... 22

                3.      Oregon's signature threshold and signature-submission deadline
                        both fail strict scrutiny as-applied during the Pandemic-related
                        government restrictions on PNP ............................................................. 31

        B.      Plaintiffs will suffer irreparable harm without an injunction ............................... 37

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND MEMORANDUM IN SUPPORT
1386651 (*People Not Politicians, et al. v. Beverly Clarno, Secretary of State*)

C.      The balance of equities sharply favors Plaintiffs.................................................38

D.      An injunction would serve the public interest.....................................................38

IV.   CONCLUSION ...........................................................................................................39

# TABLE OF AUTHORITIES

**PAGE(S)**

**Cases**

*All. for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ...........................................................................20

*Anderson v. Celebrezze*,
    460 U.S. 780 (1983) ...........................................................................................29

*Angle v. Miller*,
    673 F.3d 1122 (9th Cir. 2012) .....................................................................*passim*

*Arizonans for Fair Elections v. Hobbs*,
    No. 2:20-cv-00658-DWL (9th Cir. May 5, 2020)...............................................23

*Arizonans for Fair Elections v. Hobbs*,
    No. CV-20-00658-PHX-DWL, 2020 WL 1905747 (D.Ariz. Apr. 17, 2020) .......23

*Associated Press v. Otter*,
    682 F.3d 821 (9th Cir. 2012) .............................................................................39

*Buckley v. Am. Constitutional Law Found.*,
    525 U.S. 182 (1999) ....................................................................................20, 23

*Burdick v. Takushi*,
    504 U.S. 428 (1992) ...........................................................................................29

*City of Cuyahoga Falls Ohio v. Buckeye Cmty. Hope Found.*,
    538 U.S. 188 (2003) ...........................................................................................20

*Democratic National Comittee v. Bostelmann*,
    No. 20-cv-249-wmc, 2020 WL 1638374 (W.D. Wis. Apr. 2, 2020) ....................16

*Esshaki v. Whitmer*,
    20-1336, 2020 WL 2185553 (6th Cir. May 5, 2020) ................................18, 33, 35

*Esshaki v. Whitmer*,
    No. 2:20-cv-10831-TGB, 2020 WL 1910154 (E.D. Mich. Apr. 20, 2020).......... 17, 18, 33, 35

*Esshaki v. Whitmer*,
    No. 2:20-cv-10831-TGB, 2020 WL 2556754 (E.D. Mich. May 20, 2020) ..........18

*Fair Maps Nevada v. Cegavske*,
    No. 3:20-cv-00271, 2020 U.S. Dist. LEXIS 94696 (D. Nev. May 29, 2020) ................*passim*

*Faulkner v. Va. Dep't of Elections*,
No. CL 20-1456, slip op. (Va. Cir. Ct. Mar. 25, 2020) ......................................................33

*Faulkner v. Va. Dep't of Elections*,
No. CL 20-1456 (Va. Cir. Ct. Mar. 25, 2020) ....................................................................16

*Geiger v. Kitzhaber*,
994 F. Supp. 2d 1128 (D. Ore. 2014) ..................................................................................32

*Goldstein v. Sec'y of Commonwealth*,
484 Mass. 516 (Mass. 2020) ............................................................................... 17, 33, 35

*Harper v. Virginia State Board of Elections*,
383 U.S. 663 (1966) .............................................................................................................29

*Koller v. Brown*,
224 F. Supp. 3d 871 (N.D. Cal. 2016) .................................................................................20

*Libertarian Party of Illinois v. Pritzker*,
20-cv-02112, 2020 WL 1951687 (N.D. Ill. Apr. 23, 2020) ........................................... 17, 33

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012) ......................................................................................... 19, 39

*Meyer v. Grant*,
486 U.S. 414 (1988) ..................................................................................................*passim*

*Nev. Comm'n on Ethics v. Carrigan*,
564 U.S. 117 (2011) .............................................................................................................20

*Perry Educ. Ass'n v. Perry Educators' Ass'n*,
460 U.S. 37 (1983) ..............................................................................................................30

*Prete v. Bradbury*,
438 F.3d 949 (9th Cir. 2006) ...............................................................................................31

*SawariMedia LLC v. Whitmer*,
Case No. 20-cv-11246, 2020 U.S. Dist. LEXIS 102237 (E.D. Mich June 11,
2020)...................................................................................................................*passim*

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
240 F.3d 832 (9th Cir. 2001) ...............................................................................................19

*Uherbelu v. Clarno*,
No. 20CV13939 (Or. Cir. Ct. Mar 27, 2020).......................................................................24

*Warsoldier v. Woodford*,
418 F.3d 989 (9th Cir. 2005) ...............................................................................................39

6

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ..................................................................................................... 19

**Statutes**

Fed. R. Civ. Pro. 65 ........................................................................................................ 19

Oregon Revised Statutes Ann. § 188.125 ....................................................................... 37

Oregon Revised Statutes § 250.105 ................................................................................ 36

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND MEMORANDUM IN SUPPORT
1386651 (*People Not Politicians, et al. v. Beverly Clarno, Secretary of State*)

## I.     **INTRODUCTION**

The COVID-19 Pandemic ("the Pandemic") and responsive "Stay Home, Save Lives" government orders upended normal life.  The mundane social act of approaching strangers in a crowd to collect signatures on a petition is now not only unimaginable, but illegal.[2]  Although Oregon's Pandemic-related public health restrictions are undoubtedly important protections, they impose significant burdens on democratic participation.  Plaintiffs People Not Politicians Oregon, League of Women Voters of Oregon, Common Cause, NAACP of Eugene/Springfield, Independent Party of Oregon, and C. Norman Turrill ("Plaintiffs") are in the unique and unfortunate position of attempting to collect signatures to qualify an initiative for the ballot entirely during the era of shelter-in-place orders, social distancing restrictions, and mandatory non-essential business closures.  Unable to engage in normal in-person signature collection, Plaintiffs attempted to collect signatures through a number of creative, but ultimately unproven and less efficient, methods.  Although it obtained enough signatures to demonstrate widespread support for its proposed initiative—concerning innovative and time-sensitive changes to Oregon's once-a-decade redistricting process—it has fallen short of Oregon's pre-Pandemic signature requirements.  Through no fault of its own, Plaintiffs now stands unable to exercise its fundamental First Amendment right to participate in the initiative process and further statewide discussion of their initiative.

---

[2] *See* Or. Exec. Order No. 20-12(1)(c) (Mar. 23, 2020) ("When individuals need to leave their homes or residences, they should at all times maintain social distancing of at least six feet from any person who is not a member of their immediate household."); Or. Exec. Order No. 20-25(2)(c) (May 14, 2020) ("When individuals leave their home or place of residence, they should maintain physical distancing of at least six (6) feet from any person who is not a member of their household."); *see also* Oregon Health Authority, *Reopening Guidance* (Jun. 11, 2020), https://sharedsystems.dhsoha.state.or.us/DHSForms/Served/le2342D.pdf ("Practice physical distancing of at least six (6) feet between you and people who you do not live with.").

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND MEMORANDUM IN SUPPORT
1386651 (*People Not Politicians, et al. v. Secretary of State*)

The United States Constitution requires Oregon's election regulations, like all other aspects of life, to adapt to the Pandemic's exceptional circumstances. Courts across the country have recently provided relief to parties, like Plaintiffs, who have struggled to meet election requirements created for a world that looks nothing like the present day. Given Plaintiffs' diligent efforts to comply with Oregon's initiative signature requirements during exceptional circumstances, and the practically insurmountable burden those requirements now impose on Plaintiffs' First Amendment rights to participate in the political process, this Court should grant PNP's request for injunctive relief.

## II.    STATEMENT OF FACTS

### A.    The Initiative Coalition and Goals

Plaintiff People Not Politicians ("PNP") is a broad nonpartisan coalition of good government groups, which includes Plaintiffs League of Women Voters of Oregon, Common Cause Oregon, Eugene/Springfield NAACP, Independent Party of Oregon, and Norman Turrill—former president of the League of Women Voters of Oregon and current PNP coalition chair, and others. Together, these parties are the Plaintiffs in this lawsuit.

Plaintiffs seek to participate in Oregon's November general election through the initiative process. On November 12, 2019, PNP filed Initiative Petition 57 ("Initiative"), proposing to amend the Oregon Constitution to create an independent redistricting commission to draw Oregon's electoral maps for the State Senate, State House and U.S. House of Representatives. Declaration of C. Norman Turrill in Support of Plaintiffs' Motion for a Temporary Restraining Order ("Turrill Decl), ¶ 2.

On April 9, 2020, after resolution of separate legal challenges to the Initiative, the Oregon Secretary of State cleared PNP to begin gathering the required 149,360 signatures.

9

Turrill Decl., ⁋ 19.  But by early April, the COVID-19 pandemic and "Stay Home, Save Lives" restrictions had already upended normal life—including the normal ways of collecting voter signatures.

The Initiative proposes an independent citizens' redistricting commission composed of twelve Oregonians who are free from conflicts of interest and represent the diversity of the state. *See* People Not Politicians, Initiative 2020-057 (Or. 2019).  The commission would be charged with holding public hearings, providing for public input, and drawing maps in compliance with strict mapping criteria.  *Id.*

The Initiative is the result of years of work with various policy experts and advocates from across the political spectrum both in Oregon and nationally who have come together to reform Oregon's redistricting process ahead of the 2021 redistricting cycle.  The Initiative is modeled on the widely acclaimed California Citizens Redistricting Commission and work in a 2017 Oregon Secretary of State Redistricting Reform Task Force.[3]  The Initiative removes the inherent conflict of interest that results when politicians chose their own voters through gerrymandering.  Instead, the Initiative is designed to put people, not politicians, at the center of the redistricting process and ensure that every Oregonian has equal opportunity to elect a candidate of their choice regardless of their party affiliation or zip code.[4]

Members of the PNP coalition, led by the League of Women Voters of Oregon and Common Cause, conducted extensive pre-petition and pre-pandemic efforts to plan for this

---

[3] Redistricting Reform Task Force, Oregon Secretary of State (last visited Jun. 29, 2020), https://sos.oregon.gov/Pages/independent-redistricting.aspx.

[4] *See* People Not Politicians, Our Proposal, https://www.peoplenotpoliticiansoregon.com/our-proposal/.

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND MEMORANDUM IN SUPPORT
1386651 (*People Not Politicians, et al. v. Secretary of State*)

initiative.  Such efforts included holding a series of forums on the need for redistricting reform around that state in late 2018, drafting the initiative in 2019, and recruiting volunteer circulators for in-person signature collection in early 2020.  Declaration of Candalynn Johnson in Support of Plaintiffs' Motion for a Temporary Restraining Order ("Johnson Decl."), ¶ 4.

> **B.    The state's Pandemic-related restrictions on signature gathering**

State and local governments have taken important steps to protect individuals' health during the Pandemic.  But the same features that make these measures effective from a public health perspective—sheltering in place, social distancing, closures of public spaces—also fundamentally frustrate PNP's signature collection efforts.  While Oregon does not require signature gathering to take place only in-person, such collection remains the most common and efficient means of doing so.  Plaintiffs, through no fault of their own, have now been functionally barred from engaging in such collection for the entirety of the period in which the State authorized them to do so.

Prior to the Pandemic, initiative campaigns seeking to collect signatures engaged petition circulators to approach people in public spaces. These petition circulators — armed with clipboards, petitions, and pens — typically operated in high-traffic public spaces.  Declaration of Ted Blaszak in Support of Plaintiffs' Motion for a Temporary Restraining Order ("Blaszak Decl."), ¶ 4.  The most efficient locations for collection were those where a large number of people concentrated in a small area, such as public transit stations, shopping centers, farmers markets, libraries, fairs, rallies, parades, and concerts. *Id.*  Inevitably, in-person signature collection depends on conversing with strangers in close quarters, while around passing clipboards, sheets, and pens. *Id.*

The Pandemic made this type of signature collection a public health risk, and the

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND MEMORANDUM IN SUPPORT
1386651 (*People Not Politicians, et al. v. Secretary of State*)

resulting government restrictions effectively barred it.  On March 23, Governor Kate Brown

issued Executive Order 20-12.  Included in the new restrictions were: (1) requiring individuals to

"at all times maintain social distancing of at least six feet from any person who is not a member

of their immediate household" (2) a prohibition on all non-essential social and recreational

gatherings of individuals, regardless of size, if a distance of at least six feet between individuals

cannot be maintained; (3) the closing of specific categories of businesses, including indoor and

outdoor malls and retail complexes, arcades and theaters; (4) the closure of outdoor recreation

facilities such as playgrounds, sports courts, and skate parks; (5) the limit of all outside

recreational activities to non-contact activities; and (6) the directive that Oregonians stay home

whenever possible. Failure to comply with the order is a punishable crime and civil violation that

can result in fines or jail time.

     These restrictions were on top of earlier orders to shut down on-site dining at restaurants,

in-person teaching at schools, and in-person public gatherings larger than 25 persons.

Subsequent executive orders established a phased reopening of some Oregon businesses and

granted permission for gatherings of greater numbers of people—primarily on a county-by-

county basis.  Or. Exec. Order No. 20-05 (Mar. 12, 2020); Or. Exec. Order No. 20-07 (Mar. 17,

2020).  Oregon's three most populous counties – Multnomah, Washington, and Clackamas –

cannot obtain approval to move to phase II until July 10, 2020 at the earliest.  All other counties

in Oregon have received approval to enter phase II except for Lincoln County, which remains in

phase I.  Phases I and II of Oregon's gradual reopening, and thus restrictions that currently apply

to the entire state, continue to mandate physical distancing of at least six feet and significant

restrictions on large gatherings that render the in-person gathering of signatures practically

impossible.  And with recent rises in COVID-19 cases, there is no end in sight to these state

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND MEMORANDUM IN SUPPORT
1386651 (*People Not Politicians, et al. v. Secretary of State*)

restrictions that inhibit in-person signature gathering.

**C. PNP's extraordinary signature-gathering efforts despite state restrictions on signature gathering**

By the time PNP was authorized to begin its signature collection efforts to qualify the Initiative, the once-mundane behavior on which the qualification process typically relied simply was not possible. PNP's petition circulators could not approach strangers and hand them petitions, the spaces in which they normally would operate had been declared off limits, and the social gatherings of people that would have facilitated contact with a large number of voters was specifically banned. This required PNP to abandon its extensive prior plans for circulation and shift to an entirely new approach.

Despite these tremendous challenges, PNP has engaged in a good faith effort to meet the qualifying signature requirements through unconventional means. PNP built from scratch a signature gathering campaign that relies exclusively on downloadable and mail petition signature gathering methods. Johnson Decl., ⁋ 7. Although some parts of this campaign are straightforward—for example, PNP created a website portal allowing Oregonians to download petitions and signature pages at home—key aspects are acutely burdensome. Most homes do not have the capacity to print documents on the required 20-pound paper, and any printed petition would still need to be addressed and mailed by the signing party, creating additional barriers to participation. Or. Admin. R. 165-014-0005; Turrill Decl., ⁋ 15. To overcome these challenges, PNP also mailed over 500,000 packets to households reaching over 1.1 million Oregon voters. Turrill Decl., ⁋ 29. These packets provided voters the petition, signature page, instructions and return envelope with paid postage that would allow every eligible person in the household to sign a petition and mail it back. *Id.* While the response rate has been higher than most mailings, it is still far lower than the response rate for in-person signature gathering. Finally, PNP's coalition

13

member Common Cause organized an effort to send texts to 25,220 Oregon voters with a link allowing them to print a petition, which they could sign and mail back. *Id.* ⁋ 25.

Despite these efforts, the Pandemic-related order's frustration of the traditional signature collection methods has proven insurmountable. Using normal in-person signature collection, PNP would expect to collect an average of 15,000-20,000 signatures per week deploying a typically-sized team of petition circulators. Blaszak Decl., ⁋ 9. Had PNP been able to collect signatures in the usual manner, it would have met the signature requirement in an 8 to 10-week period before the July 2, 2020 submission deadline. But because state and local regulations effectively barred these methods during the Pandemic, PNP gathered over 60,000 signatures, but not the requisite 149,360. Turrill Decl., ⁋⁋ 4, 30.

On June 29, 2020, PNP formally requested that Secretary Clarno remedy the as-applied unconstitutionality of Oregon's initiative requirements be extending the signature submission deadline to August 17 and using the 2018 threshold for referenda (58,789) as the most appropriate basis of demonstrating sufficient support. The Secretary did not provide the requested relief. Given the extraordinary circumstances of Pandemic public health restrictions, the pre-Pandemic requirements for qualifying an initiative for the ballot have imposed unreasonable burdens on PNP's rights to participate in the initiative process.

### D.  Oregon's Secretary of State recognized the need to modify other elections processes in light of COVID-19

On March 19, 2020, Oregon's Secretary of State determined that "[b]ecause Oregon votes by mail we do not have to be concerned about social distancing issues," so she moved forward with the May 19 primary election while also developing "[c]ontingency plans . . . to deal

with any impacts the COVID-19 virus may have on our election processes." [5]

On March 24, 2020, in light of the Governor's Executive Order one day earlier, the Secretary suspended most agency in-person services and began requiring appointments for limited in-person elections services.[6] These restrictions continue today.[7]

On June 12, 2020, the Secretary convened the first meeting of the Financial Estimate Committee as a live-streamed remote meeting, despite having only four members and a few staff.[8] The Secretary chairs this committee, which drafts financial estimates of potential ballot measures for the voters' pamphlet. As chair, the Secretary determined that a remote meeting was needed and had members sign an official committee document electronically.[9] Committee staff working at the direction of the Secretary as chair indicated that all official documents would be

---

[5] Press Release, Oregon Secretary of State, May Primary Moves Forward as Planned (Mar. 19, 2020), https://www.oregon.gov/newsroom/Pages/NewsDetail.aspx?newsid=36214.

[6] Press Release, Oregon Secretary of State, Service Impacts to Secretary of State (Mar. 23, 2020), https://www.oregon.gov/newsroom/Pages/NewsDetail.aspx?newsid=36242; Press Release, Oregon Secretary of State, News from the Secretary of State (Apr. 15, 2020), https://www.oregon.gov/newsroom/Pages/NewsDetail.aspx?newsid=36377 ("In light of the Governor's Executive Order and the current health situation in general, I have ordered my staff to suspend in-person services normally offered by Secretary of State's office until further notice. The vast majority of public needs can be addressed online, by phone, or email. Statutorily required in-person services will be available by appointment only.").

[7] Secretary of State Response to COVID-19, Oregon Secretary of State Bev Clarno (last visited Jun. 29, 2020), https://sos.oregon.gov/Pages/covid-19.aspx ("All in-person services normally offered by Secretary of State are suspended until further notice.").

[8] Press Release, Secretary of State, Financial Estimate Committee Meeting: June 12, 2020 (Jun. 8, 2020), https://www.oregon.gov/newsroom/Pages/NewsDetail.aspx?newsid=36761.

[9] Appointment of City, County, or District Representative to the Financial Estimate Committee, Financial Estimate Committee (Jun. 12, 2020), https://sos.oregon.gov/elections/Documents/fec/Appoint-5th-member-signed.pdf.

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND MEMORANDUM IN SUPPORT
1386651 (*People Not Politicians, et al. v. Secretary of State*)

signed electronically for the remainder of the summer.[10]

On June 19, 2020, the Secretary announced that meetings of the Financial Estimate

Committee scheduled for July 8, July 9, July 23, and even as far out as August 5, 2020 would not

allow in-person public testimony despite statutory public hearing requirements.[11]

> **E.    Numerous courts in other states have modified election requirements to protect political rights in light of COVID-19**

On March 25, 2020, a Virginia court granted a preliminary injunction reducing in the

number of signatures needed to be a primary election candidate by 66%.  The court found that

"the circumstances as they exist in the Commonwealth of Virginia and across the United States

are not normal right now," and that the signature threshold was not narrowly tailored because it

did "not provide for emergency circumstances, like those that currently exist."  *Faulkner v. Va.*

*Dep't of Elections*, No. CL 20-1456, slip op. at 2-3 (Va. Cir. Ct. Mar. 25, 2020).

On April 2, 2020, a Wisconsin federal court extended deadlines for requesting an

absentee ballot, for postmarking absentee ballots, and for absentee ballots to be received after

election, due to the undue burden on constitutional rights created by otherwise applicable

statutory requirements in light of COVID-19.  *Democratic National Comittee v. Bostelmann*, No.

20-cv-249-wmc, 2020 WL 1638374 at *22 (W.D. Wis. Apr. 2, 2020).

On April 17, 2020, Massachusetts' highest state court ordered a 50% reduction in the

---

[10] The Secretary of State's office said they are preparing IP57 for a possible financial estimate statement. Financial Estimate Committee, June 12, 2020 Meeting (Oregon State Legislature 2020), https://oregon.granicus.com/MediaPlayer.php?view_id=23&clip_id=28268 (at 15:02 to 15:37).

[11] Press Release, Secretary of State, Financial Estimate Committee (FEC) Meeting Schedule (Jun. 19, 2020), https://www.oregon.gov/newsroom/Pages/NewsDetail.aspx?newsid=36826.

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND MEMORANDUM IN SUPPORT
1386651 (*People Not Politicians, et al. v. Secretary of State*)

signature requirement to be a candidate and extended the deadlines for filing signatures.  The

court agreed that "these extraordinary times of a declared state of emergency arising from the

COVID-19 pandemic create an undue burden on prospective candidate's constitutional right to

seek elective office." *Goldstein v. Sec'y of Commonwealth*, 484 Mass. 516, 517 (Mass. 2020).

On April 20, 2020, a Michigan federal court granted a motion for preliminary injunction

reducing the state signature requirement by 50% for a candidate to Michigan's Eleventh

Congressional District and extending the submission deadline after finding that "the State's

actions in the form of enforcing both the Stay-at-Home Order and the statutory ballot-access

requirements operate in tandem to impose a severe burden." *Esshaki v. Whitmer*, No. 2:20-cv-

10831-TGB, 2020 WL 1910154, at *1 (E.D. Mich. Apr. 20, 2020).  The court found that "state

action"—Michigan's social distancing order—"pulled the rug out from under [candidates']

ability to collect signatures," "shuttered" the locations and events at which signatures are

normally gathered, and left only "prohibitively expensive" means to obtain signatures.  *Id.* at *6.

Further, the court found that the option of running a mail-only petition campaign was not

sufficient and created an unacceptable hurdle to ballot access.  *Id.* at *5.

On April 23, an Illinois federal court granted a motion for preliminary injunction

eliminating the signature requirements for candidates of existing third parties as well as reducing

the signature requirement by 90% and extending the submission deadline for a candidate to

qualify from a new party or as an independent.  *Libertarian Party of Illinois v. Pritzker*, 20-cv-

02112, 2020 WL 1951687, at *4-5 (N.D. Ill. Apr. 23, 2020).

On May 5, 2020, the Sixth Circuit Court of Appeals upheld the *Esshaki* order enjoining

the state from enforcing the signature threshold and submission deadline but stayed the specific

remedy ordered by the district court.  Instead, the Sixth Circuit ordered the state "to select its

own adjustments so as to reduce the burden on ballot access, narrow the restrictions to align with its interest, and thereby render the application of the ballot access provisions constitutional under the circumstances." The Sixth Circuit noted that the district court's ordered remedy was not necessarily right or wrong, but rather that the state needed to have the first opportunity to attempt to remedy the constitutional violation before the court weighed in on whether the state's attempted remedy was sufficient. *Esshaki v. Whitmer*, 20-1336, 2020 WL 2185553, at *2 (6th Cir. May 5, 2020).

On May 8, 2020, Michigan adopted the three remedies originally ordered by the district court in *Esshaki*—including the 50% signature reduction and delayed deadline—but limited the availability of those remedies to candidates who had created candidate committees by March 10, 2020. On May 20, 2020, however, the district court enjoined the state's enforcement of the additional requirement to file a candidate committee by March 10 as overly burdensome. *Esshaki v. Whitmer*, No. 2:20-cv-10831-TGB, 2020 WL 2556754, at *5 (E.D. Mich. May 20, 2020).

On May 29, 2020, a Nevada federal court granted a motion for preliminary injunction extending the deadline for initiatives to file signatures. The court held that it is "both unreasonable and unfair not to extend a statutory deadline for a corresponding period of time" as the six weeks Plaintiffs were effectively prohibited from collecting signatures by the Governor's Stay-at-Home orders. Despite the fact that the Secretary of State would be "severely inconvenienced" by extending the deadline, the court held that the normal deadline was "neither narrowly tailored, nor does it advance a compelling governmental interest under the circumstance." *Fair Maps Nevada v. Cegavske*, No. 3:20-cv-00271, 2020 U.S. Dist. LEXIS 94696, at *42-43 (D. Nev. May 29, 2020).

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND MEMORANDUM IN SUPPORT
1386651 (*People Not Politicians, et al. v. Secretary of State*)

On June 11, 2020, a Michigan federal court granted a motion for preliminary injunction and held that both the Michigan constitution's signature threshold and the statutory signature deadline for placing an initiative on the ballot were unconstitutional as-applied in light of the state's COVID-19-related orders.  The court recognized that "there is nothing inherent in the [8%] signatures threshold that establishes that an initiative has a modicum of public support only if it has that many signatures."  *SawariMedia LLC v. Whitmer*, Case No. 20-cv-11246, 2020 U.S. Dist. LEXIS 102237, at \*36 (E.D. Mich June 11, 2020).  Notably, Michigan's constitutional signature threshold in Mich. Const., 1963, art. 2, § 9 is nearly identical to Oregon's—8% "of the total vote cast for all candidates for governor at the last preceding general election at which a governor was elected"—and it was found unconstitutional as-applied in *SawariMedia*.

## III.    <u>ARGUMENT</u>

Under Rule 65 of the Federal Rules of Civil Procedure, this Court may issue a temporary restraining order. The standards for preliminary injunctions and requests for temporary restraining orders are "substantially identical."  *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).

A plaintiff must show (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord Melendres v. Arpaio*, 695 F.3d 990, 1000 (9th Cir. 2012). All these factors are met here.

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND MEMORANDUM IN SUPPORT
1386651 (*People Not Politicians, et al. v. Secretary of State*)

A.    **Plaintiffs are likely to succeed on the merits of their claims because, as applied during the Pandemic-related government restrictions on Plaintiffs, Oregon's signature-gathering requirements violate Plaintiffs' First Amendment rights.**

To satisfy the "likelihood of success" element, the plaintiffs do not have to "prove [their] case in full" nor show that they are "more likely than not to prevail." *Koller v. Brown*, 224 F. Supp. 3d 871, 875 (N.D. Cal. 2016) (*quoting Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). Rather, a plaintiff must show only that the plaintiff has a "fair chance of success on the merits or raises questions serious enough to require litigation." *Koller*, 224 F. Supp. 3d at 875 (*quoting Benda v. Grand Lodge of Int'l Ass'n. of Machinists & Aerospace Workers*, 584 F.2d 308, 315 (9th.Cir. 1978)); *see also All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) ("This circuit has adopted and applied a version of the sliding scale approach under which a preliminary injunction could issue where the likelihood of success is such that 'serious questions going to the merits were raised and the balance of hardships tips sharply in [plaintiff's] favor.'").

The right to petition the government is at the core of First Amendment protections, which include the right of initiative. *City of Cuyahoga Falls Ohio v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 196 (2003). As such, the circulation of ballot petitions is "core political speech" where First Amendment protection is at its "zenith." *Meyer v. Grant*, 486 U.S. 414, 421-422, 425 (1988); *see also Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 128 (2011). While certain regulations of the initiative process are valid, regulations that are overly burdensome to the initiative process–let alone regulations that would make participation in the initiative process effectively impossible–are met with strict scrutiny. *Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182, 197 (1999) (blocking requirement that petition circulators be registered voters).

In *Meyer*, for example, the United States Supreme Court overturned prohibitions on paid

petition circulators.  *Meyer*, 486 U.S. at 423.  While recognizing that petitioners had "other

avenues of expression" and that "the State has the authority to impose limitations on the scope of

the state-created right to legislate by initiative," the Court determined that the "prohibition of

paid petition circulators restricts access to *the most effective, fundamental, and perhaps*

*economical avenue* of political discourse, direct one-on-one communication."  *Id.* at 424

(emphasis added).  Going further, the Court determined that leaving open "'more burdensome'

avenues of communication, does not relieve its burden on First Amendment expression."  *Id.*

(citations omitted).  Rather, the "First Amendment protects appellees' right not only to advocate

their cause but also to select what they believe to be the most effective means for so doing."  *Id*.

The Ninth Circuit has recognized that the analysis in *Meyer* is directly parallel to the type

of situation in this case.  The Ninth Circuit found two categories of restrictions on initiatives that

create a "severe burden" triggering strict scrutiny: (1) "restrict[ing] one-on-one communication

between petition circulators and voters" (2) "mak[ing] it less likely that proponents will be able

to garner the signatures necessary to place an initiative on the ballot."  *Angle v. Miller*, 673 F.3d

1122, 1132 (9th Cir. 2012).

    1.    **As applied during the Pandemic-related government restrictions on Plaintiffs, Oregon's signature-submission deadline restricts one-on-one communication between petition circulators and voters.**

In evaluating the first category of "sever burden," the Ninth Circuit considers whether a

restriction "limits the number of voices who will convey the initiative proponents' message," or

"discourages participation in the petition circulation process."  *Id.* at 1132-33 (quoting *Buckley*,

525 U.S. at 194-95, 200).  Oregon requires ballot initiative proponents to turn in signatures at

least four months before the election, which is July 2, 2020 for this election.  Oregon

Constitution Art. IV § 1.  There is no question that this deadline "restrict[s] one-on-one

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND MEMORANDUM IN SUPPORT
1386651 (*People Not Politicians, et al. v. Secretary of State*)

communication between petition circulators and voters" as it shortens the time period for such communication to occur.  Further, it limits the overall number of voices that will be involved—for example, someone who only hears about the initiative after the deadline will never have the opportunity to convey the initiative's campaign message if the deadline prevents the initiative from qualifying.  For the same reasons, it also discourages participating in the petition circulation process, especially where, as here, Pandemic-related restrictions on person-to-person contact are expected to be in place well past the deadline. Thus, the petition-submission deadline is subject to strict scrutiny.

> **2.**   **As applied during the Pandemic-related government restrictions on Plaintiffs, Oregon's signature threshold and signature-submission deadline both make it less likely that proponents will be able to garner the signatures necessary to place an initiative on the ballot.**

In evaluating the second category of "severe burden," the Ninth Circuit recognized that "ballot access restrictions place a severe burden on core political speech, and trigger strict scrutiny, when they significantly inhibit the ability of initiative proponents to place initiatives on the ballot"—thereby "limiting their ability to make the matter the focus of statewide discussion." *Angle, supra*, 673 F.3d at 1132-33 (*quoting Meyer*, 486 U.S. 423).  An initiative barrier will be subject to strict scrutiny if "(1) the proponents of the initiative have been 'reasonably diligent' as compared to other initiative proponents; and (2) when the restrictions significantly inhibit the proponents' ability to place an initiative on the ballot." *Fair Maps Nevada*, 2020 U.S. Dist. LEXIS 94696 at *31 (*quoting Angle*, 673 F.3d at 1132).

> **a.**   **Plaintiffs' efforts to gather signatures under extraordinary circumstances have far exceeded reasonable diligence.**

Plaintiffs' efforts to collect signatures in the midst of a global pandemic easily meet the first *Angle* requirement for application of strict scrutiny to Oregon's ballot initiative signature

requirements.

In *Fair Maps Nevada*, the federal court found reasonable diligence when petitioners pushed forward with organizing their campaign infrastructure during pre-circulation legal challenges, begin gathering signatures as soon as the main legal challenges were resolved, and continued working on their campaign infrastructure when COVID-19-related government orders effectively prevented circulation.  This was despite the facts that petitioners (1) did not file their initiative until January 7, 2020; (2) had collected less than 11% of required signatures—only about 10,000 out of the 97,598 needed; (3) did not even attempt to collect any signatures after the Stay-at-Home order went into effect; and (4) had not presented any evidence about comparable initiative campaigns.  *Id.*  Since this fact pattern showed reasonable diligence, Plaintiffs in this case satisfy this requirement easily.[12]  *See also SawariMedia*, 2020 U.S. Dist. LEXIS 102237, at *36 (holding Plaintiffs showed "diligence" by collecting over 60% of required initiative signatures despite waiting to file until January 16, 2020).

PNP filed three initiative petitions, including this one, on November 12, 2020. Nine of the 65 other initiatives this cycle were filed at later dates.[13]  Oregon law requires that any

---

[12] State Defendants are likely to point to an earlier Arizona federal court decision distinguished by *Fair Maps Nevada*. The Arizona decision denied a motion for a temporary restraining order against state *statutory* requirements for in-person signature gathering. However, that occurred primarily because the plaintiffs in that case failed to also challenge the state's *constitutional* requirements—thus their entire case was moot. *Arizonans for Fair Elections v. Hobbs*, No. CV-20-00658-PHX-DWL, 2020 WL 1905747 (D.Ariz. Apr. 17, 2020). On appeal, the Ninth Circuit denied a motion for emergency relief for the sole reason that redress from state statutory requirements was meaningless when the unchallenged state constitutional requirements would still be in place. *Arizonans for Fair Elections v. Hobbs*, No. 2:20-cv-00658-DWL (9th Cir. May 5, 2020). In contrast, PNP challenges Oregon's constitutional, statutory, and administrative restrictions. Overall, the present case is far more analogous to *Fair Maps Nevada*.

[13] *See* Search Result For: 2020 Active Initiatives, Elections Division Initiative, Referendum, and Referral Search (last visited Jun. 29, 2020),

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND MEMORANDUM IN SUPPORT
1386651 (*People Not Politicians, et al. v. Secretary of State*)

prospective ballot initiative effort collect and submit to the Secretary of State's office an initial

set of between 1,000 and 2,000 signatures.  ORS 250.045(1).  People Not Politicians

demonstrated its initial diligence by collecting the requisite signatures quickly over the

Thanksgiving weekend in 2019.  Turrill Decl., ⁋ 3.  PNP's team gathered these signatures in

Portland by carrying petitions attached to clipboards and approaching strangers in high-traffic

public spaces, including public transit stations, on Portland MAX trains, in busy shopping

centers and farmers markets.  *Id.*

 After collecting the initial set of signatures in the traditional in-person manner, PNP

submitted the sponsorship signatures to the Elections Division. Opponents of IP 57 quickly

launched a legal challenge to the Initiative's draft ballot title. Complaint, *Uherbelu v. Clarno,*

No. 20CV13939 (Or. Cir. Ct. Mar 27, 2020). Under Oregon law, petitioners cannot collect more

than the first 2,000 signatures until the ballot title is finalized. *See* ORS 250.052(3)(b)-(4).

 The Oregon Supreme Court did not certify the final ballot title needed to begin signature

collection until March 27, 2020. In every election cycle this decade, initiatives that have received

final ballot title approval to begin circulating around the same time, or even much later, have

qualified for the ballot—2018 (IP37 March 3), 2016 (IP65 March 18), 2014 (IP55 May 14; IP44

May 12; IP53 March 22), 2012 (IP21 April 3; IP35 April 2), 2010 (IP77 March 18).[14]  In fact,

these similarly timed initiatives represent just over one third (8/23) of the initiatives that have

---

http://egov.sos.state.or.us/elec/web_irr_search.main_search (detailing the dates at which
initiatives were filed with the Secretary of State's office).

[14] *See* Oregon Secretary of State, Elections Division, Initiative, Referendum, and Referral Search
("Oregon Initiative Search") (last visited Jun. 29, 2020),
http://egov.sos.state.or.us/elec/web_irr_search.search_form (showing all certified initiatives,
including when they were approved for circulation and which ones met the requirements to be
placed on the ballot).

qualified for the ballot this decade—2018 (1/4); 2016 (1/4); 2014 (3/4); 2012 (2/7); 2010 (1/4).[15]

Clearly, then, ballot title approval in March is consistent with reasonable diligence.  IP36 in 2004

qualified despite being first *filed* on March 2 and not receiving ballot title approval till May 21.[16]

Thus, at the time PNP's initiative received ballot title approval on March 27, it was well in line

with—or even ahead of—where a "reasonably diligent" initiative campaign in Oregon needed to

be to qualify for the ballot.

On April 9, 2020, the Secretary of State cleared PNP to gather petition signatures. By that

time, Oregon Governor Brown's first Stay Home Save Lives orders had been in place for weeks.

No other still-active initiative faced this perfect storm of challenges in qualifying for the ballot—

the burden of pre-Pandemic qualification requirements combined with a signature-collection

period that fell during the height of the Pandemic's public health restrictions.  All three other

initiatives that faced the same situation (45/2020, 46/2020, and 60/2020) have given up.[17]

Given public health restrictions, the PNP campaign could not deploy signature gatherers

to large public gatherings, stores, or transit centers to gather signatures in person.  State

requirements of six-foot distance from non-household members in all public places have

blocked, and continue to block traditional in-person circulation.  During PNP's signature

collection period, state and local regulations banned gatherings of more than 25 persons and shut

all businesses except those providing essential services.  Or. Exec. Order No. 20-07 (Mar. 17,

2020).  The traditional methods that PNP had used successfully just a few months earlier—

---

[15] *See* Oregon Initiative Search, http://egov.sos.state.or.us/elec/web_irr_search.search_form.

[16] *See* Oregon Initiative Search, http://egov.sos.state.or.us/elec/web_irr_search.search_form.

[17] *See* Oregon Initiative Search, http://egov.sos.state.or.us/elec/web_irr_search.search_form.

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND MEMORANDUM IN SUPPORT
1386651 (*People Not Politicians, et al. v. Secretary of State*)

approaching strangers, engaging them in a conversation, and handing them a petition on a clipboard with a pen that other people had touched—were no longer viable or legal.

The Pandemic's unprecedented and unpredictable nature further frustrated People Not Politicians' efforts to adopt alternative means of signature collection. When the first Pandemic public health orders issued in late March, no one knew how virulent COVID 19 would be or how long the Stay Home restrictions would need to be in place. Over the course of April, PNP learned from health authorities about the categories of people who were considered high risk and what activities and types of contact might promote or prevent spread. Turrill Decl., ⁋ 11. The campaign discussed the possibility that the orders might be lifted in a few weeks with the coalition of supporters, volunteers, vendors, lawyers and state officials—a possibility that would have allowed it to continue its traditional signature gathering methods rather than creating new methods from scratch. Turrill Decl., ⁋ 17. PNP remained in regular contact with its signature gathering team about adjustments they could make to begin gathering petitions, but as the weeks of April passed, it became clear that the campaign would not be able to rely on in-person signature gathering to gather the bulk of the signatures as planned. With no "return to normal" in sight, PNP devised an alternative plan to contact voters, through email, mail, phone and texts. Turrill Decl., ⁋ 22. But the cascading closures or disruptions of support organizations, vendors, and government offices as a result of the Pandemic-related orders frustrated even these alternative efforts. Turrill Decl., ⁋ 23. On May 4, 2020, Gov. Brown issued an Executive Order extending the state of emergency in response to COVID-19 to July 6, 2020. This order was challenged in court and momentarily suspended by a circuit court—injecting additional uncertainty into PNP's planning—until the Oregon Supreme Court accepted review and reversed the suspension.

Ultimately, despite these unprecedented challenges, People Not Politicians diligently continued its signature collection efforts.  PNP activated a website portal to allow Oregonians to download petition and signature pages at home, print them, and return the signatures by mail. Turrill Decl., ⁋ 22.  Additionally, because most households do not have the capacity to print documents on 20-pound paper at home, PNP printed and mailed petition packets to 500,000 households with a total of over 1.1 million Oregon voters.  Turrill Decl., ⁋ 29.  These packets provided the petition, signature page, instructions and return envelope that would allow every eligible person in the household to sign a petition and mail it back.  *Id.*  Coalition member Common Cause organized an effort to send texts to 25,220 Oregon voters with a link allowing them to print, sign, and mail one or more signatures.  Turrill Decl., ⁋ 25.  Although these efforts have yielded impressive results, the mail and internet outreach required a significant infrastructural shift to as yet, largely untested methods of signature gathering.  Turrill Decl., ⁋ 30.

During the same time period, one recall petition campaign was active in State Senate District 26.  Recalls have 90 days to gather signatures.  ORS 249.875.  After the first few weeks of circulation before COVID-19 orders, the recall campaign was on track to gather the 9,025 needed signatures well before the June 2 deadline.  However, the campaign said that "because of the restrictions required to keep Oregonians safe during the COVID-19 crisis, in-person signature gathering had to stop abruptly, and it became impossible to maintain our pace." Thomsen Recall Folds Up Short of Needed Signatures, The Dalles Chronicle (Jun. 10, 2020).[18] Only about 400 signatures were gathered from voters who were able to "locat[e] the petition online, print[] it, and mail[] in their signatures."  *Id.*  The recall failed overwhelmingly despite

---

[18] https://www.thedalleschronicle.com/free_news/thomsen-recall-folds-up-short-of-needed-signatures/article_711f1648-aa7f-11ea-9837-7b50fe6560fb.html.

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND MEMORANDUM IN SUPPORT
1386651 (*People Not Politicians, et al. v. Secretary of State*)

strong financial backing—raising $130,750—from influential labor unions. Dirk VanderHart, Effort Fails To Recall Oregon Republican For State Senate Walk-Out, OPB (Mar. 29, 2020).[19] Despite facing similar difficulties, PNP has been far more diligent.

To date, PNP has gathered over 60,000 signatures and counting—an average of just over 20,000 per month each in April, May, and June. This is well ahead of the pace of signature gathering for the two other initiatives still active this cycle. Both of those initiatives received ballot title clearance far earlier, so they had already gathered most needed signatures before the pandemic came along. By the end of March, IP34 had 126,964 signatures and IP44 had 142,391.[20] Both needed more signatures to offset likely invalid signatures, so they continued collection efforts. IP34 managed to gather and submit 8,609 signatures from April 1 to May 22—a pace around 76% lower than PNP. IP44 managed to gather and submit 21,134 signatures from April 1 to June 19—a pace around 57% lower than PNP.[21] Thus, PNP gathered signatures at a far higher rate during the pandemic restrictions—more than demonstrating that PNP was "reasonably diligent."

PNP has collected over 40% of the normal signature threshold despite Pandemic-related restrictions. This is far above the 11% found sufficient in *Fair Maps Nevada* and close to the 60% found sufficient in *SawariMedia*. The discussion above shows that PNP meets or surpasses all of the relevant considerations that the court found sufficient in *Fair Maps Nevada* to meet the controlling *Angle* test and trigger strict scrutiny.

---

[19] https://www.opb.org/news/article/recall-fails-oregon-republican-senator-chuck-thomsen/.

[20] *See* Oregon Initiative Search, http://egov.sos.state.or.us/elec/web_irr_search.search_form.

[21] *See* Oregon Initiative Search, http://egov.sos.state.or.us/elec/web_irr_search.search_form.

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND MEMORANDUM IN SUPPORT
1386651 (*People Not Politicians, et al. v. Secretary of State*)

In short, PNP has engaged in a creative and energetic effort to meet pre-Pandemic signature requirements that have not been appropriately adjusted to meet the current unprecedented emergency circumstances.  PNP's efforts go beyond reasonable diligence.

> **b.    Oregon's signature threshold and signature-submission deadline both significantly inhibit People Not Politicians' ability to place their Initiative on the ballot**

Oregon's signature-gathering requirements—and the Secretary of State's refusal to grant People Not Politicians relief from them—satisfy the second *Angle* requirement for strict scrutiny because they significantly inhibit PNP's ability to place the Initiative on the ballot.  Courts assess regulations and restrictions on the right to vote and to engage in political expression under the sliding-scale standards established by *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi,* 504 U.S. 428 (1992).  If a severe burden on these rights is established, then strict scrutiny applies.  *See, e.g.*, *Harper v. Virginia State Board of Elections*, 383 U.S. 663 (1966).

The Supreme Court has identified ways in which regulations on the initiative process may burden "core political speech."  *Meyer*, 486 U.S. at 422.  Regulations may make it less likely that proponents will be able to gather the necessary signatures to get their initiative on the ballot, "thus limiting their ability to make the matter the focus of statewide discussion."  *Id.* at 423.  In *Meyer*, the unconstitutional restriction was a ban on paid signature gathering, which is the most efficient subset of in-person petitioning.  *Id.* at 424.  Such ballot initiative regulations trigger strict scrutiny when they "significantly inhibit the ability of initiative proponents to place initiatives on the ballot."  *Angle*, 673 F.3d at 1133.

Here, the analysis is very simple.  PNP cannot qualify for the ballot with the current signature threshold and submission deadline.  This factor is met, and strict scrutiny is triggered for both requirements.

Oregon's initiative signature requirements pose such a significant burden to People Not Politicians' efforts because the requirements have failed to account for the Pandemic's wave of unprecedented public restrictions. Governor Brown's Stay Home, Save Lives order, the banning of public gatherings of larger than 25 people, and six-feet social distancing requirements have severely limited the one-on-one communication between the plaintiffs, petition circulators, and voters. They preclude the traditional approach to signature-gathering, where circulators engage voters in the public arena and highly-trafficked areas, including markets or public-transportation nexuses, which are the type of quintessential public forums where First Amendment Protections are at their highest. *See, e.g., Perry Educ. Ass'n v. Perry Educators' Ass'n,* 460 U.S. 37, 45 (1983). These in-person interactions, in public spaces less than six feet apart with strangers, are at the core of traditional signature-gathering practices and were integral parts of the elections used to set the current signature requirement figures. As recognized by the court in *Fair Maps Nevada,* the Pandemic-related state restrictions create the factual circumstances under which the signature threshold and submission deadline requirements are severely burdensome.

The Pandemic-related orders prohibit high-efficiency, in-person *paid* circulators—a prohibition that the United States Supreme Court found was unconstitutional in *Meyer*. However, the Pandemic-related orders also go even further than the unconstitutional prohibition in *Meyer* by also prohibiting in-person *volunteer* circulators. Now, although the Pandemic has completely stymied fundamental signature-gathering practices, the Secretary of State has not adjusted the signature requirements accordingly.

The impending submission deadline for the petition and the high signature threshold in light of the pandemic and the subsequent restrictions on movement make it practically impossible for the proponents to gather the necessary signatures to place this initiative on the

ballot.  As discussed above, no other active initiative campaign faced these challenges, since all other initiative campaigns were cleared to begin their signature collections before the Pandemic arose and disrupted normal life or have given up.[22]  With the significant restriction on collecting signatures due to social distancing measures and the Stay Home order, the plaintiffs are unable to gather the required number of signatures to meet the signature threshold and submission deadline. This precludes plaintiffs from making this initiative a matter of statewide discussion and places a severe burden on the plaintiffs' core political speech. As the court recognized in *Fair Maps Nevada*, this satisfies the second prong of the *Angle* test and triggers strict scrutiny.

### 3. Oregon's signature threshold and signature-submission deadline both fail strict scrutiny as-applied during the Pandemic-related government restrictions on PNP.

In order to survive strict scrutiny, the Secretary of State's signature requirements must be narrowly tailored to further a compelling government interest.  *Prete v. Bradbury*, 438 F.3d 949, 961-62 (9th Cir. 2006).  Oregon's regulations fail that test.

The present combination of state restrictions is even more burdensome than the restriction on *paid* circulators that the Supreme Court held unconstitutional in *Meyer*.  The Pandemic-related orders restricting both *paid* and *volunteer* in-person circulation, in combination with the artificial signature thresholds and turn-in deadlines, create an overall regulator scheme that is unconstitutional as-applied to PNP in this unique situation.

---

[22] Like IP 57, many earlier initiative campaigns have received ballot title approvals and approvals for circulation between late-March to mid-May before they were allowed to begin signature collection. In each of these previous cases, however, the campaigns were able to operate traditional signature gathering operations without the burdens of a pandemic and ultimately qualified for the ballot.

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND MEMORANDUM IN SUPPORT
1386651 (*People Not Politicians, et al. v. Secretary of State*)

### a.    Oregon's arbitrary 149,360 signature threshold cannot survive strict scrutiny in these unique circumstances

The signature threshold requirement to place an initiative on the ballot is not narrowly tailored given the challenges faced by People Not Politicians to collect signatures during the Pandemic-related orders. PNP recognizes the state's interest in conducting an orderly election process and ensuring reasonable statewide support before placing an initiative on the ballot.[23] But imposing a pre-Pandemic numerical signature requirement provides no flexibility for accurately or reliably determining sufficient support for a ballot initiative when the in-person gathering of signatures is impossible. The threshold thus is not narrowly tailored to achieve the governmental interest of properly measuring support for initiatives and qualifying them for the ballot in a fair and objective process.

One of the key principles of fair elections is not changing the rules in the middle of the game—but this is exactly what the state did to PNP in a uniquely harmful way in this case by banning in-person signature gathering during the very period when PNP had long been planning to conduct in-person signature gathering.

Other courts have agreed that initiative requirements–including minimum signature requirements–fail strict scrutiny and must be adjusted in response to the COVID-19 pandemic-related orders. In *SawariMedia* the court held that the state's compelling interest to ensure that

---

[23] Should the state assert an interest in enforcing state constitutional requirements, it is important to point out that there is nothing extraordinary about the fact that these requirements are in the state constitution. The United States Constitution is the supreme law of the land. It is superior to state constitutions, as well as statues, rules, and policies. Courts have found that other Oregon constitutional provisions have been superseded when in conflict with the United States Constitution. *See, e.g.*, *Geiger v. Kitzhaber*, 994 F. Supp. 2d 1128 (D. Ore. 2014) (overturning Oregon's constitutional provision banning same-sex marriage due to conflicting with the Equal Protection Clause of the 14th Amendment of the U.S. Constitution).

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND MEMORANDUM IN SUPPORT
1386651 (*People Not Politicians, et al. v. Secretary of State*)

an initiative has enough verified support can still be achieved by requiring a lesser number of signatures than what would be required absent a global pandemic. That case dealt with Michigan's constitutional threshold of 8% of votes in the last governor's election—nearly identical to Oregon's threshold. The *SawariMedia* court recognized that "there is nothing inherent in the [8%] signatures threshold that establishes that an initiative has a modicum of public support only if it has that many signatures." 2020 U.S. Dist. LEXIS 102237 at *36.

Likewise, in *Esshaki*, the court found that the signature threshold for candidates did not survive struct scrutiny even when the option of running a mail-only petition campaign was available. *Esshaki v. Whitmer*, 2020 WL 1910154, at *1. The Sixth Circuit affirmed the *Esshaki* analysis that the signature threshold did not survive strict scrutiny. *Esshaki v. Whitmer*, 2020 WL 2185553 at *2.

Other cases have reached similar conclusions when enjoining signature thresholds. *Libertarian Party of Illinois,* 2020 WL 1951687 at *4-5; *Goldstein,* 484 Mass at 517; *Faulkner v. Va. Dep't of Elections*, No. CL 20-1456, slip op. at 3 (Va. Cir. Ct. Mar. 25, 2020) (the signature threshold was not narrowly tailored because it did "not provide for emergency circumstances, like those that currently exist.").

Oregon's signature threshold for a constitutional amendment is 8% of the votes cast at the last governor's election for a full term—149,360 signatures in 2020. At the outset, this is a rather arbitrary threshold. It is not the number itself that is the government interest but rather what it represents—a reasonable estimate for what is needed to determine sufficient support. The 2020 threshold is uniquely disconnected from historical standards of demonstrating sufficient support due to more than just Pandemic-related restrictions. Oregon's 2018 governor election had the highest ever mid-term election turnout, even surpassing many prior record-

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND MEMORANDUM IN SUPPORT
1386651 (*People Not Politicians, et al. v. Secretary of State*)

breaking presidential election turnouts like for President Barak Obama's election in 2008.  Voter Turnout History for General Elections, Oregon Secretary of State Elections Division (Feb. 27, 2019).[24]  This resulted in a 21.3% jump in the number of signatures required for initiatives for 2020.  Secretary of State Dennis Richardson, Midterm Election Sees Second Highest Ballots Cast in Oregon History, Oregon.gov (Dec. 6, 2018).[25]  Thus, using the artificially-high 2018 baseline for setting the threshold does not survive strict scrutiny.  Use of the most recent prior baseline is more appropriate.

Further, Oregon has a lower signature threshold for referenda (4%), which makes much more sense under the present circumstances.  In the uniquely difficult circumstances for signature collection in a world of state social distancing restrictions, the referenda threshold calculated on the 2014 baseline is a more reasonable representation of what is needed to demonstrate sufficient statewide support.  That number would be 58,789.

> **b.    Oregon's submission deadline cannot survive strict scrutiny in these unique circumstances**

The Secretary of State has ample means to conduct an orderly election process even if the signature submission deadline were delayed.

In *Fair Maps Nevada*, the court found that the existing deadline for petition submission to qualify an initiative for the ballot was not narrowly tailored to serve a compelling governmental interest because the defendants could still accomplish what they normally do to verify the collected signatures to then prepare the initiative for the ballot with less restrictive

---

[24] https://sos.oregon.gov/elections/Documents/Voter_Turnout_History_General_Election.pdf.

[25] https://www.oregon.gov/newsroom/Pages/NewsDetail.aspx?newsid=3031.

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND MEMORANDUM IN SUPPORT
1386651 (*People Not Politicians, et al. v. Secretary of State*)

means. The court held that it is "both unreasonable and unfair not to extend a statutory deadline for a corresponding period of time" as the six weeks Plaintiffs were effectively prohibited from collecting signatures by the Governor's Stay-at-Home orders. *Fair Maps Nevada,* 2020 U.S. Dist. LEXIS 94696 at * 43. While recognizing that extending the deadline for submitting signatures could create a burden on the Secretary for verification, that burden did not outweigh the right to ballot access. *Id.* at *27 ("Thus, the Court does not find severe inconvenience a compelling government interest given these extraordinary circumstances").

Likewise, in *Esshaki*, the court found that the signature deadline for candidates did not survive struct scrutiny even when the option of running a mail-only petition campaign. *Esshaki v. Whitmer*, 2020 WL 1910154 at *1. The Sixth Circuit affirmed the *Esshaki* analysis that the signature deadline did not survive strict scrutiny. *Esshaki v. Whitmer*, 2020 WL 2185553 at *2.

Other courts have reached a similar conclusion. *SawariMedia,* 2020 U.S. Dist. LEXIS 102237 at *36 (extending initiative signature deadline); *Goldstein,* 484 Mass at 517 (extending deadline for filing candidate signatures). The Secretary of State possesses similar flexibility with the Oregon election process. Oregon's deadline for verifying signatures falls on August 1, 2020, approximately one month after the signatures are currently due, but more than three months before the general election. State Initiative and Referendum Manual, Secretary of State Elections Division (Mar. 2020) (as adopted by Or. Admin. R. 165-014-0005). The Secretary is able to verify signatures very quickly when needed—for example taking only 4 business days to verify IP31's 173,142 signatures in 2018.[26]

---

[26] *See* Elections Division Initiative, Referendum, and Referral Search (last visited Jun. 29, 2020), http://egov.sos.state.or.us/elec/web_irr_search.record_detailp_reference=20180031..LSCYYY (signatures were submitted for verification on June 29, 2018 and were verified on July 5, 2018).

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND MEMORANDUM IN SUPPORT
1386651 (*People Not Politicians, et al. v. Secretary of State*)

Using a statistical sampling technique, elections staff examine a sample of no more than 5% of submitted signatures for a petition. Or. Admin. R. 165-014-0030(24). Further, the Secretary has already certified that 2020's IP44 has qualified for the ballot and has verified most of the signatures for 2020's IP34.[27] Since no other initiatives remain active, PNP's signatures would be the only remaining ones that the Secretary will need to process.

During these extraordinary circumstances presented by the ongoing pandemic, there is no compelling governmental interest in maintaining the existing requirements, as there remains sufficient time for the Secretary of State and the Elections Division to fulfill their responsibilities to verify the petition on an expedited basis.[28] This is especially the case if there is a lower signature threshold. Although it may pose some inconvenience to the Secretary of State, any such burden is outweighed by the alternative: PNP's practical exclusion from the initiative process due to the Pandemic and related public health restrictions.

Ultimately, the July 2 submission deadline and required number of 149,360 signatures are therefore not narrowly tailored as applied to People Not Politicians' efforts to qualify the

---

The total period was seven days but included two weekend days and the July 4 state holiday.

[27] *See* Oregon Initiative Search, http://egov.sos.state.or.us/elec/web_irr_search.search_form.

[28] The current deadline for submitting Voter's Pamphlet statements is not until August 25, 2020. Secretary of State, *State Voters' Pamphlet Manual*, 4 (revised Feb. 2020). Thus, without shifting any other deadlines, the Secretary could accept signatures as late as August 17 and verify them in sufficient time to allow the public a few days to submit voter's pamphlet statements on the measure. The Secretary could accept signatures even later if either (1) the total number of signatures needing to be verified was lower, or (2) the Secretary waived the policy of not beginning verification until 100% of signatures are submitted and started verifying PNP's first batch of signatures now—and especially if both occurred together. This also requires enjoining Art. IV § 1(4)(a) of the Oregon Constitution and Oregon Revised Statutes §§ 250.105(3)-(4) to facilitate the Secretary's efficient review of signatures in the least burdensome manner to the Secretary.

Initiative during the current emergency circumstances.  The defendant has no interest in effectively barring the initiative from appearing on the November ballot. The defendant's interest in providing an orderly and fair election can still be accomplished without maintaining the existing deadline or signature threshold. [29]

**B.    Plaintiffs will suffer irreparable harm without an injunction**

The People Not Politicians redistricting reform measure is unique among Oregon initiatives because 2020 represents the last opportunity voters will have to reform Oregon's redistricting process this decade.  The United States Census produces population data that states and localities use to redraw voting districts.  The Census takes place only once per decade in years ending in zero.  U.S. Const. art. I, § 2, cl. 3.  The Oregon Constitution mandates that the redistricting of state legislative and congressional districts take place in the year ending in one following the census.  Or. Const. art. IV, § 6; Or. Rev. Stat. Ann. § 188.125.  No provision of Oregon law authorizes redistricting to take place in any other year or more frequently than once per decade.  As a result, voting districts drawn following the census occurring this year must take place in 2021 and will be in effect for the rest of the decade, barring court action.

Unlike other ballot initiatives that may only be delayed in their implementation by two years if passed in 2022 instead of 2020, any delay in the passage of the People Not Politicians initiative will delay implementation for an entire decade.  If this court does not rectify the severe

---

[29] Extension of the deadline alone is not sufficient to remedy the situation here because there is no end in sight to the state orders that make a remedy necessary in the first place. COVID-19 cases have been rising recently and the Governor has stated that she is unlikely to continue lifting restrictions until September. Governor Kate Brown, *Governor Kate Brown Extends COVID-19 State of Emergency for Sixty Days* (June 30, 2020), https://www.oregon.gov/newsroom/Pages/NewsDetail.aspx?newsid=36874

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND MEMORANDUM IN SUPPORT
1386651 (*People Not Politicians, et al. v. Secretary of State*)

burden Oregon's signature-gathering requirements place on First Amendment rights during a pandemic, plaintiffs will be effectively barred from placing an effective redistricting initiative before the voters this decade.

### C.    The balance of equities sharply favors Plaintiffs

Enforcement of signature-gathering requirements that do not account for extraordinary public health restrictions would effectively bar plaintiffs from gathering signatures to place an initiative before the voters.  This causes unique harm to proponents of redistricting reform because districts drawn in 2021 will remain in effect until the next redistricting cycle following the 2030 census.

The primary harm to the defendant, a slightly abbreviated timeline to certify signatures, is minimal when weighed against a de facto prohibition preventing the plaintiffs from exercising a fundamental right enshrined in the Oregon Constitution.  Moving this deadline would still allow sufficient time to certify signatures and print materials in time to mail ballots to overseas voters by September 19, 2020.  An order lowering the number of signatures plaintiffs will be required to collect would reduce the defendant's burden. Oregon law requires a statistical sampling of at least five percent of signatures submitted to determine the validity of those signatures.  ORS 250.105(5).  Reducing the required number of signatures plaintiffs must submit would also reduce the number of signatures the defendant must verify.

From a practical perspective, the only "harm" to the state is that one more initiative qualifies for the ballot, but since this would increase statewide discussion on an important issue of public policy, this is a positive outcome rather than a negative one. More speech is good.

### D.    An injunction would serve the public interest

In the absence of action by the Court, the Plaintiffs' constitutional rights will be abridged.

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND MEMORANDUM IN SUPPORT
1386651 (*People Not Politicians, et al. v. Secretary of State*)

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002. This is particularly true for First Amendment freedoms. Indeed, the harm here will not only be felt by the Plaintiffs. Should they fail to succeed, the integrity of Oregon's political system will be harmed to the detriment of all Oregonians. Because Oregon's interest in public support and signature integrity can be accomplished through less restrictive means, there is no reason not to grant the requested relief. *See Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012) ("[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976))); *Warsoldier v. Woodford*, 418 F.3d 989, 1001 (9th Cir. 2005) (recognizing that a "colorable First Amendment claim" is "irreparable injury sufficient to merit the grant of relief").

This Court would not be alone in finding that the public interest is served by enjoining the current requirements to place an initiative on the ballot; in response to the COVID-19 pandemic, courts across the nation have recognized that these requirements must be adjusted in order to preserve citizens' constitutional rights. *See, e.g., SawariMedia,* 2020 U.S. Dist. LEXIS 102237 at *36 (lowering the number of signatures required and the submission deadline in order to place an initiative on the Michigan ballot); *Fair Maps Nev.,* 2020 U.S. Dist. LEXIS 94696 at 49-51 (extending the deadline to submit signatures to place an initiative on the ballot). Because the requested injunction will preserve the state's ability to run an orderly election process while also preserving the constitutional rights of the Plaintiffs, the public interest also favors an order protecting Plaintiffs.

## IV.     <u>CONCLUSION</u>

Plaintiffs respectfully request that this Court grant their request for a temporary

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND MEMORANDUM IN SUPPORT
1386651 (*People Not Politicians, et al. v. Secretary of State*)

restraining order to extend Oregon's deadline for submitting signatures for ballot initiatives and

to reduce the number of signatures required to be submitted.


DATED:  June 30, 2020                    SHERMAN, SHERMAN, JOHNNIE &
                                         HOYT, LLP


                             By:  s/ Steve Elzinga
                                  STEVE ELZINGA
                                  Attorneys for Plaintiffs
                                  PEOPLE NOT POLITICIANS OREGON,
                                  COMMON CAUSE, LEAGUE OF
                                  WOMEN VOTERS OF OREGON, NAACP
                                  OF EUGENE/SPRINGFIELD,
                                  INDEPENDENT PARTY OF OREGON,
                                  and C. NORMAN TURRILL

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND MEMORANDUM IN SUPPORT
1386651 (*People Not Politicians, et al. v. Secretary of State*)

## CERTIFICATE OF COMPLIANCE

This brief complies with the applicable word-count limitation under LR 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains 9,534 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.


s/ Steve Elzinga
STEVE ELZINGA

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND MEMORANDUM IN SUPPORT
1386651 (*People Not Politicians, et al. v. Secretary of State*)