**Steven C. Berman**, OSB No. 951769
Email:  sberman@stollberne.com
**Lydia Anderson-Dana**, OSB No. 166167
Email:  landersondana@stollberne.com
STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. Oak Street, Suite 500
Portland, Oregon 97204
Telephone:      (503) 227-1600
Facsimile:      (503) 227-6840

Attorneys for Our Oregon and Becca Uherbelau

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### EUGENE DIVISION

| | |
|---|---|
| PEOPLE NOT POLITICIANS OREGON, COMMON CAUSE, LEAGUE OF WOMEN VOTERS OF OREGON, NAACP OF EUGENE/SPRINGFIELD, INDEPENDENT PARTY OF OREGON, and C. NORMAN TURRILL,<br><br>Plaintiffs,<br><br>v.<br><br>BEVERLY CLARNO, OREGON SECRETARY OF STATE,<br><br>Defendant. | Case No. 6:20-cv-01053-MC<br><br><br>BECCA UHERBELAU AND OUR OREGON'S OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION<br><br><br>**ORAL ARGUMENT REQUESTED** |

TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

I.    BACKGROUND ....................................................................................... 2

    A.    The Initiative Power Under Oregon Law and the Process for
          Qualifying an Initiative Petition .................................................. 2

    B.    Initiative Petition 57 .................................................................... 4

    C.    IP 57 Fails to Collect Sufficient Signatures ............................... 6

II.   PLAINTIFFS ARE NOT ENTITLED TO AN EXCEPTION TO THE
      SIGNATURE THRESHOLD AND FILING DEADLINE IN THE
      OREGON CONSTITUTION ..................................................................... 7

    A.    The Two Controlling Ninth Circuit Cases Are Dispositive ....... 7

    B.    The Facts Defeat Plaintiffs' Theory ........................................... 9

          1.    Plaintiffs' Evidence Is Insufficient. .............................. 9

          2.    The IP 57 Qualification Campaign Was Not Diligent. ......... 12

                a.    IP 57 Was Filed Too Late ................................... 13

                b.    The IP 57 Campaign Did Not Secure Sufficient
                      Funding. ........................................................... 15

                c.    The IP 57 Campaign Was Not Proactive After It
                      Obtained a Final Ballot Title ............................. 16

                d.    Plaintiffs Overstate the IP 57 Campaign's Ability to
                      Collect Signatures and Overestimate the Initiative's
                      Grassroots Support ........................................... 18

                e.    Other Initiatives Were Able to Qualify During This
                      Election Cycle ................................................... 20

    C.    Courts Consistently Have Rejected Plaintiffs' Arguments ....... 21

    D.    Plaintiffs Seek an Unfair and Improper Advantage ................. 26

CONCLUSION .................................................................................................. 28

i

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

TABLE OF AUTHORITIES

**Cases**

*Angle v. Miller*
    673 F3d 1122 (9th Cir. 2012) ............................................................. passim

*Arizonans for Fair Elections v. Hobbs*
    ___ F.Supp.3d ___, 2020 WL 1905747 (D. Ariz. April 10, 2020) .................................... passim

*Buckley [v. Am. Const. Law Found., Inc.]*
    525 U.S. [182,] , 119 S. Ct. 636 (1999) ....................................................... 7

*Fair Maps Nevada v. Cegavske*
    2020 WL 2798018 (D. Nev. May 29, 2020) .............................................. 26

*Fight for Nevada v. Cegavske*
    ___ F.Supp.3d ___, 2020 WL 2614624 (D. Nev. May 15, 2020) ............................. 25

*Fletchall v. Rosenblum*
    365 Or 98, 442 P3d 193 (2019) ............................................................. 6

*Morgan v. White*
    2020 WL 2526484 (N.D. Ill. May 18, 2020) .............................................. 26

*Prete v. Bradbury*
    438 F.3d 949 (9th Cir. 2006) ...................................................... 7, 8, 12, 23

*Sinner v. Jager*
    2020 WL 324413 (D.N.D. June 15, 2020) .............................................. 25

*Unger v. Rosenblum*
    362 Or 210, 407 P3d 817 (2017) ............................................................. 3, 4

**Statutes**

Or. Const., Art. IV, § 1 ........................................................................ passim

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

# INTRODUCTION

The Oregon Constitution sets certain basic requirements for citizen initiative petitions to qualify for the ballot.  Article IV, section 1(2)(c) of the Oregon Constitution sets a minimum signature threshold for a proposed constitutional amendment.  It provides that "[a]n initiative amendment to the Constitution may be proposed only by a petition signed by a number of qualified voters equal to eight percent of the total number of votes cast for all candidates for Governor at the last election at which a Governor was elected for the term of four years next preceding the filing of the petition."  The Oregon Constitution also sets a deadline for filing an initiative petition.  Under Article IV, section 1(2)(e), "[a]n initiative petition shall be filed not less than four months before the election at which the proposed law or amendment to the Constitution is to be voted upon."  For the November 3, 2020 General Election, the signature threshold for a proposed amendment to the constitution is 149,360.  The filing deadline was July 2, 2020.

Plaintiffs are the supporters of Oregon statewide Initiative Petition 57 for the November 3, 2020 General Election ("IP 57").  Plaintiffs' efforts to qualify IP 57 fell far short.  Plaintiffs were able to obtain less than a third of the raw, unverified signatures necessary to qualify their initiative and did not submit the required number of signatures before the July 2, 2020 deadline.  Days before the deadline, Plaintiffs filed an action in this Court, seeking an exception to both the signature threshold and filing deadline in the Oregon Constitution.  Plaintiffs argue that they are entitled to a special exception to the constitutional requirements, because the current COVID-19 pandemic has impeded their signature collection efforts.

Plaintiffs' arguments are flawed.  As the evidence shows, Plaintiffs got an extremely late start pursuing their initiative.  Plaintiffs had inadequate funding and an insufficient signature

Page 1 **-**    BECCA UHERBELAU AND OUR OREGON'S OPPOSITION TO MOTION
FOR A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

collection effort in place.  Plaintiffs' efforts would have failed regardless of the pandemic.  In contrast, better organized and better run Oregon statewide initiative petition campaigns were able to obtain sufficient signatures in advance of the constitutional deadline.  Courts consistently have rejected similar efforts by other campaigns that have failed to establish that they would have qualified but for the pandemic.  Plaintiffs' request for extraordinary relief is wholly unsupported by the facts or the law.

## I.    BACKGROUND

### A.    The Initiative Power Under Oregon Law and the Process for Qualifying an Initiative Petition.

The initiative power is a core tenet of democracy in Oregon.  In order to protect the integrity of the initiative system, the Oregon Constitution sets certain criteria for an initiative to qualify.  And, the statutory process for qualifying has a number of steps that any successful initiative petition qualification campaign must take into consideration.  As the Oregon Supreme Court recently explained:

> The Oregon Constitution places a number of requirements and conditions on the exercise of the initiative power.  First, a measure may not be submitted to a vote until supported by a petition signed by a specified number of qualified voters equal to a percentage of the total number of votes cast for all candidates for governor at the last election at which the governor was elected to a four-year term; the percentage depends on whether the measure is statutory or constitutional.  Or. Const., Art. IV, § 1(2)(b), (c).  Second, the petition must be filed with the Secretary of State "not less than four months before the election at which the proposed law or amendment to the Constitution is to be voted upon.  *Id.* at § 1(2)(e) . . . . .

> The constitution expressly authorizes the legislature to prescribe "[t]he manner of exercising" the initiative power by "general laws," that is, by statutes. Or. Const., Art. IV, § 1(5) . . . Pursuant to that constitutional authority, the legislature enacted ORS chapter 250, which provides a comprehensive statutory process for placing proposed initiative petitions on the ballot and ensuring compliance with constitutional requirements and conditions. . .

Page 2 -    BECCA UHERBELAU AND OUR OREGON'S OPPOSITION TO MOTION
            FOR A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION

In brief, the law requires that individuals who propose a statewide initiative measure, known a "chief petitioners," file with the Secretary of State a "prospective petition," which consists of the text of the proposed measure along with the signatures of at least 1,000 electors. ORS 250.045(1). Once the secretary has received a prospective petition and verified the sponsorship signatures, the secretary forwards it to the Attorney General. ORS 250.065(2). The Attorney General then has five days in which to prepare a draft ballot title — that is, a three-part summary of the proposed measure and its major effects stated in the form of (1) a caption of no more than 15 words; (2) a "yes" and "no" vote result statement of no more than 25 words explaining the consequences of a "yes" and "no" vote; and (3) a summary of no more than 125 words. ORS 250.035(2). The secretary then provides notice of the public's right to submit written comments on the draft ballot title. ORS 250.067(1). After receiving any comments, the secretary forwards them to the Attorney General. *Id.* The Attorney General then considers those comments and certifies either the original draft ballot title or a revised ballot title. ORS 250.067(2).

Electors who previously commented on the draft ballot title and who are dissatisfied with the certified ballot title may seek review in the Supreme Court. ORS 250.085(2). Any such electors are required to file a petition for judicial review within 10 business days of the Attorney General's certification of the ballot title. ORS 250.085(3)(a). And the elector must notify the Secretary of State in writing the following business day that the petition has been filed. ORS 250.085(4).

The Supreme Court reviews the Attorney General's certified ballot title to determine whether it substantially complies with the statutory requirements as to its form and content. ORS 250.085(5). . . If the court determines that the challenged ballot title substantially complies with the statutory requirements, the court certifies the ballot title to the secretary. ORS 250.085(8). If the court determines that the challenged ballot title does not substantially comply, then the court refers the ballot title to the Attorney General for modification. *Id.* The final, certified ballot title then is placed on the cover of the initiative petition, which is required before chief petitioners may solicit signatures in support of the measure. ORS 250.045(6).

*Unger v. Rosenblum*, 362 Or 210, 214-215, 407 P3d 817 (2017).

There are no restrictions on when an initiative petition may be filed. "A petition may be filed for any election." Oregon Secretary of State, "Initiatives, Referendums and Referrals."[1]  A

---

[1]Available at https://sos.oregon.gov/elections/Pages/2022-irr.aspx (last accessed July 7, 2020).

Page 3 **-**    BECCA UHERBELAU AND OUR OREGON'S OPPOSITION TO MOTION
                FOR A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION

petition for a future election may be filed before the signature submission deadline for a prior

election has concluded.  As the Secretary of State explains, during an election cycle, "Petitions

for future elections may go through the sponsorship phase, obtain a ballot title and go through

ballot title appeal process."  *Id.*  In other words, the chief petitioners for IP 57 could have filed

their petition and completed the ballot title process for the November 2020 General Election

during the 2018 election cycle and started collecting signatures on what became IP 57 as early as

July 2018.

    **B.**    **Initiative Petition 57**

    Initiative Petition 57 is one of four statewide redistricting initiatives proposed during this

election cycle.  Initiative Petition 5 was filed early in the election cycle, in June 2018.  As with

IP 57, IP 5 would have transferred redistricting authority away from the Oregon Legislature to a

commission.  The proponents of IP 5 received their final ballot title on September 4, 2019.  They

withdrew their initiative the following month, on October 31, 2019.[2]  Less than two weeks later,

Mr. Turrill and two other chief petitioners filed IP 57, along with Initiative Petition 58 and

Initiative Petition 59.  Each of those initiative petitions proposed amending the Oregon

Constitution to repeal the existing redistricting process and take redistricting authority away from

the Oregon Legislature.[3]  At the time of filing, Mr. Turrill acknowledged that the chief

---

[2]The Oregon Secretary of State maintains a publicly accessible Initiative, Referendum and Referral database (the "IRR Database"), accessible at http://egov.sos.state.or.us/elec/web_irr_search.search_form).  Specific information regarding IP 5 (2020) is available at http://egov.sos.state.or.us/elec/web_irr_search.record_detail?p_reference=20200005..LSCYYY5. In this memorandum, publicly available information about a specific initiative obtained from the IRR Database is cited by reference to the "IRR Database" followed by the initiative petition number.

[3]*See generally* IRR Database, IP 57 (2020), available at http://egov.sos.state.or.us/elec/web_irr_search.record_detail?p_reference=20200057..LSCYYY5

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

petitioners were floating three measure to determine which one was most viable, a practice commonly referred to as "ballot title shopping." *See, e.g.*, Jeff Mapes, *Group Seeks to Take Oregon Redistricting Out of State Legislature's Hands*, OR. PUB. BROAD. (November 12, 2019).[4] *See also* Declaration of Ben Unger ("Unger Decl.") at ¶ 8(e) (discussing ballot title shopping by the initiative's proponents).

IP 57 quickly garnered opposition from progressive and voter advocacy groups. Although the intricacies of IP 57 are not material to this dispute, in summary IP 57 would repeal the existing provisions of the Oregon Constitution addressing legislative redistricting. IP 57 would create a 12-person commission to conduct redistricting of state legislative districts and federal congressional districts. It is strongly opposed for many reasons. Two predominant concerns are the initiative would lead to over-representation of Republican-backed interests (giving Republicans disproportionate power on the commission) and commission membership would exclude many highly qualified candidates, including younger voters, immigrants and newer Oregon residents.

IP 57 went through the ballot title process. Petitioner Uherbelau petitioned the Oregon Supreme Court for review of the certified ballot title. She filed her challenge on February 2, 2019. That challenge was resolved very quickly, on March 26, 2020. *Uherbelau v. Rosenblum* (S067451) (March 26, 2020); *see* IRR Database, IP 57 (2020). Ballot title challenges often can

---

7; IRR Database, IP 58 (2020), available at
http://egov.sos.state.or.us/elec/web_irr_search.record_detail?p_reference=20200058..LSCYYY58 (IP 58); and IRR Database, IP 59 (2020), available at
http://egov.sos.state.or.us/elec/web_irr_search.record_detail?p_reference=20200059..LSCYYY59 (IP 59).

[4]Available at https://www.opb.org/news/article/gerrymandering-redistricting-oregon-census/ (last accessed July 7, 2020).

Page 5 **-**   BECCA UHERBELAU AND OUR OREGON'S OPPOSITION TO MOTION
FOR A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION

take months to resolve.  Unger Decl., ¶ 8(f); Declaration of Elizabeth Kaufman ("Kaufman

Decl.), ¶ 7.  For example, the ballot title challenge for related IP 5 took over seven months for

the Supreme Court to decide.  *See* IRR Database, IP 5 (2020) (setting forth timeline); *see also*

*Fletchall v. Rosenblum*, 365 Or 98, 442 P3d 193 (2019), *opinion after remand* 365 Or 527, 448

P3d 634 (2019).

By law, as soon as the ballot title process was completed, the proponents of IP 57 could

begin circulating the initiative to collect signatures.  Templates for signature collection for IP 57

were issued by the Secretary of State on March 30, 2019, within one business day of when the

Secretary of State received notice of the court's final judgment.  The chief petitioners obtained

templates to circulate ten days later, on April 9, 2020.  IRR Database, IP 5 (2020); Declaration of

Norman Turrill ("Turrill Decl."), ¶ 19.  However, the chief petitioners undertook no efforts to

collect signatures for over a month, when they "launched a portal for Oregonians to view,

download and print the IP 57 petition and signature page." Turrill Decl., ¶ 22.  The initiative's

proponents did not undertake any significant outreach to voters to obtain signatures until late,

when they sent a mass mailing to over 1.1 million registered Oregon voters.  Turrill Decl., ¶ 29.

In other words, the supporters of IP 57 waited almost two months *after* they received a certified

ballot title before they begin collecting signatures.

### C.      IP 57 Fails to Collect Sufficient Signatures

As discussed above, under Article IV, section 1(2) of the Oregon Constitution, for the

November 2020 General Election, an initiative petition to amend the Oregon Constitution must

contain at least 149,360 valid signatures submitted by July 2, 2020.  As Plaintiffs conceded, the

IP 57 campaign fell far short of that threshold, and had collected approximately 60,000 raw,

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

unverified signatures by the end of June.  Turrill Decl., ¶ 30.  On June 30, 2020, just two days

before the signature submission date, Plaintiffs filed this suit.

## II.   PLAINTIFFS ARE NOT ENTITLED TO AN EXCEPTION TO THE SIGNATURE THRESHOLD AND FILING DEADLINE IN THE OREGON CONSTITUTION

The law and the facts are fatal to Plaintiffs' request for extraordinary relief.

### A.   The Two Controlling Ninth Circuit Cases Are Dispositive.

Two Ninth Circuit decisions – *Prete v. Bradbury*, 438 F.3d 949 (9th Cir. 2006) and *Angle*

*v. Miller*, 673 F3d 1122 (9th Cir. 2012) – are applicable here.  Plaintiffs disregard *Prete* and

misread *Angle*.

In *Prete*, the Ninth Circuit rejected a challenge to Oregon's constitutional pay-per-

signature ban.  The Ninth Circuit began its analysis by recognizing that while the circulation of

initiative petitions involves "core political speech," the First Amendment does not prohibit "all

restrictions upon election processes."  438 F.3d at 961.  The Court explained:

> "'States may, and inevitably must, enact reasonable regulations of parties,
> elections, and ballots to reduce election and campaign-related disorder.'  *Timmons
> v. Twin Cities Area New Party,* 520 U.S. 351, 358, 117 S. Ct. 1364, 137 L.Ed.2d
> 589 (1997).  Indeed, the U.S. Supreme Court has recognized 'States allowing
> ballot initiatives have considerable leeway to protect the integrity and reliability
> of the initiative process, as they have with respect to election processes generally.'
> *Buckley* [*v. Am. Const. Law Found., Inc.*]*,* 525 U.S. [182,] 191, 119 S. Ct. 636
> (1999)."

*Prete*, 438 F.3d at 961.

Because Oregon's pay-per-signature ban is "content-neutral," the Ninth Circuit rejected

the plaintiffs' argument that it was subject to strict scrutiny, *Prete*, 438 F.3d at 968.  The Court

further concluded that the plaintiffs had failed to establish that the pay-per-signature ban

imposed a severe burden on signature collection, because the plaintiffs' evidence amounted to

little more than "unsupported speculation," and referendum petitions continued to qualify with

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

the ban in place.  *Id.* at 964-967.  The Court determined that Oregon's "important regulatory interest in preventing fraud and its appearances in electoral processes" outweighed any perceived infringement on First Amendment rights.  *Id.* at 969.

In *Angle*, the Ninth Circuit considered, and rejected, a challenge to an Arizona law that required an initiative petition to have signatures from each congressional district in the state. The Ninth Circuit determined that the rule did not trigger an equal protection strict scrutiny analysis, "because it serves the state's legitimate interest in ensuring a minimum of statewide support for an initiative as a prerequisite to placement on the ballot."  673 F.3d at 1129; *see also id.* at 1130 (rejecting the argument that a ballot access requirement is subject to strict scrutiny because "[a] ballot access requirement determines whether there is a minimum level of grassroots support for an initiative to warrant its inclusion on the ballot").

As for the *Angle* plaintiffs' First Amendment challenge, the Ninth Circuit concluded that Arizona's ballot access rule did not impose a severe burden on signature collection.  As the Court recognized, "[t]here is no First Amendment right to place an initiative on the ballot" and "regulations that make it more difficult to qualify an initiative for the ballot therefore do not necessarily place a burden on First Amendment rights."  673 F3d at 1133.  A ballot access rule is "severe" only if it would "significantly inhibit" a "reasonably diligent" campaign from placing an initiative on the ballot.  *Id.*   The Ninth Circuit rejected the plaintiffs' challenge because the plaintiffs failed to present evidence "that, despite reasonably diligent efforts, they *and other initiative proponents* have been unable to qualify initiatives for the ballot as a result of the" objected to law.  *Id.* at 1134 (emphasis added).  In other words, the test is not merely whether a campaign cannot gain ballot access, but rather whether other campaigns in the same election cycle are also precluded from obtaining ballot access.  The court in *Angle* recognized that states

Page 8 -    BECCA UHERBELAU AND OUR OREGON'S OPPOSITION TO MOTION
             FOR A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION

have an "important regulatory interest" in ensuring that initiative petitions have sufficient grassroots support to be placed on the ballot and the First Amendment allows states "considerable leeway" in how to protect that interest.  "We believe this leeway applies to a state's decision about how to measure the grassroots support sufficient to qualify an initiative for the ballot."  *Id.* at 1135.

B.    **The Facts Defeat Plaintiffs' Theory.**

As the foregoing discussion shows, whether a state election law imposes an unconstitutional restriction on a specific signature collection campaign depends on the diligence of the campaign.  A determinative measure of diligence is whether other campaigns in the same election cycle were able to qualify.  The Plaintiffs have failed to present sufficient evidence on either issue.  In fact, the evidence clearly refutes Plaintiffs' claim.

1.    **Plaintiffs' Evidence Is Insufficient.**

The declarations filed by Plaintiffs fail to establish that the campaign was reasonably diligent.  In her declaration, Candalynn Johnson testifies that she acted as a deputy campaign manager for IP 57 beginning in early January.  She states that she attended a number of forums, beginning in September 2018, to promote IP 57.  Johnson Decl., ¶ 5.  She states that by late March 2020, she had a list of 77 people who said they would volunteer to circulate IP 57.  *Id.* She does *not* testify that the campaign had adequate financial resources or an organized paid signature circulator presence to engage in a signature gathering effort that would have garnered sufficient signatures for IP 57 to qualify.

The declaration from plaintiff and chief petitioner Norman Turrill is similarly unavailing to Plaintiffs.  Mr. Turrill acknowledges that the IP 57 campaign did not begin discussing how to acquire signatures until January 2020, and that the campaign concluded it "would rely principally

Page 9 **-**    BECCA UHERBELAU AND OUR OREGON'S OPPOSITION TO MOTION
          FOR A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION

on paid signature circulators, supplemented by volunteer circulators, to gather the required 149,360 signatures." *Id.*, ¶ 4. Over the next few months, Mr. Turrill and the campaign apparently scheduled and held a series of meetings but did nothing meaningful to move their actual signature collection organizational efforts forward. *Id.*, ¶ 7. By March 2020, the campaign apparently still had not finalized the procedures for (or even retained anyone to conduct) its paid signature collection effort when Mr. Turrill "told the EC that we should start preparing for signature gathering now, so that the campaign is ready to hit the streets once the legal challenges had concluded." *Id.*, ¶ 9. The campaign apparently also lacked sufficient funds at that time. *See id.* (Mr. Turrill testifying that he was hopeful "the campaign's finances would improve once we hit the streets"). According to Mr. Turrill, by March 20, the campaign was aware that "general public signature solicitation had not been prohibited." *Id.*, ¶¶ 11, 13. However, for reasons that are unclear, the campaign subsequently erroneously concluded that it could not conduct in-person signature collection. *Id.* at ¶ 15.

According to Mr. Turrill's testimony, it was not until March 31, 2020 that the IP 57 campaign even had an estimate of the raw (unverified) number of signatures it would need to qualify IP 57. At that point, the committee concluded "the campaign would need about 213,000 signatures to meet the required number of valid signatures (149,360)."[5] Turrill Decl., ¶ 17. Still, the campaign did nothing to pursue signatures. Even though it could have obtained signature templates, the campaign waited until April 9 to get those templates. *Id.*, ¶ 19. And, for the most part, the campaign continued to sit on its hands. In mid-May – almost two months after the

---

[5]Mr. Turrill assumes a validity rate of 70%, which, as discussed below, is substantially higher than the validity rate achieved for other campaigns conducted by Ted Blaszak.

Page 10 -    BECCA UHERBELAU AND OUR OREGON'S OPPOSITION TO MOTION
              FOR A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION

campaign received its final, certified ballot title and could begin circulating – the campaign set up a website where voters could download, print, sign and mail-in a completed petition. *Id.*, ¶ 22. (Such websites are standard for any initiative qualification campaign). It was not until the end of May that the campaign made any concerted effort to reach electors, when it sent a mass mailing. *Id.*, ¶ 29. The campaign never undertook in-person signature collection.

Mr. Turrill's declaration reveals a disorganized campaign that was behind the curve well before any order issued by the Governor. As with Ms. Johnson's declaration, what is surprisingly absent from Mr. Turrill's declaration is any indication that the campaign had sufficient financial resources or a sufficient paid signature circulator presence to engage in a signature gathering effort. Mr. Turrill's declaration, perhaps unintentionally, emphasizes that the IP 57 did not have the financial resources, or any plan in place, to qualify IP 57.

Plaintiffs' final declaration, from Ted Blaszak, is also inconclusive. Mr. Blaszak testifies that he has helped initiative petitions qualify in the past "in shorter periods of time than the April 9-July 2, 2020 period available to the PNP campaign." Blaszak Decl., ¶ 3. He also testifies that paid circulators would be essential to qualification. *Id.* Mr. Blaszak's testimony then shifts to the campaign's mail signature-solicitation campaign. He states that the campaign's mail solicitation statistics "were excellent – six percent of all households returns signatures." *Id.*, ¶ 8.[6] Finally, Mr. Blaszak testifies that "my clients in Oregon ballot measure campaigns received an average of 15,000-20,000 signatures per week."[7] *Id.*, ¶ 9. He also states that "under normal signature-gathering circumstances" a hypothetical initiative campaign could have "collected and

---

[6]As is discussed below, this 6% return is well-below the return achieved by other campaigns during this same election cycle.

[7]As is discussed below, the evidence is inconsistent with Mr. Blaszak's sworn statement.

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

submitted to the Oregon Secretary of State at least 150,000 valid signatures between April 9 and July 2, 2020." *Id.* As with Ms. Johnson and Mr. Turrill's declarations, clearly missing from Mr. Blaszak's declaration is that the IP 57 campaign actually had funding to conduct a paid signature collection effort (under any circumstances) or that Mr. Blaszak had been retained or was prepared to conduct that effort.

At most, Plaintiffs convey a speculative, aspirational hope that IP 57 could have qualified. What their declarations fail to establish is that the campaign was in any actual position to collect sufficient signatures for IP 57, under even normal circumstances. As in *Angle*, their "assertions are too vague, conclusory and speculative to create a triable issue." 673 F.3d at 1134; *see also Prete*, 485 F.3d at 964-965 (declarations proffered by the plaintiffs were insufficient as "unsupported speculation"). Plaintiffs fail to establish any probability, much less a likelihood, that they were ever in any position to qualify IP 57. Their proffer is insufficient.

### 2.    The IP 57 Qualification Campaign Was Not Diligent.

Declarations from three established campaign veterans establish that the campaign to qualify IP 57 was doomed from the outset, and that the pandemic is *not* the reason the initiative failed. Ben Unger has been working in initiative politics for years, and until 2018, oversaw Our Oregon's initiative qualification and monitoring operations. He currently is the campaign consultant for Initiative Petition 34 (2020), which has qualified for the November 2020 ballot. Unger Decl., ¶¶ 2-6. Elizabeth Kaufman also has been working in initiative politics for years. She led the campaign to qualify and pass Initiative Petition 53 (2014), to legalize recreational marijuana, which became Measure 91 and was resoundingly approved by Oregon voters. Ms. Kaufman currently is the campaign director for Initiative Petition 44 (2020), which also has qualified for the November 2020 ballot. Kaufman Decl., ¶¶ 2-3. Finally, Becca Uherbelau – a

Page 12 -    BECCA UHERBELAU AND OUR OREGON'S OPPOSITION TO MOTION
              FOR A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION

proposed intervenor in this case and the executive director of Our Oregon – currently oversees

Our Oregon's initiative monitoring program.  Declaration of Becca Uherbelau ("Uherbelau

Decl."), ¶ 5.  All three testify that IP 57 never was in position to qualify for the ballot.   Unger

Decl., ¶¶ 8-11, 15; Kaufman Decl., ¶¶ 5-13; Uherbelau Decl., ¶¶ 6-11.

### a.    IP 57 Was Filed Too Late

As discussed above, an initiative petition must go through a series of procedural steps

before it can be circulated for signatures.  As part of that process, the Attorney General issues a

ballot title and (if the title is challenged), the Supreme Court will review it.  Once Supreme Court

review is complete, the chief petitioners may obtain templates and begin circulation.  There are

no restrictions on when the chief petitioners can begin the process of obtaining a ballot title and

templates.  Chief petitioners with a final ballot title and templates can begin circulating an

initiative petition once the signature submission deadline for the prior cycle has passed.  In other

words, chief petitioners for a 2022 initiative could begin obtaining signatures now (because the

2020 signature deadline has passed).

The later in an election cycle that an initiative petition is filed, the more difficult and

expensive it will be for the initiative to qualify.  Unger Decl., ¶ 8(b); Kaufman Decl., ¶ 6;

Uherbelau Decl., ¶ 8.  IP 57 was not filed with the Secretary of State's office until November 12,

2019.  Unger Decl., ¶ 8(c); Kaufman Decl., ¶ 6; Uherbelau Decl., ¶ 8; *see also* IRR Database, IP

57 (2020).  This was unreasonably late in the election cycle and would have made it extremely

challenging for IP 57 to qualify.  Unger Decl., ¶ 8(c); Kaufman Decl., ¶ 6; Uherbelau Decl., ¶ 8.

Given the extremely late filing date, the only way that IP 57 could have obtained sufficient

signatures to qualify (under any circumstances) would have been if the campaign had sufficient

funding, a well-organized ground game, and a paid petition circulation firm ready to hit the

Page 13 -   BECCA UHERBELAU AND OUR OREGON'S OPPOSITION TO MOTION
            FOR A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION

streets.  Unger Decl., ¶¶ 8(h), (i); Kaufman Decl., ¶ 8, Uherbelau Decl., ¶ 12.  However, IP 57 did not.[8]

Plaintiffs' decision to file IP 57 so late in the cycle was not the result of the coronavirus or any other pandemic related event.  The proponents of IP 57 had been contemplating filing a redistricting initiative as early as the 2018 election cycle.  Unger Decl., ¶ 8(d); *see also* Johnson Decl., ¶¶ 4, 5 (IP 57 deputy campaign director testifying that the campaign to qualify IP 57 began contacting people about a possible ballot measure "from as early as September 2018").  Other redistricting advocates filed their initiative petitions much earlier in this election cycle.  Initiative Petition 5, which also would have removed redistricting authority from the legislature and given it a committee, was filed in June 2018.  The IP 57 campaign's late start is particularly confounding, in the light of Mr. Turrill's own testimony that the campaign was "aware that this was our last once-in-a-decade opportunity to create a redistricting commission in time for the 2021 redistricting process."  Turrill Decl., ¶ 5.  It may well be that the proponents of IP 57 were engaging in "ballot title shopping," looking for the best way to promote their initiative.  Unger Decl., ¶ 8(e).  While that is not impermissible, any attendant delay in the initiative process that resulted was a strategic choice made by the initiative's proponents.

Over the last two election cycles, no initiative petition (either statutory or constitutional) has qualified for the ballot that was filed as late in the election cycle as IP 57.  And, over the last two election cycles, no initiative petition approved for circulation as late as IP 57 has qualified for the ballot.  The only initiative petition that has come as close to pushing the timeline as IP 57

---

[8]IP 57 benefitted from a very quick resolution of Supreme Court's review of the ballot title.  That review took only six weeks, whereas review can often take months (as it did for the ballot title for IP 5).  Unger Decl., ¶ 8(f); Kaufman Decl., ¶ 7, *Uherbelau v. Rosenblum* (S067451) (March 26, 2020).

Page 14 -    BECCA UHERBELAU AND OUR OREGON'S OPPOSITION TO MOTION
            FOR A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION

was Initiative Petition 37 [Measure 103] (2018).  But that initiative was filed a month earlier than IP 57, obtained its certified ballot title weeks earlier than IP 57 and, as discussed below, had exponentially more cash on hand to devote to signature collection than did IP 57.  Uherbelau Decl., ¶ 7.

For this election cycle, the successful campaigns to qualify Initiative Petition 34 and Initiative Petition 44 both began significantly earlier than did the campaign to qualify IP 57.  IP 34 was filed on July 2, 2019.  IP 44 was filed on August 15, 2019.  Both were months ahead of IP 57.  Unger Decl, ¶¶ 8(c), 13; Kaufman Decl., ¶¶ 6, 14.

### b.    The IP 57 Campaign Did Not Secure Sufficient Funding.

A second hurdle faced by the IP 57 campaign is that it never secured sufficient funding to conduct its signature collection effort.  Given the campaign's late start date, the campaign would have needed funding in place to begin a vigorous paid signature collection effort the minute the ballot title was finalized.  Unger Decl., ¶¶ 8 (g), (h), (i); Kaufman Decl., ¶ 8; Uherbelau Decl., ¶ 7.  The last-minute, rush signature collection effort that IP 57's late filing would require would cost approximately $1,000,000.  Unger Decl., ¶ 8 (g).  Yet, the IP 57 campaign's total reported fundraising for all purposes was significantly less than that.  Unger Decl., ¶ 8(g); Uherbelau Decl., ¶ 7.  By contrast, the IP 34 campaign spent over $900,000 and the IP 44 campaign reported spending over $2 million this election cycle during the qualification period.  Uherbelau Decl., ¶ 7.  Both campaigns filed (and were able to begin signature collection) months before IP 57.  And, both IP 34 and IP 44 are statutory initiatives, with a lower signature threshold than the proposal to amend the Oregon Constitution in IP 57.

The IP 57 qualification campaign's limited resources were fatal, regardless of any pandemic concerns.  Measures to amend the constitution that qualified for the 2018 General

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

Election were much better financed. For example, Initiative Petition 37 [Measure 103] (2018) – a constitutional amendment to limit taxes – spent $2.2 million during the qualification period. While IP 37 was filed just a month earlier in the election cycle than IP 57, it had to spend nearly four times more during qualification. And, Initiative Petition 31 [Measure 104] – another constitutional amendment to limit taxes – spent over $1 million during the qualification period. While two other initiatives during the 2018 election cycle qualified with lower expenditures – Initiative Petition 1 [Measure 106] (2018) and Initiative Petition 22 [Measure 103] – they were filed, respectively, two years and fourteen months before the signature deadline. Uherbelau Decl., ¶¶ 7-8. It would have been wholly unprecedented for the IP 57 campaign to qualify the measure, given the limited time it allowed itself and the campaign's resources.

### c. The IP 57 Campaign Was Not Proactive After It Obtained a Final Ballot Title.

The IP 57 campaign's lack of diligence continued even after it received a certified ballot title and could begin petition circulation. As Mr. Turrill testifies, the Supreme Court's decision certifying the ballot title was issued on March 26, 2020. Turrill Decl., ¶ 16. However, the campaign did not obtain templates from the Secretary of State for almost two weeks, until April 9. *Id.*, ¶ 19. A campaign can obtain signature templates almost immediately after the Court issues its decision. That two-week delay further shortened the timeline for the campaign to gather signatures and is "inexplicable, given the timeline." Unger Decl., ¶ 9(a); *see also* Kaufman Decl., ¶ 11(a).

Even after the IP 57 campaign obtained templates, it made no immediate efforts to reach out to voters. As Mr. Turrill testified, the IP 57 campaign did not set up website where petitions could be downloaded and printed until mid-May. The campaign did not send out its mailer until

Page 16 - BECCA UHERBELAU AND OUR OREGON'S OPPOSITION TO MOTION
FOR A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600  FAX (503) 227-6840

late May, nearly two months after it had obtained its ballot title.  "These two months of inactivity were not reasonable, given the approaching submission deadline."  Kaufman Decl., ¶ 11(b).  *See also* Unger Decl., ¶ 9(b) ("[t]hose two months of inactivity, with the deadline approaching and the pandemic swirling, is a mindboggling delay").  The campaign apparently did not institute any significant follow-up to accompany its mailing effort.  Any successful mail effort requires follow-up to electors.  Kaufman Decl., ¶ 13.  In contrast, the campaign to qualify IP 34 had a detailed plan to contact potential petition signers both before and after they sent out their mailing.  Unger Decl., ¶ 11.

Plaintiffs also made no effort to conduct in-person signature collection.  Plaintiffs have taken the position – without any viable legal support – that executive orders from the Governor prohibited in-person signature collection.  That is inaccurate.  The Governor's orders did not prohibit in-person signature collection.  After making necessary safety protocol adjustments, both the IP 34 and IP 44 campaigns continued in-person signature collection in "phase 1" counties.  Unger Decl., ¶ 11(c), (d); Kaufman Decl., ¶¶ 11(c), (d).

The IP 57 campaign made a strategic decision not to engage in-person signature collectors at any time.  That was their choice.  The campaign's decision was not compelled by any government restriction and certainly was not mandated by anything in Article IV, section 1 of the Oregon Constitution.

The campaign unreasonably delayed in starting the initiative process by not filing IP 57 until November 2019.  Even after the campaign received its ballot title, it took no action to begin signature collection.  The campaign waited weeks to set up a standard website where electors could download and print petitions and months to initiate a mail-signature solicitation effort.  The campaign never undertook in-person signature collection, even though such activity was not

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

prohibited, and other campaigns continued their in-person efforts. The campaigns post-pandemic actions were not reasonably diligent.

> ### d. Plaintiffs Overstate the IP 57 Campaign's Ability to Collect Signatures and Overestimate the Initiative's Grassroots Support.

The campaign overstates its ability to collect signatures. Mr. Blaszak testifies that "using normal in-person signature collection efforts, my clients in Oregon ballot measure campaigns received an average of 15,000-20,000 signatures per week." Blaszak Decl., ¶ 9. Based on that estimate, he claims that an initiative campaign could have collected and submitted at least 150,000 valid signatures "between April 9 and July 2, 2020." *Id.* Mr. Blaszak offers no evidence for his assertions. However, publicly available information on the Secretary of State's website reveals that Mr. Blaszak's statements are not accurate.

Mr. Blaszak's then-company NW Democracy Resources conducted the signature collection campaign for Initiative Petition 76 (2010). IP 76 (2010) was a proposed constitutional amendment to allow casino gambling in Oregon. Although that campaign spent over $750,000 (in 2010 dollars) and had over three months to collect signatures, Mr. Blaszak's company did not obtain sufficient signatures to qualify the initiative. For IP 76, Mr. Blaszak's experience fell far short of his sworn testimony. For IP 76, with over fourteen weeks, Mr. Blaszak's campaign was unable to collect the 110,358 signatures to qualify; his campaign averaged less than 8,000 signatures a week. Uherbelau Decl., ¶ 9.[9] The validity rate was dismal – less than 62.5%. Mr. Blaszak's campaign for Initiative Petition 53 (2014) achieved similar results. That campaign had

---

[9]*See also* IRR Database, IP 76 (2010) (providing data) (available at http://egov.sos.state.or.us/elec/web_irr_search.record_detail?p_reference=20100076..LSCYYY76).

Page 18 -   BECCA UHERBELAU AND OUR OREGON'S OPPOSITION TO MOTION FOR A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION

about the same amount of time to collect signatures as did IP 57.  With well over half a million

dollars, Mr. Blaszak's signature collection firm was able to collect only 88,584 valid signatures

for IP 53 (2014), barely enough to qualify.  Kaufman Decl., ¶ 10.  The validity rate was again

quite low – 64.41%.  Again, he averaged less than 8,000 signatures a week.  *Id.*

The facts are inconsistent with Mr. Blaszak's assertion "my clients in Oregon ballot

measure campaigns received an average of 15,000-20,000 signatures a week."  Blaszak Decl.,

¶ 9.  His average has been closer to 7,500-8,000 valid signatures a week.  In 2010, with

substantially more money and more time, he failed to gather the required 110,358 signatures and

was unable to qualify IP 76.  In 2014, with more money and the same amount of time, he barely

qualified IP 53.  However, the signature threshold for IP 53, a statutory initiative, was only

88,584.  The threshold for IP 59 – a proposed constitutional amendment – is much higher,

149,360.  For IP 57 to qualify, Mr. Blaszak's signature collection efforts would have had to have

been twice as effective (and his validity rate substantially higher) than his past performance.

Plaintiffs provide no basis to believe that Mr. Blazak's signature collection efforts would

be exponentially more effective in this election cycle than in the past.  Rather, Mr. Turrill's

declaration reveals that the IP 57 campaign was ineffective at obtaining signatures.  As Mr.

Turrill testifies, using paid signature collectors, the IP 57 campaign submitted its 1,000

sponsorship signatures 22 days after the prospective petition was filed, with 10 days spent

collecting the signatures.  Turrill Decl., ¶¶ 2, 3.  A well-run campaign can complete that

signature collection in a day.  Unger Decl., ¶ 8(j).

Plaintiffs' declarations also reveal that IP 57 lacks significant grassroots support.  The

response the campaign received to its mail signature-solicitation effort was lackluster.  Mr.

Blaszak testifies that their 6% return rate was "excellent."  Blaszak Decl., ¶ 7.  But, that return

Page 19 -    BECCA UHERBELAU AND OUR OREGON'S OPPOSITION TO MOTION
              FOR A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION

rate is almost half of the 11.4% return rate that the IP 34 and IP 44 campaigns obtained on their mail signature-solicitation efforts.  Unger Decl., ¶ 10; Kaufman Decl., ¶ 12.  That low return rate indicates that IP 57 "never had sufficient support."  Kaufman Decl., ¶ 12.  Moreover, Mr. Blaszak's reported return rate is for raw, *unverified* signatures.  When Our Oregon ran a test signature-collection direct mail program for IP 25 (2018), it had a return rate of 8.47% *after* validating the signatures, a return rate 25% higher than IP 57's unverified return rate.  Uherbelau Decl., ¶ 10.  The evidence suggests that electors are just not that interested in IP 57, a clear indication that the initiative could not qualify under normal circumstances.

### e.    Other Initiatives Were Able to Qualify During This Election Cycle.

As discussed above, both Initiative Petition 34 and Initiative Petition 44 were able to qualify during this election cycle.  Unger Decl, ¶¶ 13, 14; Kaufman Decl, ¶ 15, 16.  The Secretary of State has formally announced that both initiatives will be on the November 3, 2020 General Election ballot.[10]

The recent campaign to qualify a Multnomah County initiative petition further undermines Plaintiffs' argument that successful in-person petition drives were not possible over the past few months.  The Universal Preschool Now petition, designated as MultCoInit-08, was approved for circulation on June 3, 2020.  UPN's signature collectors have been a common sight at the various mass rallies and marches in Multnomah County that have occurred over the past

---

[10]*See* IRR Database, IP 34 (2020) (so stating) (available at http://egov.sos.state.or.us/elec/web_irr_search.record_detail?p_reference=20200034..LSCYYY34) (last accessed July 8, 2020); IRR Database, IP 44 (2020) (so stating) (available at http://egov.sos.state.or.us/elec/web_irr_search.record_detail?p_reference=20200044..LSCYYY44) (last accessed July 8, 2020).

Page 20 -    BECCA UHERBELAU AND OUR OREGON'S OPPOSITION TO MOTION FOR A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION

six weeks.  Signature collectors for Measure 57 also could have collected signatures at those

mass gatherings but chose not to.  On July 6, 2020, the chief petitioners for MultCoInit-08

submitted 32,356 raw signatures, almost 10,000 signatures more than required for that initiative

to qualify.[11]  In other words, the chief petitioners for that local initiative were able to collect over

30,000 raw signatures in Multnomah County in a month.

### C.    Courts Consistently Have Rejected Plaintiffs' Arguments.

The recent decision in *Arizonans for Fair Elections v. Hobbs*, ___ F.Supp.3d ___, 2020

WL 1905747 (D. Ariz. April 10, 2020) is most analogous to this case.  In *Arizonans for Fair*

*Elections*, the plaintiffs – a pair of ballot measure committees seeking to place initiatives on the

ballot – alleged that state and local pandemic responses made it impossible for them to obtain

sufficient signatures.  They argued, in particular, that the state's requirement for "in-person"

rather than "electronic" signatures infringed on the plaintiffs' First and Fourteenth Amendment

rights.

The court's legal analysis began with a discussion of *Prete* and *Angle*.  Applying that

settled Ninth Circuit caselaw, the court rejected the challenge.  The court concluded that the

plaintiffs had failed to show that they had been "reasonably diligent" in pursing their initiatives

and, accordingly, could not establish a "severe burden."  The court wrote:

> Under Ninth Circuit law, such a challenger must show that the law creates a
> "severe burden" on the ability to successfully place an initiative on the ballot, and
> burdensomeness is gauged in part by assessing whether a "reasonably diligent"
> initiative committee could have succeeded despite the law.   Here, although it is
> undeniable that the COVID-19 pandemic is currently wreaking havoc on initiative
> committees' ability to gather signatures, it is undisputed that some Arizona

---

[11]The June 3, 2020 letter from Multnomah County Elections Division Director Tim Scott
approving the initiative for circulation is available on the County's website, at
https://multco.us/file/89605/download.  The campaign's July 6, 2020 submission is also
available on the County's website, at https://multco.us/file/90148/download.

Page 21 -    BECCA UHERBELAU AND OUR OREGON'S OPPOSITION TO MOTION
              FOR A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION

initiative committees (including one of the committees in this case) had gathered enough signatures to qualify before the pandemic took hold. It is also undisputed that the two committees in this case didn't start organizing and gathering signatures until the second half of 2019, whereas some of their counterparts began organizing as early as November 2018. Finally, although it is impossible to predict how the pandemic will play out in the coming weeks and months, it is possible that conditions will abate to the point that in-person signature gathering again becomes viable before the July 2020 submission deadline for signatures. On this record, Plaintiffs have not demonstrated that Arizona law creates a severe burden that would prevent a reasonably diligent initiative committee from placing its proposed initiative on the ballot. And because Plaintiffs failed to make this showing, the challenged laws are subject to a relaxed form of scrutiny that is easily satisfied by Arizona's interests in preventing fraud and promoting political speech and civic engagement.

*Arizonans for Fair Elections*, 2020 WL 1905747 at *2.

In *Arizonans for Fair Elections*, the Court properly rejected the plaintiffs' argument that

Arizona's ballot qualification requirements inhibited face-to-face communication with voters.

As it explained:

To the extent Plaintiffs aren't currently able to engage in face-to-face interactions with qualified electors, that's the fault of the COVID-19 pandemic, not the [state's] requirements. It's only when a state law bars certain individuals from serving as petition circulators that the first category of First Amendment harm might arise."

2020 WL 1905747 at *9. That analysis applies here as well. The signature threshold and filing

deadline in the Oregon Constitution do not bar any individuals from serving as petition

circulators. The Governor's content-neutral executive orders similarly did not bar any person or

individual from acting as a petition circulator.

Similarly, the plaintiffs' argument that Arizona's ballot qualification requirements

imposed a severe burden were not supported by the record.

The State's final argument—diligence—has more force. The State notes that Plaintiffs could have begun organizing and gathering signatures in November 2018 (as at least one other initiative committee did) yet didn't file the necessary registration paperwork with the Secretary until August 20, 2019 (HRAZ) and

Page 22 -    BECCA UHERBELAU AND OUR OREGON'S OPPOSITION TO MOTION
          FOR A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION

October 30, 2019 (AFE), thereby wasting between 45% and 55% of the 20-month election cycle. In contrast, the State notes that the government-issued social distancing guidelines arising from the COVID-19 pandemic, which came into effect on March 11, 2020, will cover only 7.5% to 12.5% of the election cycle, depending on whether they remain in effect through April 30, 2020 or May 31, 2020. . .

The Court agrees with the State that, on this record, Plaintiffs have not established that the Title 19 requirements create a "severe burden" on the ability to place an initiative on the ballot. As noted, "the burden on plaintiffs' rights should be measured by whether, in light of the entire statutory scheme regulating ballot access, 'reasonably diligent' initiative proponents can gain a place for their proposed initiative on the ballot." *Angle*, 673 F.3d at 1133 (quotation omitted). The party challenging the regulation bears the burden of establishing severity. "Speculation, without supporting evidence," is insufficient to demonstrate that the statutory scheme results in a severe burden. *Angle*, 673 F.3d at 1134; *Prete*, 438 F.3d at 964 (rejecting "unsupported speculation" as insufficient to demonstrate severe burden).

Here, a "reasonably diligent" committee could have placed its initiative on the November 2020 ballot despite the Title 19 requirements and the COVID-19 outbreak. It is notable that Plaintiffs' declarations fail to provide any explanation (let alone justification) for why they waited so long to begin organizing and gathering signatures. The State has presented evidence that at least one Arizona initiative committee began that process in November 2018, yet the two committees in this case waited until the second half of 2019, thereby missing out on essentially a year's worth of time to work toward the 237,645 signature cutoff. . . . All of this strongly suggests that, had Plaintiffs simply started gathering signatures earlier, they could have gathered more than enough to qualify for the ballot before the COVID-19 pandemic started interfering with their efforts.

*Arizonans for Fair Elections*, 2020 WL 1905747 at *10-11.

As with the plaintiffs in *Arizonans for Fair Elections*, the Plaintiffs here have failed to

establish reasonable diligence. It is undisputed that IP 57 got an extremely late start in this

election cycle. Whereas an earlier redistricting initiative, IP 5, was filed in June 2018, the chief

petitioners for IP 57 did not file their initiative until November 12, 2019. Both IP 34 and IP 44,

which got earlier starts in the election cycle and had better organized campaigns, were able to

qualify. And, in-person signature collection was possible throughout the time that IP 57 was

Page 23 -   BECCA UHERBELAU AND OUR OREGON'S OPPOSITION TO MOTION
            FOR A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

authorized to circulate.  In-person signature collection for IP 34 and IP 44 continued during that

same time.  In addition, Multnomah County initiative petition MultCoInit-08 was able to obtain

all the signatures it needed to qualify during the month of June using in-person signature

collection.  "[C]ourts (including the Ninth Circuit) require parties raising constitutional

challenges to state ballot access laws to show not only that *they* have been thwarted by the law,

but that a reasonably diligent party would have been thwarted, too."  *Arizonans for Fair*

*Elections*, 2020 WL 1905747 at *2.   It is undisputed that other campaigns were able to qualify

their initiatives during this same election cycle.

　　　The evidence submitted by Plaintiffs is even weaker than the evidence presented in

*Arizonans for Fair Elections*.  Plaintiffs have failed to show any reasonable likelihood that they

could have qualified IP 57 absent the pandemic.  Given the short time frame that the IP 57

campaign imposed on itself, it had an insufficient ground game, insufficient funding and no

viable plan to collect the signatures it needed to qualify the initiative.  *See, e.g.*, *id.* at *11 n 13

("a reasonably diligent campaign wouldn't have needed to put all its eggs in the March/April

basked").   At most, the declarations submitted by Plaintiffs show that Plaintiffs hoped to try to

qualify IP 57.  But, what is missing is *any* evidence that they would have qualified IP 57.  The

pandemic did not prevent the IP 57 campaign from qualifying; rather, the campaign's own

efforts fell far short.

　　　Oregon has a well-established interest in maintaining the integrity of its initiative system.

Oregon voters first enshrined the initiative power in the Oregon Constitution in 1902.  When

voters adopted the current version of Article IV, section 1 in 1968, they included both the 8%

signature threshold requirement for constitutional amendments in Article IV, section 1(2)(c) and

the signature filing deadline in Article IV, section 1(2)(e).  The people set those constitutional

Page 24 -    BECCA UHERBELAU AND OUR OREGON'S OPPOSITION TO MOTION
　　　　　　FOR A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION

baselines, to ensure that any proposed amendment to the Oregon Constitution had sufficient

grassroots support to justify an expensive election on a statewide ballot measure. As the Court in

*Arizonans for Fair Elections* recognized, "it is . . . a profound thing for a federal court to rewrite

state election laws that have been in place since the 1910s." 2020 WL 1821991 at *3. Here, "the

signature requirements Plaintiffs seek to displace have been a part of [Oregon]'s constitutional

and electoral landscape for over a century." *See id.* at *16. Plaintiffs have failed to meet their

burden to overturn this "bedrock component" of the Oregon Constitution. *See id.* at *11.

The decision in *Arizonans for Fair Elections* is consistent with decisions from other

jurisdictions facing similar issues regarding ballot access. For example, in *Fight for Nevada v.

Cegavske*, ___ F.Supp.3d ___, 2020 WL 2614624 (D. Nev. May 15, 2020), the court rejected a

challenge brought by a recall committee to statutory signature deadlines "because of emergency

directives that Governor Sisolak has issued in response to the coronavirus pandemic." *Id.* at *1.

Applying *Angle* and *Prete*, the court concluded that the plaintiff failed to establish it had made a

diligent effort to obtain signatures on their recall petition *before* the governor issued his

directives. "That Plaintiff was already so far from its goal by March 30, 2020 gives less

credence to the argument that the emergency directives, as opposed to other reasons, such as a

lack of diligence, prevented Plaintiff from acquiring the requisite signatures." *Id.* at *6.

Similarly, in *Sinner v. Jager*, 2020 WL 324413 (D.N.D. June 15, 2020), the plaintiffs

sought to place a redistricting initiative on the North Dakota ballot. The plaintiffs challenged

North Dakota's constitutional and statutory signature requirements, arguing that a state of

emergency declared by the North Dakota governor in response to coronavirus pandemic

infringed on their First and Fourteenth Amendment rights. The Court rejected that argument.

Page 25 -    BECCA UHERBELAU AND OUR OREGON'S OPPOSITION TO MOTION
FOR A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION

Further, even assuming the pandemic's impact on in-person signature gathering created a severe burden for NDVF beginning in March, strict scrutiny still is not warranted here.  That is so because the *Anderson-Burdick* framework mandates analysis of a ballot-access scheme as a whole.  Critically, North Dakota law allows for circulation of a petition for up to one year following approval. Despite knowing that the 2020 general election presented the final opportunity to implement legislative redistricting reform for the next decade, NDVF waited until four months before the July 6, 2020 signature deadline to submit a proposed petition.  After the Secretary returned the petition with corrections, NDVF waited another month and a half before submitting its revised petition, leaving a mere 67 days to gather signatures. So NDVF's predicament is largely attributable to its own delay.

*Id.* at *6 (citations omitted); *see also Morgan v. White*, 2020 WL 2526484 at *6 (N.D. Ill. May 18, 2020) (rejecting challenge to Illinois constitutional and statutory signature requirements because "Plaintiffs have not established that it is state law, rather than their own 16-month delay, that imposes a severe burden on their First Amendment rights, even in the context of the COVID-19 pandemic").

### D.    Plaintiffs Seek an Unfair and Improper Advantage.

Plaintiffs ask the Court to allow them to play by their own, special, rules.  Plaintiffs downplay that it is the signature threshold in Article IV, section 1(2)(c) and the filing deadline in Article IV, section 1(2)(e) of the Oregon Constitution that they seek to evade.  Instead, they focus on the Governor's executive orders.  But, as was discussed above, those content-neutral executive orders did not prohibit in-person signature collection or other methods of obtaining signatures, and at least three campaigns continued their (successful) in-person signature collection efforts after the executive orders were in place.  Even in the cases on which Plaintiffs so heavily rely, courts have refused to find *constitutional* signature requirements improper.  *See, e.g.*, *Fair Maps Nevada v. Cegavske*, 2020 WL 2798018, at *16 (D. Nev. May 29, 2020) (court, when modifying statutory filing deadline that was six weeks earlier than constitutional filing

Page 26 -    BECCA UHERBELAU AND OUR OREGON'S OPPOSITION TO MOTION
                 FOR A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION

deadline, concluding statute is not narrowly tailored, because "the deadline it imposes is not required by Nevada's constitution"); *id.* at *15 (writing that the statute "in not narrowly tailored because extending the Deadline by six weeks . . . would not even push back the deadline to the deadline required by Nevada's constitution"); *id*. at *16 n. 20 ("the Court assumes without deciding the result of this finding is the deadline will revert to the constitutional deadline").

Plaintiffs seek an advantage that would be unfair.  The campaigns to qualify IP 34 and IP 44 were able to comply with the applicable constitutional requirements.  Those campaigns planned ahead, did not wait until late in the cycle to file their initiatives, and organized well-financed and well-run efforts.  The sponsors of those initiatives incurred substantial expense in so doing.  The IP 57 campaign seeks preferential treatment.  It wants to be the beneficiary of different legal standards, merely because it was not diligent from the outset.  They ask the court – at this very late date – to create a two-tiered system from which *only* Plaintiffs will benefit. Under Plaintiffs' proposal, campaigns that plan ahead, comply with the rules, and budget appropriately would be held to a higher standard than campaigns that are disorganized and delay. Unger Decl., ¶ 16; Kaufman Decl., ¶ 18; Uherbelau Decl, ¶ 12.  The law does not countenance such an unjust result.

The relief Plaintiffs seek also would give them an advantage in the upcoming election. As discussed above, Oregon voters included signature thresholds and filing deadlines to ensure that initiative petitions have significant grassroots support.  It is not supposed to be easy to amend the Oregon Constitution.  IP 57's opponents  should be able to reasonably rely on the signature thresholds and deadlines in the Oregon Constitution as a necessary filter to prevent initiative petitions that lack widespread public support – such as IP 57 – from qualifying for the ballot.  Statewide ballot measure campaigns can run into the tens of millions of dollars and

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. FIFTH STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

require extensive resources.  Uherbelau Decl., ¶ 14.  The opposition to IP 57 should not be forced to incur such expense in the absence of clear, timely support for IP 57.  The constitution sets signature thresholds to determine what qualifies as adequate support, and Plaintiffs have fallen far short of the applicable threshold.

The November 2020 election is less than four months away.  Pulling together an opposition coalition is a complex, time-consuming process.  In less than two months, Voters' Pamphlet statements are due and explanatory statements must be finalized.  The filing deadline in the Oregon Constitution provides advocates with the necessary time to determine whether they need to prepare for an election contest.  Delay prejudices the opponents' rights.  Uherbelau Decl., ¶ 13.

Finally, if the Plaintiffs were able to obtain the relief that they seek here, that would dramatically alter the initiative process landscape moving forward.  Proponents seeking to qualify initiatives in the future would demand their own exceptions to the requirements set in the Oregon Constitution, which would significantly impact how campaigns to qualify initiative petitions would be run and would seriously undermine the integrity of Oregon's voter-approved initiative system.

## CONCLUSION

For the reasons set forth above, Ms. Uherbelau and Our Oregon respectfully request that the Court deny Plaintiffs' motion and dismiss this case with prejudice.

Page 28 -   BECCA UHERBELAU AND OUR OREGON'S OPPOSITION TO MOTION
               FOR A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION

DATED this 9th day of July, 2020.

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.

By: s/ Lydia Anderson-Dana
    **Steven C. Berman**, OSB No. 951769
    Email: sberman@stollberne.com
    **Lydia Anderson-Dana**, OSB No. 166167
    Email: landersondana@stollberne.com

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. Oak Street, Suite 500
Portland, Oregon 97204
Telephone:    (503) 227-1600
Facsimile:    (503) 227-6840

Attorneys for Our Oregon and Becca Uherbelau

Page 29 -  BECCA UHERBELAU AND OUR OREGON'S OPPOSITION TO MOTION
             FOR A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION