**Steven C. Berman**, OSB No. 951769
Email:  sberman@stollberne.com
**Lydia Anderson-Dana**, OSB No. 166167
Email:  landersondana@stollberne.com
STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. Oak Street, Suite 500
Portland, Oregon 97204
Telephone:     (503) 227-1600
Facsimile:     (503) 227-6840

Attorneys for Our Oregon and Becca Uherbelau

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| PEOPLE NOT POLITICIANS OREGON, COMMON CAUSE, LEAGUE OF WOMEN VOTERS OF OREGON, NAACP OF EUGENE/SPRINGFIELD, INDEPENDENT PARTY OF OREGON, and C. NORMAN TURRILL, <br><br> Plaintiffs, <br><br> v. <br><br> BEVERLY CLARNO, OREGON SECRETARY OF STATE, <br><br> Defendant. | Case No. 6:20-cv-01053-MC <br><br><br> DECLARATION OF BEN UNGER |

I, Ben Unger, declare as follows:

1.      I am a campaign consultant with extensive experience with the process for

qualifying initiatives for the Oregon ballot.

2.      In the course of my professional career, I have served as a Special Assistant to

the Oregon Attorney General, as the Executive Director of the Oregon Senate Democratic

Page 1 -      **DECLARATION OF BEN UNGER**

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

Exhibit C
Page 1 of 9

Leadership Fund, and as a representative in the Oregon State Legislature.  In 2011, I also was the director of Portlanders for Schools, a campaign committee to pass a Portland ballot measure to provide funding for Portland area schools.

3.      From June 2014 through June 2018, I was the Executive Director of Our Oregon.

4.      During my time at Our Oregon, I managed and oversaw Our Oregon's watchdog efforts in monitoring signature collection, turn-in and verification for myriad statewide initiative and referendum petitions filed over three election cycles.  Those included Referendum 301 [Measure 88] (2014); Initiative Petition 55 [Measure 90] (2014); Referendum 301 [Measure 101] (2018); IP 1 [Measure 106] (2018); IP 22 [Measure 105] (2018); IP 31 [Measure 90] (2014); and IP 37 [Measure 103] (2018).

5.      As Executive Director of Our Oregon, I also participated in many statewide initiative campaigns.   As discussed below, I was the chief petitioner for IP 28 [Measure 97] (2018) and I oversaw the process of qualifying IP 28 (2016) for the November 2016 General Election ballot.

6.       For this election cycle, I am the general consultant for the successful campaign to qualify Initiative Petition 34 for the 2020 General Election cycle.

7.       Based on my experience, I am quite familiar with the steps and efforts that are necessary to qualify a statewide initiative petition for the general election ballot.

8.      From my review of the Complaint, Motion for Preliminary Injunction and Declarations submitted by the Plaintiffs in this case, and my review of all the publicly submitted information provided by the IP 57 initiative qualification campaign available on the Secretary of State's website, it is my unequivocal conclusion that IP 57 would not have been able to collect a sufficient number of valid signatures to qualify for the November 3, 2020 General Election ballot

Page 2 -      **DECLARATION OF BEN UNGER**

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

Exhibit C
Page 2 of 9

even if there were no coronavirus pandemic.  Based on the information provided by the
Plaintiffs, IP 57 never had a viable plan to qualify for the ballot.  The pandemic is not the reason
IP 57 did not qualify for the ballot.  Even in the world we all want, where no pandemic exists, IP
57 simply did not have the necessary infrastructure or funding in place to qualify.  My
conclusion is based on the following factors:

a.     The initiative campaign for IP 57 did not start early enough.  Under
Oregon law, an elector can file an initiative petition at more than two years before the
General Election on which the initiative would appear on the ballot.  In fact, the first
initiative petition for the November 3, 2020 general election, ("IP 1") was filed on
February 2, 2018.

b.     The later in an election cycle an initiative is filed, the more difficult and
more expensive it will be for it to qualify.  There are multiple steps in the process before
an initiative petition can be circulated.  Importantly, a prospective initiative petition must
go through the ballot title process before signatures may be collected.  The ballot title
process can often take months.  After the chief petitioners have submitted 1,000 valid
"sponsorship" signatures, the Attorney General drafts a ballot title, there is a public
comment period, the Attorney General then certifies a ballot title, and then that title goes
through Supreme Court review.  Ballot titles can take several months to be resolved.  An
initiative petition campaign must plan for all those steps in the process.

c.     The Chief Petitioners for IP 57 did not file their proposed initiative
petition until November 12, 2019.  This was very late in the process and means that they
would be facing an uphill battle in obtaining sufficient signatures to qualify the initiative
in the best of circumstances.  In contrast, the Chief Petitioners for IP 34 filed their

Page 3 -      **DECLARATION OF BEN UNGER**

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

Exhibit C
Page 3 of 9

initiative on July 2, 2019.  In other words, the Chief Petitioners for IP 34 got a four-month head start on the Chief Petitioners for IP 57.  When I ran the initiative qualification effort for IP 28 (2016), we filed the initiative petition in February 2015 – almost nineteen months before signatures were due. (All this information is available on the Oregon Secretary of State's publicly accessible Initiative, Referendum and Referral database on the Secretary of State's website, at

http://egov.sos.state.or.us/elec/web_irr_search.search_form).

      d.     The delay in beginning the initiative process for IP 57 is particularly difficult to explain, given that these proponents of redistricting have been contemplating a redistricting initiative for years.  In fact, a national proponent associated with the IP 57 campaign approached me about possibly running a similar initiative petition during the 2018 election cycle.

      e.     The Chief Petitioners for IP 57 offer no explanation for why they chose to start so late in the process, but I suspect it was in part because of "ballot title" shopping. IP 57 was not the first redistricting initiative filed this election cycle, and when the chief petitioners for IP 57 filed that initiative, they also filed IP 58 and IP 59, two similar redistricting initiatives.  Likewise, IP 5 (2020) was a similar redistricting initiative.  That initiative was filed on June 19, 2018.  It received a final ballot title on September 4, 2019. The Chief Petitioners for IP 5 withdrew their initiative on October 31, 2019.  The Chief Petitioners for IP 57 filed their initiative less than two weeks later.  (This information is available on the Oregon Secretary of State's Initiative, Referendum and Referral database).

Page 4 **-**      **DECLARATION OF BEN UNGER**

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

Exhibit C
Page 4 of 9

f.    The Chief Petitioners for IP 57 cannot legitimately complain of delay in the ballot title process.  The Oregon Supreme Court resolved the ballot title challenge for IP 57 in less than six weeks.  This is an incredibly fast turn-around for a ballot title challenge.  (In contrast, it took the Oregon Supreme Court almost eight months to resolve the ballot title challenge for IP 5).

g.    The Chief Petitioners for IP 57 did not obtain sufficient funding to qualify their measure.   Successful campaigns develop a plan to gather the required signatures before the titling process begins and must be prepared to make adjustments for contingencies such as a prolonged legal challenge on the title. This should include a fundraising plan with enough cash on hand to qualify the measure once the title is certified.  Mr. Blazak, in his declaration, concedes that one factor an initiative needs to qualify for the ballot is "adequate funding" and that to qualify IP 57, on the very short timeline they set for themselves, a paid signature collection effort would have been necessary.  Any such paid signature effort would cost in excess of $1,000,000, especially to qualify an initiative to amend the Oregon Constitution (which requires 149,360 valid signatures) on such short timeline.  According to the Secretary of State's publicly accessible ORESTAR campaign finance reporting system, the IP 57 campaign raised only slightly over $500,000 for *all* purposes, not just signature circulation.  Their funding fell far short.

h.    Moreover, given the late filing date for IP 57, the only way the initiative ever could have qualified under normal circumstances (meaning with no pandemic) would have been if the chief petitioners had lined up sufficient funding, and had contracted with a qualified, experienced petition circulating firm, with circulators ready

Page 5 -        **DECLARATION OF BEN UNGER**

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

Exhibit C
Page 5 of 9

to obtain secretary of state approval and ready to hit the streets, well in advance of when the initiative was authorized to be circulated.

      i.    Even if all those factors had been in place, obtaining the necessary signatures would have been a herculean effort. However, based on the declarations provided by the plaintiffs, it appears that the supporters of IP 57 had no such plan in place. Rather, Mr. Turrill's declaration makes clear that by early March (before the pandemic hit Oregon), the IP 57 campaign still had not hired or decided upon who would run a paid signature collection effort. In my opinion, this was a significant shortcoming on the part of whoever was advising Mr. Turrill or the campaign.

      j.    There are other factors that indicate that IP 57's signature collection efforts would never be sufficient to meet the qualification requirements. For example, after the Chief Petitioners filed IP 57 on November 12, 2019, it took the campaign until December 5, 2019 – over four weeks – to obtain and submit the required 1,000 sponsorship signatures. (In contrast, it took the chief petitioners for IP 34 just two weeks to obtain the necessary sponsorship signatures and this number of signatures can be gathered in one day by a well-run, strongly supported, or well-funded campaign). IP 57's painfully slow collection of sponsorship signatures indicates that campaign consultants did not have a skilled or robust signature collection effort in place or an effective plan to qualify for the ballot.

9.    The signatures efforts by IP 57 after the pandemic were similarly lackluster. For example:

Page 6 -     **DECLARATION OF BEN UNGER**

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

Exhibit C
Page 6 of 9

a.    IP 57 received a final ballot title on March 27, 2020.  However, the campaign waited almost two weeks to get approval to circulate the initiatives.  That delay is inexplicable given the timeline.

b.    The campaign apparently did not make any effort to conduct signature circulation until almost two months after they obtained a final ballot title, when the IP 57 campaign sent out a bulk mailing in late May.  These two months of inactivity, with the deadline approaching and the pandemic swirling, is a mindboggling delay.

c.    In contrast, for IP 34, the campaign temporarily halted in-person signature collection in mid-March, to adopt new safety protocols that would account for social distancing.  However, I immediately was in touch with the Secretary of State's office for guidance about how to best proceed with signature collection by mail and via the internet.  After the campaign adjusted its approach, and with clarification from the Secretary of State's office about how to proceed with mail-in signature collection, we were able to restart our efforts.  By April, we sent out a targeted mailing, and resumed our in-person signature collection campaign.

d.    Contrary to arguments made in the Plaintiffs' legal papers, face-to-face signature collection was never prohibited by any of the Governor's stay-at-home orders.  After a delay for safety preparation, the IP 34 campaign conducted in-person signature collection in counties in Phase 1 re-opening through the end of June.  Even Mr. Turrill acknowledges in his declaration, at paragraph 13, that it was his understanding that "general public signature solicitation had not been prohibited."

10.    The response to IP 57's by mail signature effort indicates that IP 57 never had sufficient support to qualify the measure.  Mr. Blazak claims, at paragraph 7 of his declaration,

Page 7 -    **DECLARATION OF BEN UNGER**

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

Exhibit C
Page 7 of 9

that that the rate of return for the IP 57 mail-in sheets was 6%, which he characterizes as "excellent." That is a mischaracterization. The rate of return for IP 34's targeted mailing was almost twice that much, 11.4%.

11. There were also a number of other shortcomings with IP 57's mail-in signature effort that are not the result of the pandemic. For example, IP 57 did not appear to have any significant follow-up to accompany its mailing effort. Any successful mail effort (in non-pandemic times) requires follow-up to electors. For IP 34, we had and exercised a detailed plan to contact potential petition signers both before and after we sent out our mailing, to encourage them to sign and return the petition.

12. In contrast to IP 57, for IP 34 we took a number of steps to ensure that the measure would qualify. In particular: IP 34 filed its proposed initiative four months earlier; had a signature collection strategy (and funding) in place early on; and did not wait until the eleventh hour to begin signature collection.

13. IP 34 is not the only initiative petition to qualify this election cycle. Initiative Petition 44 also has qualified. As with IP 34, the chief petitioners for IP 44 filed the initiative in August 2019, months before IP 57 filed its petition. As with IP 34, the chief petitioners for IP 44 had secured funding and had a signature collection plan (with a paid signature collection firm) in place well in advance of the deadline. And, as with IP 34, in-person signature collection efforts continued through June. In fact, the campaign for IP 44 was so well run that it submitted signatures and qualified before the signature filing deadline.

14. The success of the IP 34 and IP 44 signature collection efforts belies the Plaintiffs' assertion that signature collection was impossible or otherwise unmanageable during this election cycle.

Page 8 -        **DECLARATION OF BEN UNGER**

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

Exhibit C
Page 8 of 9

15.    As discussed above, it is apparent that IP 57 lacked the campaign structure, organizational foresight and necessary funding to complete a successful initiative petition signature collection drive under any circumstances.  Poor planning, insufficient organization, inadequate funding and lack of public support are the reasons the IP 57 campaign could not obtain sufficient signatures before the constitutional deadline.  No Secretary of State rule prevented the IP 57 campaign from collecting signatures. A reasonably run campaign could have qualified for the ballot.

16.    Finally, it would be unfair for the IP 57 campaign to get to play by a different set of rules than the IP 34 campaign or any other campaign during the election cycle.  The sponsors of IP 34 incurred significant expense to qualify their initiative under the established constitutional provisions, laws and regulations that are in place.  The IP 57 campaign should not receive preferential treatment, or be the beneficiaries of different legal standards, merely because it was not diligent from the outset.  The effect of that would be a two-tiered system, where campaigns that play by the rules, plan ahead, and budget accordingly are effectively held to a higher standard than campaigns that are disorganized and delay.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED this 8th day of July, 2020.


s/ Ben Unger
_____
Ben Unger


Page 9 -    **DECLARATION OF BEN UNGER**

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

Exhibit C
Page 9 of 9