**Steven C. Berman**, OSB No. 951769
Email: sberman@stollberne.com
**Lydia Anderson-Dana**, OSB No. 166167
Email: landersondana@stollberne.com
STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. Oak Street, Suite 500
Portland, Oregon 97204
Telephone: (503) 227-1600
Facsimile: (503) 227-6840

Attorneys for Our Oregon and Becca Uherbelau

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| PEOPLE NOT POLITICIANS OREGON, COMMON CAUSE, LEAGUE OF WOMEN VOTERS OF OREGON, NAACP OF EUGENE/SPRINGFIELD, INDEPENDENT PARTY OF OREGON, and C. NORMAN TURRILL,<br><br>Plaintiffs,<br><br>v.<br><br>BEVERLY CLARNO, OREGON SECRETARY OF STATE,<br><br>Defendant. | Case No. 6:20-cv-01053-MC<br><br>DECLARATION OF ELIZABETH KAUFMAN |

I, Elizabeth Kaufman, declare as follows:

1. I am a campaign and grassroots organizer, with extensive experience with the process for qualifying statewide initiatives for the Oregon ballot. I am also an Oregon elector and reside in Oregon.

Page 1 -   **DECLARATION OF ELIZABETH KAUFMAN**

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

Exhibit D
Page 1 of 6

2.  I have been the campaign manager or consultant for many statewide initiative campaigns. Over the past six years, I have been the manager or consultant on three different Oregon statewide ballot initiatives. I directed the initiative qualification effort and campaign for Initiative Petition 53 [Measure 91] (2014), which legalized the possession and sale of recreational marijuana. I also directed the initiative qualification effort and campaign for Initiative Petition 65 [Measure 98] (2016), the Oregonians for High School Success Initiative. Both initiatives were approved by the voters.

3.  For this election cycle, I am the campaign director for the successful campaign to qualify Initiative Petition 44 for the 2020 General Election cycle.

4.  Based on my experience, I am quite familiar with the steps and efforts that are necessary to qualify a statewide initiative petition for the general election ballot.

5.  It is my opinion that IP 57 would not have been able to collect a sufficient number of valid signatures to qualify for the November 3, 2020 General Election ballot even if there were no coronavirus pandemic. Based on the information provided by the Plaintiffs, IP 57 never had a viable plan to qualify for the ballot.

6.  The initiative campaign for IP 57 did not start early enough. The later in an election cycle an initiative is filed, the more difficult and more expensive it will be for it to qualify. The Chief Petitioners for IP 57 did not file their proposed initiative petition until November 12, 2019. This was very late in the process and means that they would be facing an uphill battle in obtaining sufficient signatures to qualify the initiative in the best of circumstances. The Chief Petitioners for IP 44 filed their initiative on August 15, 2019. IP 44 got a three-month head start on IP 57.

Page 2 -    **DECLARATION OF ELIZABETH KAUFMAN**

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

Exhibit D
Page 2 of 6

7.      The Chief Petitioners for IP 57 cannot legitimately complain of delay in the ballot title process.  The Oregon Supreme Court resolved the ballot title challenge for IP 57 in less than six weeks.  This is a very fast turn-around for a ballot title challenge.  In my experience, it can take months for a ballot title challenge to be resolved.

8.      With the late filing date for IP 57, the only way the initiative ever could have qualified under normal circumstances would have been if the chief petitioners had lined up sufficient funding, and had contracted with a qualified, experienced petition circulating firm, with circulators ready to obtain Secretary of State approval and available to begin signature collection, well in advance of when the initiative was authorized to be circulated.  Even if all those factors had been in place, obtaining the necessary signatures would have been a substantial effort that would have had limited likelihood of success.

9.      By way of comparison, our signature collection efforts for IP 53 (2014) also got a late start.  That initiative was not filed until January 28, 2014 and did not receive a final ballot title until late March 2014.  When I was hired to run the campaign for IP 53, I know signature collection would be a challenge.  The campaign contracted with Ted Blazak's NW Democracy Resources for its paid signature collection efforts.  Knowing that it would be a push to get the required number of signatures before the July submission deadline, the campaign retained Mr. Blazak before the ballot title was finalized, so that his signature collectors could hit the streets immediately upon the campaign's receipt of the final ballot title.

10.     Given that IP 57 had less funding than IP 53 (2014), received its final ballot title later than did IP 53 (2014), and needed to obtain over 60,000 more valid signatures than did IP 53 (2014), it seems highly improbable that IP 57 could have qualified for the November 2020 ballot under normal circumstances (meaning with no pandemic).  For the IP 53 (2014) campaign,

Page 3 -      **DECLARATION OF ELIZABETH KAUFMAN**

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

Exhibit D
Page 3 of 6

Mr. Blazak's NW Democracy Resources received $584,753.92 for its paid signature collection efforts. With well over half a million dollars, Mr. Blazak's campaign was able to collect only 88,584 valid signatures. (The signature validity rate for that campaign was 64.41%). The signature collection effort for IP 53 (2014), while successful, barely made it over the finish line. IP 53 (2014) needed 87,213 signatures to qualify that statutory initiative. With three months to collect signatures and a substantial budget, the signature collection effort for IP 53 (2014) was able to collect only 88,584 valid signatures, or approximately 7,400 signatures a week. For IP 57 to qualify for the November 2020 ballot, because it is a constitutional amendment, the IP 57 campaign would have had to collect almost twice as many valid signature as IP 53 (2014), a total of 149,360 signatures as opposed to the 87,213 signatures required to qualify IP 53 (2014).

    11.    The signatures collection efforts by IP 57 after the pandemic were not diligent. For example:

    a.    IP 57 received a final ballot title on March 27, 2020. However, the campaign waited almost two weeks to get approval to circulate the initiatives.

    b.    The campaign apparently did not make any effort to conduct signature circulation until almost two months after they obtained a final ballot title, when the IP 57 campaign sent out a bulk mailing in late May. These two months of inactivity were not reasonable, given the approaching submission deadline.

    c.    In contrast, for IP 44, the campaign temporarily halted in-person signature collection in mid-March, to adopt new safety protocols that would account for social distancing. After the campaign adjusted its approach, we were able to restart our efforts. By April, we resumed our in-person signature collection campaign.

Page 4 -    **DECLARATION OF ELIZABETH KAUFMAN**

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

Exhibit D
Page 4 of 6

      d.      Signature collection was never prohibited by any of the Governor's stay-at-home orders. After a delay for safety preparation, the IP 44 campaign conducted in-person signature collection in counties in Phase 1 re-opening through the end of June.

12.      The 6% response to IP 57's by mail signature effort indicates that IP 57 never had sufficient support to qualify the measure. The rate of return for IP 44's targeted mailing was almost twice that much, 11.4%.

13.      There were also a number of other shortcomings with IP 57's mail-in signature effort that are not the result of the pandemic. For example, IP 57 did not appear to have any significant follow-up to accompany its mailing effort. Any successful mail effort requires follow-up to electors.

14.      In contrast to IP 57, for IP 44 we took a number of steps to ensure that the measure would qualify. In particular: IP 44 filed its proposed initiative three months earlier than did IP 57; IP 44 had a signature collection strategy (and funding) in place early on; and IP 44 did not wait until the end of the election cycle to begin signature collection.

15.      IP 44 is not the only initiative petition to qualify this election cycle. Initiative Petition 34 also has qualified. As with IP 44, the chief petitioners for IP 34 filed the initiative in July 2019, months before IP 57 filed its petition. As with IP 44, the chief petitioners for IP 34 had secured funding and had a signature collection plan (with a paid signature collection firm) in place well in advance of the deadline. And, as with IP 34, in-person signature collection efforts for IP 44 continued through June. In fact, the campaign for IP 44 was able to submit signatures and qualified before the signature filing deadline.

Page 5 -      **DECLARATION OF ELIZABETH KAUFMAN**

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600  FAX (503) 227-6840

Exhibit D
Page 5 of 6

16. The success of the IP 34 and IP 44 signature collection efforts belies the Plaintiffs' assertion that signature collection was impossible or otherwise unmanageable during this election cycle.

17. No Secretary of State rule prevented the IP 57 campaign from collecting signatures. A reasonably run campaign could have qualified for the ballot.

18. Finally, it would be unfair for the IP 57 campaign to get to play by a different set of rules than the IP 44 campaign or any other campaign during the election cycle. The sponsors of IP 44 incurred significant expense to qualify their initiative under the established constitutional provisions, laws and regulations that are in place. The IP 57 campaign should not receive preferential treatment, or be the beneficiaries of different legal standards, merely because it was not diligent from the outset. The effect of that would be a two-tiered system, where campaigns that play by the rules, plan ahead, and budget accordingly are effectively held to a higher standard than campaigns that are disorganized and delay.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED this 8th day of July, 2020.

s/ Elizabeth Kaufman
Elizabeth Kaufman

Page 6 -   **DECLARATION OF ELIZABETH KAUFMAN**

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600  FAX (503) 227-6840

Exhibit D
Page 6 of 6