ELLEN F. ROSENBLUM
Attorney General
CHRISTINA L. BEATTY-WALTERS  #981634
BRIAN SIMMONDS MARSHALL #196129
Assistant Attorneys General
Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email:  Tina.BeattyWalters@doj.state.or.us
            Brian.S.Marshall@doj.state.or.us

Attorneys for Defendant Secretary Beverly Clarno

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| PEOPLE NOT POLITICIANS OREGON, COMMON CAUSE, LEAGUE OF WOMEN VOTERS OF OREGON, NAACP OF EUGENE/SPRINGFIELD, INDEPENDENT PARTY OF OREGON, and C. NORMAN TURRILL,<br>s<br><br>                    Plaintiffs,<br><br>            v.<br><br>BEVERLY CLARNO, OREGON SECRETARY OF STATE,<br><br>                    Defendant. | Case No.  6:20-cv-01053-MC<br><br>DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |

## TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................... 1

II.     STATEMENT OF FACTS ........................................................................... 2

        A.      Oregon's Initiative Process ............................................................... 2

        B.      Pandemic and Emergency Declarations ............................................ 4

        C.      Initiative Petition 57 ........................................................................ 6

        D.      The 2020 General Election ............................................................... 9

III.    ARGUMENT .............................................................................................. 10

        A.      Preliminary Injunction Standard ................................................... 10

        B.      Plaintiffs are unlikely to succeed on their claims because Oregon's
                initiative petition requirements comport with the United States
                Constitution ................................................................................... 11

                1.      The legal standards give broad leeway to the State. .............. 11

                2.      The Oregon Constitution's initiative signature and deadline
                        requirements do not create a severe burden on Plaintiffs' First
                        Amendment rights. ............................................................... 15

                        a.      The Oregon constitutional provisions do not restrict one-
                                on-one communications. ............................................. 15

                        b.      The Oregon constitutional provisions do not otherwise
                                create a severe burden. ............................................... 16

                3.      The Oregon Constitution's initiative requirements further
                        important state interests. ....................................................... 22

                4.      A preliminary injunction is barred by laches ........................ 25

        C.      The requirements of the Oregon Constitution do not irreparably harm
                plaintiffs. ....................................................................................... 27

        D.      The balancing of the harms and public interest favor the Secretary. .... 28

IV.     CONCLUSION ........................................................................................... 34

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ........................................................ 17, 18

*Angle v. Miller*, 673 F.3d 1122 (9th Cir. 2012) ............................................. 11, 13, 14, 16, 18, 21

*Arizona Green Party v. Reagan*, 838 F.3d 983 (9th Cir. 2016) .............................................. 30, 33

*Arizona Libertarian Party v. Reagan*, 189 F. Supp. 3d 920 (D. Ariz. 2016) .................. 25, 26, 27

*Arizonans for Fair Elections v. Hobbs*, No. CV-20-00658-PHX-DWL, 2020 WL 1905747 (D. Ariz. Apr. 17, 2020) ................................................ 14, 15, 19, 28, 29

*Bambenek v. White*, No. 3:20-cv-03107, 2020 WL 2123951 (C.D. Ill. May 1, 2020) .......... 12, 15

*Baum v. Newbry*, 200 Or. 576 (1954) ........................................................................... 28

*Benisek v. Lamone*, 138 S. Ct. 1942 (2018) .................................................................. 25

*California by and through Becerra v. Azar*, 950 F.3d 1067 (9th Cir. 2020) ............................... 10

*Chula Vista Citizens for Jobs & Fair Competition v. Norris*, 782 F.3d 520 (9th Cir. 2015) ...................................................................................................................... 12

*Common Sense Party v. Padilla,* No. 20-cv-01091-MCE-EFB, 2020 WL 3491041 (E.D. Cal. June 26, 2020) ...................................................................................................... 15

*Couveau v. Am. Airlines, Inc.*, 218 F.3d 1078 (9th Cir. 2000) ..................................... 25

*Dobrovolny v. Moore*, 126 F.3d 1111 (8th Cir. 1997) .................................................. 12

*Ecumenical Ministries of Oregon v. Oregon State Lottery Comm'n*, 318 Or. 551 (1994) .......... 24

*Evergreen Safety Council v. RSA Network Inc.*, 697 F.3d 1221 (9th Cir. 2012) ......................... 25

*Fair Maps Nev.,* 2020 WL 2798018 .............................................................................. 19

*Fanus v. Premo*, No. 6:14-CV-00935-AA, 2014 WL 52800272 (D. Or. Oct. 10, 2014) ............. 11

*Garcia v. Google, Inc.*, 786 F.3d 733 (9th Cir. 2015) .................................................... 10

*Garcia v. Griswold*, No. 20-cv-1268-WJM, 2020 WL 2505888 (D. Colo. May 7, 2020) 15, 25, 30

*Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082 (10th Cir. 2006) ................................... 12

*John Doe No. 1 v. Reed*, 561 U.S. 186 (2010) ............................................................... 13

*Katie A., ex rel. Ludin v. Los Angeles Cty.*, 481 F.3d 1150 (9th Cir. 2007) ................................ 11

*Kays v. McCall*, 244 Or. 361 (1966) ........................................................................ 23, 29

*Kellaher v. Kozer*, 112 Or. 149 (1924) ......................................................................... 17

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

*Lair v. Bullock*, 697 F.3d 1200 (9th Cir. 2012)........................................................ 10, 29

*League of United Latin Am. Citizens v. Perry*, 548 U.S. 399 (2006) ........................... 27

*Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579 (6th Cir. 2006) ........................ 18

*Lyons v. City of Columbus*, No. 2:20-cv-3070, 2020 WL 3396319 (June 19, 2020)....... 15, 25, 26

*McCarter v. Brown*, No. 6:20-cv-01048-MC (D. Or., filed June 30, 2020) ................................. 2

*Merill v. People First of Ala.*, 589 U.S. ---, No. 19A1063, 2020 WL 3604049 (July 2, 2020) ................................................................................................... 30

*Meyer v. Bradbury*, 341 Or 288 (2006) ...................................................... 14, 23

*Miller v. Thurston*, No. 5:20-CV-05070, 2020 WL 2617312 (W.D. Ark. May 25, 2020)..... 14, 15

*Molinari v. Bloomberg*, 564 F.3d 587 (2d Cir. 2009) .................................................. 12

*Nader v. Brewer*, 531 F.3d 1028 (9th Cir. 2008) ..................................................... 17, 18

*Perry v. Perez*, 565 U.S. 388 (2012) ..................................................................... 10

*Pest Comm. v. Miller*, 626 F.3d 1097 (9th Cir. 2010) .......................................... 14, 16

*Prete v. Bradbury,* 438 F.3d 949 (9th Cir. 2006) .................................................... 13

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) .............................................................. 29, 30

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205 (Apr. 6, 2020) ............. 30

*Rubin v. City of Santa Monica*, 308 F.3d 1008 (9th Cir. 2002) .................................... 14

*SawariMedia, LLC v. Whitmer,* Case No. 4:20-cv-11246-MFL-MJH, 2020 WL 3097266, at *11 (E.D. Mich. June 11, 2020), stay denied __ F.3d __, 2020 WL 3603684 (6th Cir. July 2, 2020) ................................................................... 20

*Shell Offshore, Inc. v. Greenpeace, Inc.,* 709 F.3d 1281 (9th Cir. 2013) ..................... 10

*Short v. Brown*, 893 F.3d 671 (9th Cir. 2018) ...................................................... 10, 30

*Sinner v. Jaeger*, No. 3:20-cv-00076, 2020 WL 3244143 (D.N.D. June 15, 2020) ............. 14, 19

*Stanley v. Univ. of S. Cal.*, 13 F.3d 1313 (9th Cir. 1994) ........................................ 11

*Thompson v. DeWine*, 959 F.3d 804 (6th Cir. 2020) ............................... 14, 15, 20, 21, 28, 29, 30

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997) ................................... 13

*Uherbelau, et al. v. Clarno*, No. 20-CV-13939 .................................................... 7

*Wasson v. Clarno*, Marion County Cir. Ct. No. 20-cv-14604 (Ct. App. Or., filed July 2, 2020) .................................................................................................. 2

Page iii

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) .................................................................... 10

**Statutes**

Nev. Rev. Stat. § 295.056 ............................................................................................................ 19

Or. Rev. Stat. § 249.740 .............................................................................................................. 13

Or. Rev. Stat. § 250.105 ................................................................................................................ 4

Or. Rev. Stat. § 250.105(3) ..................................................................................................... 4, 31

Or. Rev. Stat. § 250.127 ................................................................................................................ 9

Or. Rev. Stat. § 250.127(5) ..................................................................................................... 9, 24

Or. Rev. Stat. § 250.131(2) ........................................................................................................... 9

Or. Rev. Stat. § 250.205(4) ......................................................................................................... 31

Or. Rev. Stat. § 251.049 .............................................................................................................. 33

Or. Rev. Stat. § 251.205 ................................................................................................................ 9

Or. Rev. Stat. § 251.205(3) ......................................................................................................... 33

Or. Rev. Stat. § 251.205, 251.215 ................................................................................................ 9

Or. Rev. Stat. § 251.215 .............................................................................................................. 24

Or. Rev. Stat. § 251.215(3) ......................................................................................................... 33

Or. Rev. Stat. § 253.065(1)(a) ..................................................................................................... 32

Or. Rev. Stat. § 254.085 .............................................................................................................. 10

Or. Rev. Stat. § 255.165 .............................................................................................................. 31

**United States Code**

52 U.S.C. § 20302(a)(8)(A) ................................................................................................... 10, 32

**Rules and Regulations**

Or. Admin. Reg. 165-014-0005 ..................................................................................................... 3

**Constitutional Provisions**

Ariz. Const., art. XXI, § 1 ........................................................................................................... 16

Cal. Const. art. II, § 5 .................................................................................................................. 16

Mont. art. XIV, § 9(1) ................................................................................................................. 17

Mont. Const. art. XIV, § 9 ........................................................................................................... 16

Page iv

Nev. Const. art. 19 § 2 ................................................................................................ 19

Nev. Const. art. 19, §§ 2(2) .................................................................................. 16, 17

Okla. Const. art. V, § 2 .............................................................................................. 16

Or. Const. art. IV, § 1 .......................................................................................... 13, 22

Or. Const. art. IV, § 1(2)(b) ...................................................................................... 31

Or. Const. art. IV, § 1(2)(c) .................................................................................... 2, 16

Or. Const. art. IV, § 1(3)(b) .................................................................................. 22, 29

Or. Const. IV, § 1(2)(e) .............................................................................................. 17

U.S. Const. amend. I ................................................................................ 1, 6, 11, 12, 24

**Other**

*Coronavirus Resource Center*, Johns Hopkins Univ. & Med. ...................................... 4

Executive Order 20-12 .............................................................................................. 5, 6

Executive Order 20-25 ................................................................................................ 6

Executive Order 20-27 ................................................................................................ 6

Executive Order 20-30 ................................................................................................ 5

*Oregon Blue Book: Initiative, Referendum, and Recall* at 1 (2019–2020) ............... 16, 17

State Initiative and Referendum Manual .................................................................... 3

State Voters' Pamphlet Manual at 4 .......................................................................... 24

*The Statesman Journal.* C. Norman Turrill, (Nov. 30, 2018) ...................................... 7

*Timeline of WHO's Response to COVID-19*, (June 30, 2020) ...................................... 5

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

## I.    INTRODUCTION

Two days before the July 2 deadline to submit signatures to the Secretary of State to qualify ballot measures for the November election, Plaintiffs asked this Court to rewrite the Oregon Constitution to give them substantially more time and require far fewer signatures to complete their petition.  They claim the Governor's COVID-19-related Executive Orders made it impossible to collect the requisite number of signatures by the deadline.  But Plaintiffs' failure to secure the requisite number of signatures by July 2 was the result of their own choices, not the result of State action.  Plaintiffs started the initiative petition process late in the election cycle. Consequently, they had less than three months to obtain signatures, rather than the two years that they could have had if they had begun the process earlier.  Then, when the petition was approved for circulation in early April, Plaintiffs chose not to circulate their petition in person.  The Governor's Executive Orders did not prohibit in-person signature gathering but only required social distancing.  Plaintiffs could have chosen, as other petitioners did, to conduct in-person signature gathering.  Finally, Plaintiffs chose to file this lawsuit at the last minute rather than to file earlier when they first recognized the difficulties they now complain of.  Had they done so, Plaintiffs could have requested less drastic relief than enjoining the Oregon Constitution's requirements for amendment.  At every turn, Plaintiffs' failures are their own and are not the result of the Secretary's evenhanded application of the legal requirements for ballot initiatives.

Plaintiffs' motion for preliminary injunction should be denied because they have not met the preliminary injunction requirements.  They are not likely to prevail on the merits because the signature requirement and deadline do not implicate the First Amendment at all.  But even under the standard Plaintiffs propose, the Oregon Constitution's permissive and longstanding signature requirements and deadline for submitting initiative petitions have not severely burdened Plaintiffs.  Initiatives qualify for the ballot regularly, and this year is no exception.  Two measures have qualified for the November election.  Nor has the Governor's response to the pandemic prevented Plaintiffs' initiative from qualifying.  Among other things, Plaintiffs did not

Page 1 -    DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

submit evidence showing that they would have been able to meet the deadline but for the Governor's executive orders. Because the State created no severe burdens for Plaintiffs, the challenged requirements need only further an important regulatory interest. The State of Oregon has a strong interest in ensuring the efficient and fair administration of elections, and both requirements Plaintiffs challenge further that interest. Plaintiffs are also unlikely to prevail because their claims are barred by laches. They simply waited too long to bring this case despite knowing the circumstances about which they now complain for three months.

Because Plaintiffs have suffered no legal injury, Plaintiffs will not be irreparably harmed without immediate relief. The harm about which they complain is largely of their own making. The balancing of the harms and public interest also weigh in the Secretary's favor. Last-minute injunctions of election processes are disfavored. An injunction at this late date would undermine the fairness and efficiency of the election process, undermine state and county officials' administration of the election, and prejudice the electorate's consideration of whether to amend the Oregon Constitution.

## II.    STATEMENT OF FACTS

### A.    Oregon's Initiative Process[1]

The Oregon Constitution provides an initiative and referendum process, which allows, among other things, proposed constitutional amendments to be submitted to popular vote. To qualify a constitutional amendment for the ballot, proponents must file a petition with the Secretary of State and submit signatures of voters who are in favor of the proposed amendment, at least four months before a general election, in the number equal to eight percent of the number of ballots cast in the last gubernatorial election. Or. Const. art. IV, § 1(2)(c). For the 2020

---

[1] At least two other pending cases challenge the legality of the initiative petition process. *See McCarter v. Brown*, No. 6:20-cv-01048-MC (D. Or., filed June 30, 2020) (seeking similar relief for county initiatives); *Wasson v. Clarno*, Emergency Motion for Stay, Marion County Cir. Ct. No. 20-cv-14604 (Ct. App. Or., filed July 2, 2020) (seeking ruling that initiative petitions may span across multiple election cycles).

Page 2 -    DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

general election, this required filing a petition of 149,360 valid signatures by July 2, 2020.  *See* State Initiative and Referendum Manual at 5.[2]

A petitioner may take the initial steps to qualify a petition for the ballot at any time, even years in advance of the election.  *Id.*; Declaration of Summer S. Davis ("Davis Decl.") ¶ 4.  For example, the first initiative petition seeking to qualify for the 2020 ballot was filed on February 6, 2018.  Davis Decl. ¶ 4.  Eight initiatives have already been filed for the *2022* ballot. *Id.*  After filing the petition with a text of the proposed law, petitioners must submit at least 1,000 valid sponsorship signatures, receive a certified ballot title, and receive the Election Division's approval of the cover and signature sheets that will be used to gather signatures. *Id.*  These steps too may be completed at any time, but they are all required before circulating an initiative petition for signatures.  *Id.*

An initiative petition may be approved for circulation at any time after the prior election cycle's deadline to submit signatures.  *See* Davis Decl. ¶ 5; State Initiative and Referendum Manual at 5.  Thus, a petition for the 2020 ballot could have begun circulating for signatures on July 9, 2018.  *See* Davis Decl. ¶ 5; State Initiative and Referendum Manual at 5.  The first petition for the 2020 ballot was approved for circulation October 17, 2018.  *See* Davis Decl. ¶ 5.

Petitioners who complete these initial steps nevertheless often do not qualify their initiatives for the ballot.  For each general election from 2010 to 2018, less than half of initiative petitions that were approved for circulation qualified for the ballot each election cycle.  Davis Decl. ¶ 8.  But at least one-fifth of such petitions did qualify for each election.  *Id.*  Most petitions that qualify for the ballot begin to circulate well before the submission deadline.  Since the 2000 election, 30 initiative petitions proposing constitutional amendments have qualified for the ballot.  *Id.* ¶ 9. Only two of those initiatives were approved for circulation later than March of

---

[2] The provisions of the Manual constitute administrative rules. *See* Or. Admin. R. 165-014-0005. The Manual is available at https://sos.oregon.gov/elections/Documents/stateIR.pdf.

Page 3 -     DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

the election year: Measure 85 (2012), a school funding measure, and Measure 36 (2004), entitled the "Constitutional Definition of Marriage."  *Id.*

A petition that has a sufficient number of signatures may then be submitted for verification at any time before the submission deadline, which is four months before the general election.  *See* Or. Rev. Stat. § 250.105(3).  To efficiently and accurately determine whether a petition has valid signatures to qualify for the ballot, the Secretary uses a statistical sampling methodology that requires Elections Division personnel to individually compare up to 5.01% of the signatures submitted to signatures in the voter registration records.  *See* Or. Rev. Stat. 250.105; Davis Decl. ¶¶ 21–26.  Since 2007, the percentage of valid signatures on petitions submitted for verification has varied from 54% to 86%.  *Id.* ¶ 27.  Just as there is no way to predict precisely what percentage of signatures on a petition are valid, there is no way to reliably determine how long it will take to verify the signatures for a particular petition.  *Id.* ¶ 29.  The time to verify signatures depends in part on how many signatures are submitted, but even the average time to verify each signature varies from petition to petition.  *Id.*  Due the social distancing necessitated by COVID-19, this verification process is taking longer in 2020 than in past years.  *Id.* ¶ 30.

Two initiative petitions have qualified for the 2020 ballot, Initiative Petition 44 ("IP 44") and Initiative Petition 34 ("IP 34").  Davis Decl. ¶ 6.  Those petitions took 12 and 27 working days to verify, respectively.  *Id.* ¶ 31.  Seven other initiative petitions approved for circulation did not qualify for the ballot, including Initiative Petition 57 at issue in this case, and Initiative Petitions 58 and 59, similar petitions submitted by the same chief petitioners.  *Id.* ¶ 7.

### B.    Pandemic and Emergency Declarations

In a matter of months, COVID-19 has infected more than 11 million people worldwide and killed more than 530,000 people.[3]  On March 11, the World Health Organization declared

---

[3] *Coronavirus Resource Center*, Johns Hopkins Univ. & Med., https://coronavirus.jhu.edu/

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

COVID-19 to be a pandemic.[4]  The virus has changed much about how people go about their everyday lives.

Starting in early March, Governor Brown has issued a series of executive orders designed to slow the spread of the virus.  The Governor first declared a state of emergency on March 8, extended it until July 6, and recently extended the state of emergency again until September 4.[5] The Governor has taken necessary steps to protect Oregonians in her orders but the Governor's orders do not target, or even mention, expressive activity, electioneering, or petitioning.

The first executive order that mandated social distancing was Executive Order 20-12, issued on March 23, 2020.[6]  Executive Order 20-12 ordered that "to the maximum extent possible, individuals stay at home or at their place of residence, consistent with the directives set forth in my Executive Orders and guidance issued by the Oregon Health Authority."  Governor Brown further explained, "To that end, pursuant to [statutory authority], I am ordering the following."  The Executive Order then lists activities that were specifically limited or prohibited as part of the order. The order did not mention signature-gathering or other political activities. Importantly for present purposes, the order prohibited social and recreational gatherings but *only* "if a distance of at least six feet between individuals cannot be maintained."  Notably, the order expressly permitted outdoor recreational activities.  Additionally, Executive Order 20-12 required the closure of specified businesses and required office workers to telework if possible. But businesses and industries not specifically listed in the order could stay open, and many, including grocery stores and pharmacies, did so.

---

[4] *Timeline of WHO's Response to COVID-19*, World Health Organization (June 30, 2020), https://www.who.int/news-room/detail/29-06-2020-covidtimeline.

[5] Executive Order 20-30, https://www.oregon.gov/gov/Documents/executive_orders/eo_20-30.pdf.

[6] Oregon Executive Order 20-12 at 2, https://www.oregon.gov/gov/Documents/executive_orders/eo_20-12.pdf.

Page 5 -    DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

On May 14, 2020, Governor Brown issued Executive Order 20-25, which rescinded Executive Order 20-12.[7]  That order loosened some restrictions that had been in place statewide, including by allowing some previously closed businesses to open while conforming to physical distancing guidelines.  And it set up a structure to reopen the remaining businesses and organizations using a phased approach that would be implemented based on local conditions.  *Id.* Like Executive Order 20-12 before it, Executive Order 20-25 provides for baseline counties:  "It is essential to the health, safety, and welfare of the State of Oregon during the ongoing state of emergency that individuals continue to stay at or near their home or place of residence, whenever possible."  *Id*. at 4.  And the order required, among other things, "When individuals leave their home or place of residence, they should maintain physical distancing of at least six (6) feet from any person who is not a member of their household, when possible, and should adhere to any applicable OHA guidance, including but not limited to guidance on physical distancing and face coverings."  *Id*. at 5.  Again, the order did not mention limits on petitioning, signature-gathering, or other First Amendment activities.

On June 5, Governor Brown rescinded Executive Order 20-25 and replaced it with Executive Order 20-27.[8]  That Executive Order largely repeated the restrictions contained in Executive Order 20-25 but added criteria for entering Phase II and the restrictions that would apply in Phase II.  Currently, all Oregon Counties except Multnomah, Clackamas, Washington, and Lincoln are in Phase II; the remaining four counties are in Phase I.[9]

C.    **Initiative Petition 57**

On June 19, 2018, the first initiative petition was filed seeking to change Oregon's redistricting process by amending its Constitution at the 2020 general election. Davis Decl. ¶ 11,

---

[7] Executive Order 20-25, https://www.oregon.gov/gov/Documents/executive_orders/eo_20-25.pdf.

[8] Executive Order 20-27, https://www.oregon.gov/gov/Documents/executive_orders/eo_20-27.pdf.

[9] https://govstatus.egov.com/reopening-oregon#countyStatuses.

Page 6 -    DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
TBW/jl9/10317608

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Ex. A.  In November 2018, Plaintiff Norman Turrill published an opinion piece criticizing that proposal and suggesting his alternative independent redistricting commission.[10]

Almost a year later, in November 2019, Mr. Turrill and Sharon K. Waterman filed their constitutional initiative petition with the Secretary.  *See* Davis Decl. ¶ 12, Ex. B.  The proposed constitutional amendment, which is twelve pages long, would establish a twelve-member Citizens Redistricting Commission with authority for statewide redistricting.  *See id.* Exs. C, D. The amendment would define the qualifications of and selection process for the commissioners, establish substantive standards and procedural rules governing its adoption of statewide electoral districts, and provide administrative authorities and funding to support the Commission's operations.  *See id.*

As the fifty-seventh initiative to be filed for the 2020 general election, the Elections Division named it Initiative Petition 57 ("IP 57").  *See* Davis Decl. ¶ 12, Ex. B.  The next month, the petitioners filed sponsorship signatures, which the Secretary's Elections Division verified. *Id.*  The Secretary also determined the proposal met the procedural requirements of the Oregon Constitution,[11] and the Attorney General issued a ballot title.  *Id.*  A third-party, Becca Uherbelau, appealed the Attorney General's draft of the ballot title to the Oregon Supreme Court, which rejected the challenge on March 27, 2020.  *Id.*  The Secretary's Elections Division issued official templates for the petition on March 30.  *Id.*  IP 57 was approved for circulation on April 9, only 84 days before the July 2 deadline to submit 149,360 valid signatures to qualify for the 2020 ballot.  *Id.*

The proponents of IP 57 originally planned to rely on paid signature gatherers "supplemented by volunteer circulators" to gather about 213,000 signatures.  Turrill Decl. ¶¶ 4,

---

[10] C. Norman Turrill, "Take partisan politics out of Oregon redistricting; give it to voters," *The Statesman Journal* (Nov. 30, 2018), https://www.statesmanjournal.com/story/opinion/2018/11/30/take-partisan-politics-out-oregon-redistricting-give-voters/2163358002/.

[11] A lawsuit challenging the Secretary of State's determination was filed in Marion County Circuit Court on March 27, 2020, and remains pending. *See Uherbelau, et al. v. Clarno*, No. 20-CV-13939.

Page 7 -    DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
TBW/jl9/10317608

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

17.  Paid signature circulators "produce[] a superior result [compared] to the use of volunteer circulators."  Blaszak Decl. ¶ 3.  However, Plaintiffs did not hire paid signature circulators. Davis Decl. ¶ 14.  Although Plaintiffs do not explain why they did not hire paid circulators, they do note that major prospective donors to the campaign declined to donate and anticipated donations "failed to materialize."  Turrill Decl. ¶¶ 12, 23, 26.  Also, some volunteer circulators "became afraid that [they] could not gather signatures" due to health risks from COVID-19. Turrill Decl. ¶ 11.

On March 16, 2020, well before IP 57 proponents began to gather signatures, IP 57's chief petitioners filed a petition for rulemaking with the Secretary asking for an administrative rulemaking that they contended would facilitate online signature gathering.  Davis Decl. Ex. E. They explained they sought an administrative rule because, during the pandemic, "petition signature gatherers and voters who would want to sign petitions, would not want to come into close contact." Davis Decl. Ex. E, p. 2.  The Secretary ultimately declined to engage in rulemaking.  Davis Decl. Ex. F.

Later, on May 7, an authorized agent of the chief petitioners of IP 57 exchanged emails with the Elections Division regarding the gathering of signatures.  Davis Decl. Ex. G.  The agent asked the Elections Division to comment on whether in person signature gathering is prohibited under the Governor's Executive Orders.  *Id*.  Elections Division staff immediately disputed that the Elections Division had reached that conclusion, referred the agent to the Governor for further questions, and asked the agent which provision of the Governor's Executive Order the agent thought restricted in person circulation.  *Id*.  The agent did not respond.

The campaign decided to rely exclusively on downloadable and mail petitions to gather signatures, despite knowing that mail solicitation is "a far more complicated process" and "unchartered territory."  Turrill Decl. ¶¶ 15, 22, 25.  Accordingly, on May 11, the campaign created an online portal from which supporters could download and print signature pages.  *Id.* ¶ 22.  And they mailed 500,000 petitions to voters.  *Id.* Decl. ¶ 29.  They began mailing petitions to

Page 8 -    DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

voters on May 25, more than 6 weeks after the Secretary approved the petition sheets, and more than two months after proponents of IP 57 filed a petition for rulemaking with the Secretary that they thought was necessary due to the pandemic.  *See id.* ¶¶ 19, 29.  By the July 2 deadline, petitioners claimed to have collected a little over 64,172 signatures, barely more than a quarter their goal.  Davis Decl. ¶ 15.  During this same time period, petitioners in other initiative campaigns conducted in person signature gathering.  *Id.* ¶¶ 19-20.

Chief petitioner Norman Turrill and five organizations that support IP 57 filed this lawsuit on June 30, two days before the deadline to submit petition signatures.

### D.    The 2020 General Election

The preparations for Oregonians to vote on the two ballot measures to appear on the November ballot—IP 34 and IP 44—are underway.  First, a committee of five public officials started meeting July 8[12] to produce a financial estimate of the "amount" and "description" of the "financial effects" of these measures by July 27.  *See* Or. Rev. Stat. § 250.127(5).  The committee then must hold a hearing with public comment and produce a final statement by August 5.  Or. Rev. Stat. § 250.127.  The resulting financial estimate will be printed on the ballot.  Or. Rev. Stat. § 250.125(5).  Second, two separate five-member committees will soon be appointed to produce official explanatory statements for each ballot measure, which will be printed in the Voters' Pamphlet.  Or. Rev. Stat. § 251.205.  The explanatory statement process has similar deadlines and public comment requirements as the financial estimate.  *See* Or. Rev. Stat. §§ 251.205, 251.215.  The deadline for "any person" to petition the Oregon Supreme Court to challenge either statement is August 10.  Or. Rev. Stat. § 250.131(2) (Financial Estimate); *id.* § 250.235(1) (Explanatory Statement).  Third, arguments for or against a ballot measure must be filed with the Secretary by August 25 for inclusion in the official Voters' Pamphlet mailed to every Oregon household.  *See* State Voters' Pamphlet Manual at 4–5.

---

[12] *See* Secretary of State Elections Division, Financial Estimate Committee (FEC) Meeting Schedule, https://content.govdelivery.com/accounts/ORSOS/bulletins/2944fcc.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Ballot deadlines are approaching. By September 3, the Secretary will issue a directive listing the federal and state contests and the language that will appear on the ballot for each measure. *See* Or. Rev. Stat. § 254.085; Davis Decl. ¶ 37. Over the next 16 calendar days, each of Oregon's 36 county election administrators then must design between 6 and 250 unique ballots (listing only the local races in which a voter is eligible to vote), print those ballots, and prepare military and overseas ballots for mailing. Military and overseas ballots must be mailed by September 19, 52 U.S.C. § 20302(a)(8)(A), or earlier if possible. Davis Decl. ¶ 37.

## III.    ARGUMENT

### A.    Preliminary Injunction Standard

A preliminary injunction is an "extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). That principle carries particular force in the elections context. *See Lair v. Bullock*, 697 F.3d 1200, 1214 (9th Cir. 2012) ("[G]iven the imminent nature of the election, we find it important not to disturb long-established expectations that might have unintended consequences."). To obtain a preliminary injunction, Plaintiffs must establish that "(1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest." *Short v. Brown*, 893 F.3d 671, 675 (9th Cir. 2018) (citing *Winter,* 555 U.S. at 20). The plaintiff's likelihood of success on the merits "'is the most important' factor." *California by and through Becerra v. Azar*, 950 F.3d 1067, 1083 (9th Cir. 2020) (quoting *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015)).

The Ninth Circuit has sometimes weighed the *Winter* factors on a sliding scale, such that where there are only "serious questions going to the merits" a preliminary injunction may still issue so long as the "balance of hardships tips sharply in the plaintiff's favor" and the other two factors are met. *Shell Offshore, Inc. v. Greenpeace, Inc.,* 709 F.3d 1281, 1291 (9th Cir. 2013). *But see Perry v. Perez*, 565 U.S. 388, 394 (2012) ("Plaintiffs seeking a preliminary injunction of a statute must normally demonstrate that they are likely to succeed on the merits of their

Page 10 -  DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
        TBW/jl9/10317608

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

challenge to that law.").  Plaintiffs suggest the sliding scale standard should apply here, but it should not, for two reasons.  First, this Court's decision on the motion for preliminary injunction may be dispositive, given the time and tasks that remain before the election in November and the time any appeal is likely to take, even on an expedited schedule.  Second, and more importantly, Plaintiffs seek a mandatory injunction that forces the Secretary to change the State's elections procedures rather than a prohibitory injunction that preserves the status quo until a trial on the merits.  Plaintiffs seeking a mandatory injunction must meet a heightened standard.  *Katie A., ex rel. Ludin v. Los Angeles Cty.*, 481 F.3d 1150, 1156 (9th Cir. 2007).  "When a mandatory preliminary injunction is requested, the district court should deny such relief 'unless the facts and law clearly favor the moving party.'"  *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) (citation omitted); *accord Fanus v. Premo*, No. 6:14-CV-00935-AA, 2014 WL 5280027, at *2 (D. Or. Oct. 10, 2014) (noting that "the usual rule requir[es] a 'heightened standard' to be applied to mandatory injunctions") (quoting *Katie A., ex rel. Ludin*, 481 F.3d at 1156).

### B.    Plaintiffs are unlikely to succeed on their claims because Oregon's initiative petition requirements comport with the United States Constitution.

#### 1.    The legal standards give broad leeway to the State.

No Supreme Court or Ninth Circuit holding definitively sets a standard for a court to apply to a First Amendment challenge to the number of signatures and deadline to propose a constitutional amendment by an initiative petition.  Plaintiffs cite *Angle v. Miller*, 673 F.3d 1122, 1132 (9th Cir. 2012), as establishing such a standard for all First Amendment challenges to petition requirements, whether for a candidate to appear on the ballot or to amend a state constitution.  But *Angle* relied on cases that regulated speech between signature gatherers and voters and requirements for candidate petitions and then "assume[d]" (*arguendo*) that standard applied to other types of regulations and petitions.  *Id*. at 1133.  In *Angle*, the plaintiffs could not meet even that assumed standard, so the First Amendment challenge failed.  *Angle* is therefore weak authority for the proposition that the test it assumed applies to any challenge to every

Page 11 -   DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

initiative requirement. *See also Chula Vista Citizens for Jobs & Fair Competition v. Norris*, 782 F.3d 520, 529 (9th Cir. 2015) (rejecting challenge to requirements that chief petitioner be an elector, holding it imposed no "meaningful burden on First Amendment rights").

In cases that do not challenge a direct regulation of speech between a signature gatherer and voter, like challenges to the signatures and deadline required for a ballot measure, a First Amendment challenge should fail because those requirements do not restrict the manner or content of Plaintiffs' political speech. *See, e.g.*, *Dobrovolny v. Moore*, 126 F.3d 1111, 1112–13 (8th Cir. 1997) (rejecting First Amendment challenge to Nebraska constitution requiring submission of signatures to place measure on ballot equal to 10% of registered voters because "the constitutional provision at issue here does not in any way impact the communication of appellants' political message or otherwise restrict the circulation of their initiative petitions or their ability to communicate with voters about their proposals"); *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1099 (10th Cir. 2006) ("Although the First Amendment protects political speech incident to an initiative campaign, it does not protect the right to make law, by initiative or otherwise."); *Molinari v. Bloomberg*, 564 F.3d 587, 602 (2d Cir. 2009) ("As our Sister Circuits (and the Nebraska Supreme Court) have recognized, plaintiffs' First Amendment rights are not implicated by referendum schemes *per se* [,] but by the regulation of advocacy within the referenda process, *i.e.,* petition circulating, discourse and all other protected forms of advocacy."). Thus, Plaintiffs' claims, which are asserted solely under the First Amendment, should fail at the outset.

Additionally, a proper First Amendment test would recognize that the state's interest in regulating a candidate's access to the ballot is different in kind from its interest in regulating initiative petitions, particularly those seeking to amend a state constitution. *See Bambenek v. White*, No. 3:20-cv-3107, 2020 WL 2123951, *5 (C.D. Ill. May 1, 2020) (placing candidates on the ballot "implicate[s] unique constitutional concerns" that are not "precisely the same" as the concerns implicated in requirements for constitutional amendments and referenda). Oregon, like

Page 12 -  DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

other states,[13] has substantially higher requirements to propose a ballot measure than for a

candidate to qualify for the ballot—and an even higher threshold to amend its Constitution.

*Compare* Or. Const. art. IV, § 1 (8% of Gubernatorial vote for constitutional initiative versus 6%

for statutory initiative) *with* Or. Rev. Stat. § 249.740 (1% of Gubernatorial vote for independent

candidate for statewide office).

        Nevertheless, even if the Court adopts the standard *Angle* assumed, Plaintiffs still cannot

prevail.  *Angle* hypothesized that challenges to state regulations of initiative petitions fall into

two categories.  "First, regulations can restrict one-on-one communication between petition

circulators and voters.  Second, regulations can make it less likely that proponents will be able to

garner the signatures necessary to place an initiative on the ballot …."  *Angle*, 673 F.3d at 1132

(internal citation omitted).

        Because Plaintiffs challenge "the legal effect of a particular activity in" the petition

process (whether the signatures submitted on a given date are sufficient for a constitutional

amendment to appear on the ballot), "the government will be afforded substantial latitude to

enforce that regulation."  *John Doe No. 1 v. Reed*, 561 U.S. 186, 195–96 (2010).  Only "election

'[r]egulations imposing *severe burdens* on plaintiffs' rights must be narrowly tailored and

advance a compelling state interest.'"  *Angle*, 673 F.3d at 1132 (quoting *Prete v. Bradbury,* 438

F.3d 949, 961 (9th Cir. 2006)) (emphasis original).  Otherwise, "the state need show only that the

rule furthers 'an important regulatory interest.'"  *Id.* at 1134–35.

        "States certainly have an interest in protecting the integrity, fairness, and efficiency of

their ballots and election processes."  *Timmons v. Twin Cities Area New Party*, 520 U.S. 351,

364 (1997) (upholding requirement ballot shows only one party-affiliation per candidate).  That

---

[13] *Compare, e.g.*, Ariz. Const. art. IV, pt. 1, § 1 (15% of Gubernatorial vote for constitutional
initiatives) *with* Ariz. Rev. Stat. § 16-322 (0.25% of qualified signers required to petition for
independent candidate to be listed on ballot); Nev. Const. art. 19 § 2 (for initiative, 10% of votes
cast with geographic distribution requirements) *with* Nev. Rev. Stat. § 293.200 (for independent
candidate, 1% of all votes cast); Cal. Const. art. II § 8 (8% of Gubernatorial vote for
constitutional initiative) *with* Cal. Elec. Code § 8106 (for independent candidate for Governor,
7,000 signatures or filing fee).

Page 13 -  DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

interest "undeniably" includes "an important regulatory interest 'in making sure that an initiative has sufficient grass roots support to be placed on the ballot.'" *Angle*, 673 F.3d at 1135 (upholding requirement voters from each Congressional district sign petition) (quoting *Meyer,* 486 U.S. at 425–26). States also have "important interests in avoiding confusion [and] promoting informed decision-making" in the initiative process. *Pest Comm. v. Miller*, 626 F.3d 1097, 1107 (9th Cir. 2010) (upholding a single-subject requirement for initiatives). More generally, states have "an additional important regulatory interest in predictable and administrable election rules …." *Rubin v. City of Santa Monica*, 308 F.3d 1008, 1018 (9th Cir. 2002).

Plaintiffs cite a handful of the torrent of cases[14] seeking to apply these standards to secure relief from petition requirements in light of COVID-19. Only two of the cases Plaintiffs cite relate to initiative petitions.[15] *See* Pls.' Mot. 16–19 (citing *Fair Maps Nevada* and *SawariMedia*). But at least seven other federal cases have declined to enjoin initiative petition requirements. *See Thompson v. DeWine*, 959 F.3d 804 (6th Cir. 2020) (granting stay pending appeal of injunction of administrative requirements for initiative petitions); *Arizonans for Fair Elections v. Hobbs*, No. CV-20-00658-PHX-DWL, 2020 WL 1905747 (D. Ariz. Apr. 17, 2020) (denying temporary restraining order of administrative requirements for initiative petitions); *Sinner v. Jaeger*, No. 3:20-cv-00076, 2020 WL 3244143 (D.N.D. June 15, 2020) (same); *Miller v. Thurston*, No. 5:20-CV-05070, 2020 WL 2617312 (W.D. Ark. May 25, 2020) (granting preliminary injunction modifying signature form but denying injunction of number of signatures and deadline), *on appeal* No. 20-2095 (8th Cir.); *Bambenek v. White*, No. 3:20-cv-03107, 2020

---

[14] More than 100 cases have been filed seeking relief from election procedures based on COVID-19. *See* Justin Levitt, *The list of COVID-19 election cases*, ELECTION LAW BLOG, (June 11, 2020, 5:34 PM), https://electionlawblog.org/?p=111962.

[15] Plaintiffs also did not cite a decision enjoining Idaho's May 1 initiative petition deadline and requiring it to accept electronic signatures. *See Reclaim Idaho v. Little,* No. 1:20-cv-00268-BLW, 2020 WL 3490216 (D. Idaho June 26, 2020). The state's emergency motion to stay that preliminary injunction has been fully briefed in the Ninth Circuit since July 7. *See* Docket No. 20-35584 (9th Cir.).

Page 14 -   DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
    TBW/jl9/10317608

                                            Department of Justice
                                            100 SW Market Street
                                            Portland, OR 97201
                                    (971) 673-1880 / Fax: (971) 673-5000

WL 2123951 (C.D. Ill. May 1, 2020) (denying preliminary injunction to modify initiative

petition requirements); *Lyons v. City of Columbus*, No. 2:20-cv-3070, 2020 WL 3396319 (June

19, 2020) (same); *see also, e.g.*, *Common Sense Party v. Padilla,* No. 20-cv-01091-MCE-EFB,

2020 WL 3491041 (E.D. Cal. June 26, 2020) (denying preliminary injunction to recognize

political party); *Garcia v. Griswold*, No. 20-cv-1268-WJM, 2020 WL 2505888 (D. Colo. May 7,

2020) (denying preliminary injunction of candidate petition on laches grounds).  Notably, three

of these cases rejected challenges to initiative petition requirements when plaintiffs sought only

relief from administrative requirements, like accepting electronic signatures or signatures

without witnesses, rather than the drastic relief Plaintiffs seek here: reducing the number of

signatures that must be submitted and delaying the deadline to submit them.  *See Thompson*, 959

F.3d at 807; *Arizonans for Fair Elections*, 2020 WL 1905747, at *2; *Miller*, 2020 WL 2617312,

at *2.

      **2.**       **The Oregon Constitution's initiative signature and deadline
requirements do not create a severe burden on Plaintiffs' First
Amendment rights.**

           **a.**      **The Oregon constitutional provisions do not restrict one-on-
one communications.**

Strict scrutiny does not apply because neither of the challenged provisions restricts one-

on-one communications between proponents of the proposed initiative and voters, or any other

form of communication.  Plaintiffs argue the challenged deadline restricts one-on-one

communication by "shorten[ing]" the time period for communication to occur and limiting the

number of voices that will be involved by excluding people who only hear about the measure

after the submission deadline. Pls.' Mot. 22.  But that argument fails.  Deadlines exists because

an election could not be administered without one; Plaintiffs' argument could as easily apply to

any deadline.  But every election deadline is not automatically subject to strict scrutiny.  The

signature requirement and the deadline "do not implicate protections for core political speech

because they do not directly affect or even involve one-on-one communications with voters,"

Page 15 -   DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

*Pest Comm.*, 626 F.3d at 1107.  These are election regulations and do nothing to limit the manner, type, or content of communication between voters and circulators.

> **b.    The Oregon constitutional provisions do not otherwise create a severe burden.**

Neither the signature threshold nor the deadline creates a severe burden on Plaintiffs by making it "less likely that proponents will be able to garner the signatures necessary" to qualify for the ballot.  *Angle*, 673 F.3d at 1132.  With respect to the signature threshold, the Oregon Constitution provides, "An initiative amendment to the Constitution may be proposed only by a petition signed by a number of qualified voters equal to eight percent of the total number of votes cast for all candidates for Governor at the election … next preceding the filing of the petition." Or. Const. art. IV, § 1(2)(c).  A signature threshold for initiated constitutional amendments has been a feature of the Oregon Constitution since 1902 and has most recently been amended by a vote of the people in 1968.[16]  Before the 1968 amendments, the signature threshold was actually *higher* than it is today.  *Id.*

Oregon's signature thresholds are minimal compared to other states.  Few of the 50 states require a lower percentage of its electorate to sign a petition to propose a constitutional amendment than Oregon does.  Many states have much higher thresholds.  Oklahoma requires fifteen percent of *voters* to sign a petition, while Arizona requires fifteen percent of the number of votes cast in the last gubernatorial election.[17]  Among the four other states in the Ninth Circuit that allow constitutional initiatives at all,[18] three have higher signature thresholds, and the fourth requires the same percentage of voters to sign a petition as Oregon.[19]  And, unlike some other

---

[16] *See generally Oregon Blue Book: Initiative, Referendum, and Recall* at 1 (2019–2020), https://sos.oregon.gov/blue-book/Documents/elections/initiative.pdf.

[17] Okla. Const. art. V, § 2; Ariz. Const., art. XXI, § 1.

[18] *See* National Conference of State Legislatures, *Initiative and Referendum States*, https://www.ncsl.org/research/elections-and-campaigns/chart-of-the-initiative-states.aspx.

[19] *See* Ariz. Const., art. XXI, § 1 (15% of Gubernatorial votes); Mont. Const. art. XIV, § 9 (10% of *electors*); Nev. Const. art. 19, §§ 2(2) (10% of votes at prior general election); Cal. Const. art. II, § 5 (8% of votes for Governor).

Page 16 -   DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

states, Oregon has no geographic distribution requirement mandating that signatories reside in different parts of the state.[20]  *Thirty* constitutional initiative petitions have qualified for the ballot in the last two decades by meeting the petition requirements the Oregon Constitution sets.  *See* Davis Decl. ¶ 9.  Over the last five elections alone, 25 initiatives have qualified for the ballot, including 8 constitutional initiatives.  Davis Decl. ¶ 8.

This history demonstrates that neither the signature requirement nor the deadline imposes a severe burden.  *Cf. Nader v. Brewer*, 531 F.3d 1028, 1035 (9th Cir. 2008) ("To determine the severity of the burden, we said that past candidates' ability to secure a place on the ballot can inform the court's analysis.").  The Secretary's simply continued to apply these longstanding requirements in 2020.

With respect to the deadline, the Oregon Constitution provides, "An initiative petition shall be filed not less than four months before the election at which the proposed law or amendment to the Constitution is to be voted upon."  Or. Const. IV, § 1(2)(e).  "This provision of the Constitution is explicit and mandatory," *Kellaher v. Kozer*, 112 Or. 149, 157 (1924), (rejecting submission of late signature petitions), and has existed in the Oregon Constitution since 1902, when initiatives were first allowed under the Oregon Constitution.  Oregon law gives petitioners a full two years to gather signatures.  That is plenty of time to qualify a measure for the ballot with diligent effort, as the 375 initiatives that have qualified for the ballot since 1904 amply demonstrate.[21]

The deadline imposed by the Oregon Constitution does not severely burden initiative petitioners and is consistent with the requirements of the U.S. Constitution.  In *Anderson v. Celebrezze*, the Supreme Court held a March deadline for independent Presidential *candidates* to

---

[20] *See, e.g.*, Nev. Const. art. 19, §§ 2(2); Mont. art. XIV, § 9(1).

[21] *See Oregon Blue Book: Initiative, Referendum, and Recall* at 1 (2019–2020), https://sos.oregon.gov/blue-book/Documents/elections/initiative.pdf.  *See also* Initiative and Referendum Institute, *Initiative Use* (Dec. 2019), http://www.iandrinstitute.org/docs/IRI-Initiative-Use-(2019-2).pdf (showing more initiatives have qualified for the ballot in Oregon than any state except California).

Page 17 -  DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

file petitions to be placed on the ballot violated in the U.S. Constitution, because "the identity of the likely major party nominees may not be known until shortly before the election," the likely supporters of a third-party candidacy "'will rarely if ever be a cohesive or identifiable group until a few months before the election.'" 460 U.S. 780, 791 (1983). The circuit courts applying that holding have generally struck down filing deadlines for independent and minor party candidates that fall months before a state's primary, but upheld deadlines immediately before the primary election (or later). *See Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 590–91 (6th Cir. 2006) (collecting cases); *accord Nader v. Brewer*, 531 F.3d 1028, 1030–31 (9th Cir. 2008) (striking down requirement to file nominating petitions 90 days before a primary). But this case involves an initiative petition, not a petition for a candidate for office.

*Angle* assumed, for the sake of argument, that the reasoning of these cases may apply to geographic distribution requirements in the initiative context. But, with respect to timing, the burdens for an initiative and for a candidate are not the same. In particular, the late emergence of the party nominees that animated *Anderson*'s concern for late-announcing independent candidates does not extend to initiatives. Here, the redistricting process has long been at the forefront of political controversy. Another constitutional initiative seeking to change the redistricting process filed its initial petition paperwork for a vote *at this election* back in June 2018.

The challenged requirements are clearly not a severe burden given that two measures have qualified for the November ballot. *See* Davis Decl. ¶ 6. Both measures were certified for circulation long before IP 57 because the proponents of those proposed initiatives submitted their petitions much earlier. IP 34 was approved for circulation on September 26, 2019, and IP 44 was approved for circulation on November 26, 2019. *Id*. And the proponents of IP 34 and 44 were able to complete their signature gathering work and file more than the required number of signatures by the deadline.

Page 18 -  DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs could have filed their initiative petition with the Elections Division years ago and given themselves two full years to gather signatures. Davis Decl. ¶ 5. Instead, the proponents of IP 57 waited until November 2019 to even start the initial administrative steps to pursue their petition, and they were not ready to gather signatures until 84 days before the deadline. The reality is that the Plaintiffs did not qualify IP 57 for the ballot because they waited too long to start the process. For that reason alone, the burden is not severe and strict scrutiny does not apply. *See, e.g.*, *Sinner,* 2020 WL 3244143, at *6 (finding the plaintiff's "predicament is largely attributable to its own delay); *Arizonans for Fair Elections*, 2020 WL 1905747, at *11 (finding that plaintiffs were not reasonably diligent because "had Plaintiffs simply started gathering signatures earlier, they could have gathered more than enough to qualify for the ballot before the COVID-19 pandemic started interfering with their efforts").

Plaintiffs argue they were burdened by the deadline because the pandemic overlapped with the 84 days they chose to collect signatures. But petitioners bear the risk of their decision to wait to gather petition signatures. A federal district court in Arizona recently rejected a lawsuit that mirrors this one, because petitioners there did not file necessary paperwork for their initiative until August and October 2019 respectively, "thereby wasting between 45% and 55% of the 20-month election cycle." *See Arizonans for Fair Elections*, 2020 WL 1905747, at *10. Oregon allows petitioners even more time—up to two full years to collect signatures. Davis Decl. ¶ 5. By contrast, in Nevada, petitioners had less than a year, from September 1, 2019 to June 24, 2020. *See Fair Maps Nev.,* 2020 WL 2798018, at *5; Nev. Const. art. 19 § 2; Nev. Rev. Stat. § 295.056.

More specifically, Plaintiffs contend the Governor's Executive Orders prevented them from obtaining signatures. They argue the required social distancing measures "have blocked and continue to block traditional in person circulation," and that they "prohibit[]. . . in person *paid* circulators . . . [and]. . . in-person *volunteer* circulators." Pls' Mot. 25, 30. That is simply not true. No executive order blocked in-person circulation of measures, nor did the generic

TBW/jl9/10317608

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

social distancing requirements block in-person circulation. The Governor prohibited gathering in numbers greater than 10 or 25, and shut certain businesses in certain sectors. But there is no reason under any of the Governor's executive orders that a circulator could not have set up a card table near a grocery store entrance with the proposed measure, a signature sheet, pens, and hand sanitizer and stood six feet back while asking grocery store customers for signatures. Plaintiffs could have done the same thing along walking trails where people have gone throughout the pandemic for fresh air, or at outdoor farmer's markets, or even at public protests, many of which have occurred in Oregon, especially since May 25.[22] Plaintiffs' claim that signature gathering has been prohibited during the pandemic goes too far. *See Thompson*, 959 F.3d at 809–10 (noting Ohio's stay-at-home orders allowed opportunities to seek signatures).

Plaintiffs have long known that signature gathering was not prohibited. An authorized agent of the IP 57 petitioners, in fact, contacted the Elections Division on May 7 to ask about whether the process for circulating petitions had changed. Davis Decl. Ex. G. Elections Division staff responded that the process had not changed. *Id*. When the agent asked specifically whether in person circulation was prohibited, Elections Division staff denied ever stating so and referred her to the Governor's office directly, but also asked the agent which provision of the Governor's Executive Order the agent thought barred in person signature gathering. *Id*. The chief petitioners did not explain then and do not explain now which provision of the Governor's orders prevented their signature gathering activities. Nor do they explain whether they sought clarification from the Governor's office months ago.

Plaintiffs cite only one decision in which a court modified the signature threshold for an initiative, but that decision is distinguishable. In *SawariMedia, LLC v. Whitmer*, the court found Michigan's signature threshold to be unconstitutional as applied. But the court found the Governor's orders there "required Michigan residents to remain in their homes for more than two

---

[22] *See* https://www.oregonlive.com/news/2020/07/black-lives-matter-protests-taking-place-in-portland-salem-on-the-fourth-of-july.htm (noting that Saturday, July 4, marked 38 consecutive days of protests in Portland).

Page 20 -  DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

months." Case No. 4:20-cv-11246-MFL-MJH, 2020 WL 3097266, at *11 (E.D. Mich. June 11, 2020), *stay denied* __ F.3d __, 2020 WL 3603684 (6th Cir. July 2, 2020) (denying stay due to the restrictions of Governor Whitmer's orders). Governor Brown's orders are not comparable to Governor Whitmer's.

Even if the Court were to construe Governor Brown's orders to restrict signature gathering for some period of time, Plaintiffs did not show those orders prevented them from meeting the signature requirements. Their declarations do not suffice. Mr. Blaszak does not claim in his declaration that the chief petitioners likely would have secured the necessary signatures by the deadline were it not for the Governor's orders. Instead, he only suggests that they *might* have secured enough signatures *if* they had enough of the right kind of support, which he does not claim they had. Blaszak Decl. ¶ 9. In fact, Ms. Johnson suggests in her declaration that support for the measure dried up due to "fears of the COVID-19 virus," rather than due to any state action. Johnson Decl. ¶ 6. Plaintiffs' claim is that the Governor's response to the pandemic made it impossible to meet the signature threshold by the deadline. But the Secretary cannot be held responsible for the pandemic itself. *See Thompson*, 959 F.3d at 810. Plaintiffs have not provided *any* proof they would have met the deadline absent the Governor's response to the pandemic.

The signature threshold and deadline are not a severe burden on Plaintiffs' First Amendment rights. They chose to wait until November 2019 to even start the initial administrative steps to pursue their petition, and they were not ready to collect until 84 days before the deadline. Plaintiffs did not submit proof that they would have qualified absent the Governor's Executive Orders. And the Governor's Executive Orders did not prevent in person gathering. Because Plaintiffs have not proven that the constitutional requirements they challenge create a severe burden on them, strict scrutiny does not apply. Because these requirements easily further an "important regulatory interest," Plaintiffs are not likely to prevail on their claims. *Angle*, 673 F.3d at 1134-35 (citation omitted).

Page 21 -  DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**3.    The Oregon Constitution's initiative requirements further important state interests.**

Whatever level of scrutiny the Court applies, the State of Oregon has a strong, even compelling, state interest in administering a fair election. Both challenged constitutional provisions advance that interest.

The State of Oregon has a significant interest in ensuring that initiatives—especially for amendments to Oregon's Constitution—have strong grass roots support before they are placed on the ballot. Oregonians long ago voted to make the level of support required for constitutional amendments exceed the level of support required for initiatives that would adopt statutes or referenda. Oregon Const., art IV., § 1. By enacting these constitutional requirements for initiatives, Oregonians never intended getting a constitutional amendment on the ballot by initiative to be easy. And that makes sense: a constitution should *not* be easy to change. Amending a constitution should be a thoughtful, well-considered, and thoroughly debated matter. Plaintiffs are ultimately seeking to limit the authority of all future Oregon legislatures and govern how all future congressional and legislative districts are drawn. The State has a legitimate interest in establishing reasonable, nondiscriminatory hurdles to amending its own Constitution.

Nor does Plaintiffs' proposed signature requirement bear any relationship at all to the requirements in the Oregon Constitution, or other state constitutions for that matter. Imposing that signature requirement would undermine the State's interests. Plaintiffs suggest the Court completely ignore the gubernatorial election of 2016 because they complain turnout in that election was too high, which makes it too hard for them to secure even four percent of that election's signatures (itself half of the eight-percent required for constitutional initiatives). Instead, Plaintiffs have selected a different gubernatorial election that had a lower turnout, and then selected the percentage of signatures that applies to referenda (which can have as few as 90 days to gather signatures, Or. Const. art. IV, § 1(3)(b)**Error! Bookmark not defined.**), rather than the percentage of signatures that applies to statutory initiatives or constitutional initiatives. Plaintiffs' argument is a transparent attempt to find the lowest conceivable signature

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

requirement.  There is no connection between the actual requirement of the Oregon Constitution

for constitutional initiatives and the signature requirement Plaintiffs propose.

The State also has important interests in the July 2 petition submission deadline.  The

deadline is essential to the fair and reasonable administration of the election, facilitates the

electorate's deliberation on proposed constitutional amendments, and protects the legitimate

interests of the opponents of a ballot measure to wage a campaign against its adoption.

The Secretary must verify the signatures on a petition within 30 days of the submission

deadline.  Or. Const. art. IV, § 1(4)(a).  The verification procedure is a detailed, multistage

process to ensure that every signature counted is the true signature of a registered voter and only

one signature per voter is counted.  *See* Davis Decl. ¶¶ 21–26.  The State has an overwhelming

interest in completing this process with ample time to prepare for the election itself.  *See Kays v.

McCall*, 244 Or. 361, 368 (1966) (noting verification delays "could produce an intolerable

situation because the Director of Elections might not be able to make the necessary preparations

for putting the issue on the ballot, which is the very purpose of the constitutional deadline").  *See

also* § III.E, below (detailing problems with Plaintiffs' proposed August 17 submission

deadline).

The petition submission deadline facilitates the State's interest in the conduct of a fair

election for reasons beyond ensuring ballots are sent to voters on time.  The state sponsors

several formal processes designed to facilitate the electorate's reasoned decision-making in

adopting or rejecting ballot measures, each of which require time between the submission and

verification of signatures and the beginning of voting.  This is particularly important because a

ballot measure requires the voter to act as a legislator.  *See Meyer v. Bradbury*, 341 Or 288, 300

(2006) (noting Oregon has "two lawmaking bodies—the legislature and the people").

For example, Oregon law requires a Financial Estimate and an official Explanatory

Statement to enhance voters' understanding of a ballot measure.  The Financial Estimate, which

includes the "amount" and "description" of the "financial effects" of the measure, is printed on

Page 23 -  DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

the ballot itself.  Or. Rev. Stat. § 250.127(5).  Additionally, a five-member committee is appointed to produce the official Explanatory Statement for each ballot measure, which is printed in the Voters' Pamphlet in a separate process with similar deadlines and public comment requirements.  *See* Or. Rev. Stat. § 251.215.

Another important aid to the electorate is the Voters' Pamphlet, an election guide that has been an essential part of Oregon elections since 1902.  *See Ecumenical Ministries of Oregon v. Oregon State Lottery Comm'n*, 318 Or. 551, 559 n.8 (1994) (noting the Voters' Pamphlet is legislative history of an enactment).  Anyone may include a statement for or against the measure by filing it with the Secretary by August 25.  *See* State Voters' Pamphlet Manual at 4.[23]  The time between the conclusion of the verification process and the Voters' Pamphlet submission deadline allows the public time to participate in this deliberative process.

Beyond these formal processes, the requirement for petitions to be submitted four months before an election allows time for Oregonians to speak for or against a ballot measure, including by organizing campaigns.  That time allows the electorate the opportunity to engage in a vigorous debate about whether to amend Oregon's Constitution.

\* \* \*

Plaintiffs' motion should be denied because they are not likely to prevail on the merits of the First Amendment claim.  The constitutional provisions Plaintiffs challenge are not a severe burden on their First Amendment rights, and the State's significant interests in facilitating deliberation on amendments to its Constitution and ensuring the integrity and efficient administration of elections easily satisfy any requirement to justify the provisions.  Plaintiffs' motion should fail on this basis alone.

---

[23] The filer must pay $1,200 or submit 500 valid signatures of registered voters.  *See* State Voters' Pamphlet Manual at 4.

Page 24 -   DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### 4.    A preliminary injunction is barred by laches

But there is an additional reason the Plaintiffs are unlikely to prevail on their claims. "Laches applies when there is both unreasonable delay and prejudice." *Arizona Libertarian Party v. Reagan*, 189 F. Supp. 3d 920, 922 (D. Ariz. 2016); *accord Evergreen Safety Council v. RSA Network Inc.*, 697 F.3d 1221, 1226 (9th Cir. 2012) ("To prove laches, the 'defendant must prove both an unreasonable delay by the plaintiff and prejudice to itself.'" (quoting *Couveau v. Am. Airlines, Inc.*, 218 F.3d 1078, 1083 (9th Cir. 2000)). "Laches … requires denial of injunctive relief, including preliminary relief." *Arizona Libertarian Party*, 189 F. Supp. 3d at 922 (denying TRO and preliminary injunction filed 19 days before petition deadline on laches grounds); *see also Garcia*, 2020 WL 2505888, at *1–2 (denying preliminary injunction of petition requirements on laches grounds); *Lyons*, 2020 WL 3396319 at *5-*6 (same).

"[A] party requesting a preliminary injunction must generally show reasonable diligence." *Benisek v. Lamone*, 138 S. Ct. 1942, 1444 (2018). "To determine whether delay was unreasonable, a court considers the justification for the delay, the extent of the plaintiff's advance knowledge of the basis for the challenge, and whether the plaintiff exercised diligence in preparing and advancing his case." *Arizona Libertarian Party*, 189 F. Supp. 3d at 923.

Plaintiffs have known the facts that form the basis of this lawsuit for more than three months. By March 8, Plaintiffs knew of the Governor's declaration of a state of emergency, Turrill Decl. ¶ 10, and they discussed its impact on petition gathering on March 10, *id.* ¶ 11. On March 13, IP 57's Chief Petitioners, including Plaintiff Norman Turrill, formally petitioned the Secretary to issue an emergency rule to loosen requirement for electronically-distributed signature sheets because "in the context of the current global pandemic, petition signature gathers and voters who would want to sign petitions, would not want to come into close contact, therefore inhibiting the right of voters to petition their government." Davis Decl., Ex. E at ¶ 12. Throughout March and April, Plaintiffs continued to consider the effect of the pandemic on their signature-gathering efforts. Turrill Decl. ¶¶ 13–15, 17–18; Johnson Decl. ¶ 6. On May 7, 2020,

Page 25 -  DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

an authorized agent of the IP 57 chief petitioners emailed the Secretary of State's office concerned about the viability of in-person signature gathering.  Davis Decl., Ex. G.  Given that on July 2 petitioners submitted less than half the signatures required to qualify for the ballot, Plaintiffs must have known well before they filed this lawsuit on June 30 that the petition would fall far short of the mark.

Under these circumstances, a three-month delay in filing a lawsuit that would require immediate relief to have any consequence at all is unreasonable.  *See Lyons*, 2020 WL 3396319 at *6 (holding suit barred by laches when "[p]laintiffs waited until the day before their [petition] filing deadline to seek injunctive or declaratory relief").  More than 100 lawsuits have been filed seeking to enjoin election laws based because of COVID-19.  *See* note 16, above.  Plaintiffs' papers themselves cite seven *decisions* that they argue are substantially similar to the one they filed here.  Pls.' Mot. at 16–19.  Plaintiffs give no hint as to why it took them so much longer than others to file suit.

"To determine whether delay has prejudiced the administration of justice, a court considers prejudice to the courts, candidates, citizens who signed petitions, election officials, and voters."  *Arizona Libertarian Party*, 189 F. Supp. 3d at 923.  The prejudice from Plaintiffs' more than three-month delay in filing this lawsuit is manifold.  First, the delay has made it impossible for this Court to order less drastic relief than changing the constitutional deadline and signature threshold.  Both Plaintiffs' rulemaking petition to the Secretary and their papers submitted here cite specific administrative requirements that Plaintiffs claim burdened their effort to meet the constitutional requirements for their petition.  *See* Davis Decl., Ex. E (petition for rulemaking); Pls.' Mot. at 12–13 (executive order requirements and 20-pound paper); Complaint ¶ 44 (citing court order allowing electronic signatures).  Because Plaintiffs waited until two days before the signature-submission deadline to file suit, the Court can no longer remedy the burdens Plaintiffs cite by enjoining these supposed procedural hurdles rather than the foundational requirements to amend the Oregon Constitution.

Page 26 -  DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Second, issuing the injunction Plaintiffs seek at this late date is uniquely injurious to the State's interests.  If the Court issued such an injunction now, not only would it severely compress the election schedule, it would do so with very little time for election administrators to determine how to modify their operations to account for new judicial mandates that supersede established statutory deadlines.  For that reason, compliance with such an injunction would be substantially more difficult now than if it were issued three months earlier, given the considerable operational planning for conducting the general election in the midst of a pandemic that the Secretary and county election officials have undertaken in the interim.

Third, Plaintiffs' belated filing prejudices proponents of other initiative petitions.  Had relief been sought and awarded earlier, other petitioners may have continued collecting signatures to seek to qualify for the 2020 ballot.  *See Ariz. Libertarian Party*, 189 F. Supp. 3d at 924–25 ("Candidates who have been collecting signatures under the current law could be greatly disadvantaged by any injunctive relief that changes the rules at the last minute.").

Fourth, Plaintiffs' delay has unnecessarily expedited this Court's proceedings.  That urgency prejudices the Secretary's capacity to defend this lawsuit, eliminates the opportunity for formal discovery, limits informal fact-gathering, and shrinks the time available for this Court's adjudication and for the parties to seek appellate review.  *See id.*, 189 F. Supp. 3d at 924 (finding election administrator's defense and administration of justice prejudiced by plaintiff's delay).

Because Plaintiffs' unreasonable delay has prejudiced the Secretary and others, injunctive relief is barred by laches.

### C.    The requirements of the Oregon Constitution do not irreparably harm plaintiffs.

Plaintiffs argue that they are irreparably harmed by the application of the Oregon Constitution's initiative signature and deadline provisions because IP 57's failure "will delay implementation" of an independent redistricting commission "for an entire decade."  Pls.' Mot. 37.  That is not necessarily true.  There is no federal barrier to mid-decade redistricting.  *See League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 423 (2006).  And, of course, an

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

amendment to the Oregon Constitution to reform the redistricting process could mandate mid-decade redistricting, as an amendment to the Oregon Constitution adopted in 1952 in fact did. *See Baum v. Newbry*, 200 Or. 576, 582 (1954).

Additionally, any harm suffered by Plaintiffs is largely the result of their own choices and the pandemic, not the result of the Oregon Constitution or the Governor's orders. Plaintiffs chose to wait until eight months before the submission deadline to file their petition, despite having the ability and right to file years earlier. If Plaintiffs viewed the 2020 general election as their last chance to make this proposed constitutional amendment, they could have filed earlier and taken the entire two-year period permitted for signature gathering. *See Arizonans for Fair Elections*, 2020 WL 1905747, at *10–11. Further, although gathering signatures during a pandemic makes some methods to gather signatures more difficult, the Governor did not prohibit signature gathering. Plaintiffs *chose* not to conduct in-person signature gathering. In short, no state action caused the harm that Plaintiffs complain of here. *See Thompson*, 959 F.3d at 810. As a result, the challenged initiative requirements did not cause Plaintiffs any irreparable harm.

### D.     The balancing of the harms and public interest favor the Secretary.

Plaintiffs seek to fundamentally alter the requirements to amend the Oregon Constitution after the two-year signature gathering period has ended. The State of Oregon has a strong interest in ensuring the efficient and orderly administration of its elections and in applying the same consistent voter-determined state constitutional standards to each matter proposed for inclusion on the ballot. Granting relief at this late date would undercut the fundamental fairness of the election process, favor one measure over others that may be similarly situated, and severely undermine state and county officials' administration of the election.

Ignoring these considerations, Plaintiffs argue that the balance of the equities favors Plaintiffs because the challenged initiative requirements "do not account for extraordinary public health restrictions" that "effectively bar plaintiffs from gathering signatures." Pls.' Mot. 38. But Plaintiffs are wrong about the Governor's orders. The Governor did not prevent Plaintiffs from

Page 28 -  DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

gathering signatures in person; rather, Plaintiffs *chose* not to gather signatures in person. Although that choice is understandable, especially for the proponents of the measure who are at high risk of complication or death from COVID-19, the State obviously did not cause the pandemic. *See Thompson*, 959 F.3d at 810.

Plaintiffs also suggest there is minimal harm to the State from opening its Constitution to amendment in a manner that would not be authorized by that Constitution itself. But the inconsistency with the will of the voters as expressed in the Oregon Constitution and changing that document outside of the process it mandates are real harms to the State. This is particularly so given that petitioners say they should be able to submit the number of signatures required to trigger a referendum in 2018. A referendum requires half the number of signatures as a constitutional initiative. *See* Or. Const. art. IV, § 1(3)(b). But a referendum affects only legislation that has already passed the Legislative Assembly, not the Constitution. Plus, to trigger a referendum, a petitioner may have only 90 days to gather the signatures required, not a full two years. *See id.* Arbitrarily reducing that number further to what was required to qualify a referendum for the ballot two years ago only compounds the harm to the State.

In addition, Plaintiffs "are requesting this court to engage in a drastic and unprecedented renovation of the law" by "disregard[ing] the constitutional deadline for filing petitions." *Kays v. McCall*, 244 Or. 361, 373 (1966) (rejecting request to certify measure for ballot despite deadline). Ordering the Secretary to make these changes would also create concrete problems with administering the election under the rules Plaintiffs propose. Such last-minute injunctions to election laws are strongly disfavored. *See Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam). When an election is "imminent," it is "important not to disturb long-established expectations that might have unintended consequences ...." *Lair v. Bullock*, 697 F.3d 1200, 1214 (9th Cir. 2012) (issuing stay pending appeal); *Arizonans for Fair Elections*, 2020 WL 1905747 at *15 (citing *Purcell* in denying injunction of initiative petition requirements, noting "it is significant that Plaintiffs are seeking to enjoin the State's election rules midway through the

Page 29 -  DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

election cycle.").  "Here, the November election itself may be months away but important, interim deadlines that affect Plaintiffs, other ballot initiative proponents, and the State are imminent.  And moving or changing a deadline or procedure now will have inevitable, other consequences."  *Thompson*, 959 F.3d at 813 (staying, on May 26, preliminary injunction of initiative petition requirements); *see also Short v. Brown*, 893 F.3d 671, 675 (9th Cir. 2018) (affirming denial of preliminary injunction filed in *February* because, *inter alia*, "the Supreme Court has warned us many times to tread carefully where preliminary relief would disrupt a state voting system on the eve of an election" (citing *Purcell*, 549 U.S. at 4 (per curiam)).  Those consequences are only compounded by the prospect that any relief granted by this court could be altered by appellate courts.  *See Thompson*, 959 F.3d at 813 ("rewriting a state's election procedures or moving deadlines rarely ends with one court order").[24]

With respect to the submission deadline, Plaintiffs breezily claim "[m]oving this deadline would still allow sufficient time to certify signatures and print materials in time to mail ballots to overseas voters by September 19, 2020."  Pls.' Mot. 38.  But that's far from certain.  And Plaintiffs barely acknowledge, much less propose how to revise, the "important, interim deadlines"[25] that govern state and county officials' administration of the election.

Plaintiffs assume their petition will be the only one submitted in mid-August, Pls.' Mot. 36, but they never say why the privilege of submitting fewer signatures after the deadline should not be extended to the other four initiatives that have been approved for circulation but have not qualified for the ballot.  *See Garcia v. Griswold*, No. 20-CV-1268-WJM, 2020 WL 2505888, at

---

[24] *See also, e.g.*, *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205 (Apr. 6, 2020) (staying district court order enjoining vote-by-mail deadlines); *Merill v. People First of Ala.*, 589 U.S. ---, No. 19A1063, 2020 WL 3604049 (July 2, 2020) (staying district court order enjoining election laws).

[25] *Thompson v. DeWine*, 959 F.3d 804, 813 (6th Cir. 2020).  *See also Arizona Green Party v. Reagan*, 838 F.3d 983, 991 (9th Cir. 2016) (recognizing, in rejecting challenge to ballot-access deadlines, the state interest in "nested deadlines leading up to" the election as "an effort by the state to achieve the important goal of orderly elections").

Page 30 -   DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

*1 (D. Colo. May 7, 2020) ("Issuing the order Plaintiffs now seek could easily throw that process into chaos—not only just to accommodate Plaintiffs, but perhaps to accommodate others, *i.e.*, if this Court were to grant Plaintiffs relief, it would call into question whether every other candidate claiming a similar impediment should also be placed on the ballot."); Davis Decl. ¶ 7. Even if Plaintiffs are right that only they will continue to petition after the deadline, the injunction they request would be unfair to the other petitioners who sought to qualify other measures for the ballot but gave up. Plus, proponents of countless local initiative petitions could also request the same relief from the deadlines they face. *See, e.g.*, Or. Const. art. IV, § 1(2)(b) (cities); Or. Rev. Stat. § 250.205(4) (non-home rule counties); Or. Rev. Stat. § 255.165 (service districts).

Plaintiffs' late submission of their petition would require an overhaul of the election calendar. The signature verification process begins when enough signatures have been submitted to qualify for the ballot. Or. Rev. Stat. § 250.105(3).[26] The time required to review petitions has increased considerably given the new COVID-19 safety requirements. *See* Davis Decl. ¶ 30.[27] The verification of the only petitions to qualify for the ballot in 2020 took 12 and 27 *working* days. *See id.* ¶ 31. There's no limit to the number of signatures Plaintiffs could submit in attempt to meet a new threshold established by an injunction in this case, and a greater number of signatures submitted requires more time to review. Even without accounting for the other responsibilities of the Elections Division staff to prepare for the general election, it could take

---

[26] Plaintiffs suggest in a footnote, Pls.' Mot. 36 n.28, that this requirement too should be enjoined to accommodate expedited processing of their belated submission. But they do not explain how the sampling methodologies the Secretary employs should be adapted to whatever series of submissions they wish to make. And even if the Court ordered such relief, the Secretary of State would still need time to verify the signatures submitted at whatever final deadline an injunction would set.

[27] For this reason, Plaintiffs' 2018 example of a short verification period (TRO Mot. at 35 & n.26) is not predictive of the time needed to verify their petition. For one thing, Plaintiffs' figures ignore several days of work conducted by the Elections Division. Davis Decl. ¶ 28. But that example is also not predictive because that petition qualified for the ballot after its 1,000-signature initial sub-sample showed, at a 95% level of confidence, that it had sufficient valid signatures to qualify. *Id.* There is no reason to believe IP 57 would clear that bar and avoid review of a full 5.01% sample.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

three weeks or more for the Secretary to verify the signatures Plaintiffs wish to submit by August 17.

If the Secretary's signature review takes more than 16 calendar days after the proposed August 17 deadline, the effects on the election schedule would cascade. The Secretary finalizes the list of federal and state contests and the language that will appear on the ballot for each on September 3. Davis Decl. ¶ 32. That gives the 36 county election offices a mere 16 days to design and print ballots to be mailed to military and overseas voters on September 19. Each county must then design between 6 and 275 unique ballots so each voter receives a ballot listing only the local races in which he or she is eligible to vote. *See id.* ¶ 33. Then the counties must print the ballots and assemble the initial mailing—this year, while their staff and vendors abide by COVID-19 safety protocols. *See id.* ¶ 34–35. Plaintiffs submit no evidence these 16 days are more time than the counties need, and there is no reason to think it is. *See id.* ¶ 36.

Military and overseas ballots must be mailed by September 19 and will be sent earlier if possible to ensure those voters have time to vote. *See* 52 U.S.C. § 20302(a)(8)(A); Or. Rev. Stat. § 253.065(1)(a); Davis Decl. ¶¶ 36–37. Even assuming county officials can rush to design, print, and mail ballots before that federal deadline, the State has an overwhelming interest in having enough time to get the ballots right. Even without outright errors, suboptimal ballot design can cause voters not to vote part of their ballot by mistake.[28]

Plaintiffs' proposed changes would also undermine the other processes the State sponsors to facilitate voters' deliberations on ballot measures, like the Voters' Pamphlet and the financial and explanatory statements. Plaintiffs say their proposed August 17 petition submission deadline would still allow "a few days" for the public "to submit voter's pamphlet statements on the measure" before the August 25 Voters' Pamphlet deadline. Pls.' Mot. 36 n. 28. But even if the

---

[28] *See, e.g.*, Michael C. Herron, et al., "Ballot design, voter intentions, and representation: A study of the 2018 midterm election in Florida," at 34 (concluding "there is no doubt that the ballot design in Broward County inflated the number of undervotes in this election" for U.S. Senate), https://cpb-us-w2.wpmucdn.com/web.sas.upenn.edu/dist/7/538/files/2019/07/broward.pdf.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

signatures could be verified before the Voters' Pamphlet submission deadline (highly doubtful),

Plaintiffs' proposed injunction would severely shrink time the public has to submit Voters'

Pamphlet statements.  Plus, advocates commonly seek to persuade voters by including lists of

endorsements for and against measures, but to do so, they must file a signed form from the

named endorser by the same deadline.  Or. Rev. Stat. § 251.049; SEL 400,

https://sos.oregon.gov/elections/Documents/SEL400.pdf.  Attempting to shrink this process to a

few days—during a pandemic—puts a severe burden on the public participation needed for the

Voters' Pamphlet to fulfill its function to inform the electorate.  And even if the Secretary was

ordered to conditionally accept Voters' Pamphlet submissions before the petition was submitted

or verified, the uncertainty surrounding the ballot measure would likely make the public less

likely to submit statements and endorsements.

Similarly, the financial estimates and explanatory statements are developed from July 6[29]

to August 5.[30]  Plaintiffs simply ignore that these processes are already underway, and that

numerous statutory deadlines fall before their proposed petition submission deadline.  Any

injunction would also have to change these "nested deadlines leading up to [the election],"

*Arizona Green Party*, 838 F.3d at 991.

The pandemic also makes administering any changed deadline more difficult.  The

people who run the machinery of elections must also comply with social distancing and other

health-related obligations while performing necessary elections-related tasks.  Davis Decl. ¶ 9.

Consequently, the Secretary's Elections Division staff cannot verify signatures as quickly as it

has in past years.  And because offices and businesses are not working as usual, it is particularly

---

[29] Or. Rev. Stat. § 251.205(3) (Secretary of State begins appointing members to Explanatory Committee on July 6); Secretary of State, Financial Estimate Committee, https://sos.oregon.gov/elections/Pages/committee-meetings.aspx (noting Financial Estimate Committee meetings July 8, 2020).

[30] Or. Rev. Stat. §§ 251.215(3) (final Explanatory Statement), 250.127(4) (final Financial Estimate).

Page 33 -  DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

imprudent to shorten timelines to design and print ballots.  The reality is that the pandemic would make any changes imposed by an injunction more challenging to implement.

Finally, whatever the State does, last-minute changes to election procedures—and the potential last-minute qualification of a ballot measure—diminish the ability of opponents of the proposed constitutional amendment to have a fair opportunity to get their message to voters.  The orderly administration of the election, as well as the opportunity for proponent and opponent campaigns to communicate with voters, would be adversely impacted.  An order of a federal court changing the requirements to submit an amendment to the Oregon Constitution after the petition deadline has lapsed is not in the public interest for that reason as well.

## IV.    CONCLUSION

Plaintiffs' motion should be denied.


DATED July 9, 2020.

Respectfully submitted,

ELLEN F. ROSENBLUM
Attorney General


_____ *s/ Christina L. Beatty-Walters* _____
CHRISTINA L. BEATTY-WALTERS #981634
BRIAN SIMMONDS MARSHALL #196129
Assistant Attorneys General
Trial Attorneys
Tel (971) 673-1880
Fax (971) 673-5000
Tina.BeattyWalters@doj.state.or.us
Brian.S.Marshall@doj.state.or.us
Attorneys for Defendant Secretary Beverly
Clarno