IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PEOPLE NOT POLITICIANS
OREGON, et al.,

          Plaintiffs,                     Civ. No. 6:20-cv-01053-MC

          v.                              OPINION AND ORDER

BEVERLY CLARNO, in her official
capacity as the Secretary of State of
Oregon, et al.,

          Defendants.

_____

**MCSHANE, Judge**:

## INTRODUCTION

Plaintiffs are a group of organizations petitioning to place an initiative on the November 2020 ballot that would alter Oregon's redistricting process. But before a constitutional amendment is presented to the voters, petitioners must gather the requisite number of signatures from Oregon voters at least four months before the election. Plaintiffs argue that these requirements are unconstitutional as applied during the ongoing coronavirus pandemic and related government regulations that limit social interaction. Defendant Beverly Clarno, Oregon's Secretary of State, counters that the initiative requirements are constitutional and that pandemic-related regulations do not alter their constitutionality. Plaintiffs seek a preliminary injunction that would both lower the required signature threshold and postpone the deadline for when signatures must be filed.

The Court heard oral argument on Plaintiffs' motion and granted the requested preliminary injunction. ECF No. 22. Defendant was given until July 13, 2020, at 5:00 p.m. P.S.T. to decide to either allow Plaintiffs initiative on the ballot as presented, or lower the required signature threshold to 58,789 and extend the submission deadline to August 17, 2020. This written order provides more detail behind the Court's decision and, as stated on the record, controls.

## BACKGROUND

As noted, Plaintiffs are a coalition of government reform organizations seeking to place an initiative before Oregon voters on the November 2020 ballot that would amend the state constitution to create an independent redistricting commission. Plaintiffs propose a commission that would diverge from the current redistricting scheme, a process routinely criticized on the grounds that it allows the political party in power to gerrymander districts into a remarkable jigsaw puzzle that best suits the party's needs by disproportionately impacting the voting power of certain communities.[1] *See Rucho v. Common Cause*, 139 S. Ct. 2484, 2512 (2019) (Kagan, J., dissenting) ("At its most extreme . . . the practice [of partisan gerrymandering] amounts to 'rigging elections.'" (quoting *Vieth v. Jubelirer*, 541 U.S. 267, 317 (2004) (Kennedy, J., concurring in judgment))). To qualify their initiative for the November ballot, Plaintiffs had to submit a certain number of signatures by July 2, 2020.

As described in the Secretary of State's Initiative and Referendum Manual, "the initiative and referendum process is a method of direct democracy that allows people to propose laws or amendments to the Constitution or to adopt or reject a bill passed by the legislature." OREGON ELECTIONS DIVISION, STATE INITIATIVE AND REFERENDUM MANUAL 3 ("INITIATIVE MANUAL")

---

[1] The criticism is often from the minority party, despite their own history of similar behavior when they stood in the majority.

(2020), *https://sos.oregon.gov/elections/Documents/stateIR.pdf*. In many ways, this form of direct democracy was a model for other states when Oregon voters passed the initiative and referendum process in 1902, creating what become known as "The Oregon System." *See generally* David Schuman, *The Origin of State Constitutional Direct Democracy: William Simon U'ren and "The Oregon System,"* 67 TEMP. L. REV. 947 (1994). Since that time, Oregonians have been active participants in a democratic process that touches every aspect of life within our state: women's suffrage, prohibition, compulsory education, hunting, environmental protections, the death penalty, LGBTQ+ rights and discrimination, marijuana legalization, taxation, voter recall, eight-hour work day, freight rates, wages, women jurors, suffrage and housing rights for people of color, jury trials, victim rights, gambling, tobacco, timber, health and safety, transportation, daylight savings time, compulsory retirement for judges, housing, nuclear power, and physician assisted suicide. Indeed, much what makes Oregon unique, for better or for worse, is its robust relationship with direct democracy.

Direct democracy, of course, requires the participation of the electorate. Before a constitutional initiative can be placed on the ballot, its advocates must obtain and submit to the Secretary of State the signatures of voters who support the initiative four months before a general election in a number equal to eight percent of ballots cast in the most recent governor's race. Or. Const. art. IV § 1(2)(c). But even before obtaining the required number of signatures to qualify for the ballot, petitioners must first file the petition with the Secretary of State with the language of the proposed amendment, submit at least 1,000 valid sponsorship signatures, receive a certified ballot title, and receive approval from Oregon's Election Division for the cover and signature sheet to be used when gathering signatures. Decl. of Summer S. Davis ("Davis Decl.") ¶ 4, ECF No. 16. This process may begin at the end of the last election cycle. *Id.* Once a

petitioner meets these requirements, the Election Division will approve their initiative for circulation. INITIATIVE MANUAL 5.

Plaintiffs filed their initiative with the Secretary of State in November 2019. Davis Decl. ¶ 12, Ex. B. Plaintiffs met all other requirements and the Attorney General then issued a ballot title a month later. *Id.* As soon as the ballot title was issued, Becca Uherbelau, *amici* here, appealed the Attorney General's ballot title. *Id.* The Oregon Supreme Court rejected this challenge and Plaintiffs initiative was approved for circulation.

By the time Plaintiffs could begin collecting signatures, a global pandemic had begun, upending all aspects of life. As of July 12, 2020, coronavirus has infected over 12.8 million people and killed over 560,000. *Coronavirus Resource Center*, JOHNS HOPKINS UNIV. & MED., https://coronavirus.jhu.edu/ (last visited July 12, 2020 at 8:38 pm). On March 8, Oregon Governor Kate Brown declared a state of emergency, currently in effect until September 4. Executive Order 20-30 (June 30, 2020), https://www.oregon.gov/gov/Document/executive _orders/eo_20-30.pdf. Fifteen days after declaring a State of Emergency, Governor Brown mandated social distancing and banned all social gatherings "if a distance of at least six feet between individuals cannot be maintained." Executive Order 20-12 (March 23, 2020), https://www.oregon.gov/gov/Documents/executive_orders/eo_20-12.pdf. While Executive Order 20-12 was eventually replaced by later Executive Orders and certain counties could partially reopen, Oregonians still had to maintain physical distance from each other. Executive Order 20-25 (May 14, 2020), https://www.oregon.gov/gov/Documents/executive_orders/eo_20-25.pdf; Executive          Order          20-27          (June          5,          2020), https://www.oregon.gov/gov/Documents/executive_orders/eo_20-27.pdf.

Despite the state's requirements to maintain social distancing, Plaintiffs began attempting to collect the necessary 149,360 signatures by the July 2, 2020 deadline. Quickly realizing that traditional methods of in-person signature gathering were no longer available, Plaintiffs instead tried alternative methods that would not violate the Governor's Executive Orders. This included mailing out over 500,000 packets with the petition inside, to be mailed back after signing, and providing a link to voters where the petition could be printed out, signed, and returned. Decl. of C. Norman Turrill ¶ 25, ECF No. 5. Unsurprisingly, these methods produced a response rate far less than in-person solicitation. *Id.* Plaintiffs have informed the Court that they have collected 64,172 unverified signatures, well short of the required 149,360.

## STANDARD OF LAW

A party seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Defense Council, Inc.*, 129 S. Ct. 365, 374 (2008). The mere possibility of irreparable harm is not enough. Rather, the plaintiff must establish that this harm is likely. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). The standards for issuing a temporary restraining order are like those required for a preliminary injunction. *Lockheed Missile & Space Co., Inc. v. Hughes Aircraft Co.*, 887 F. Supp. 1320, 1323 (N.D. Ca. 1995).

## ANALYSIS

"A plaintiff seeking a preliminary injunction must establish that: 1) it is likely to succeed on the merits; 2) it is likely to suffer irreparable harm in the absence of preliminary relief; 3) the balance of equities tips in its favor; and 4) an injunction is in the public interest." *Reclaim Idaho*

*v. Little*, No. 1:20-CV-00268-BLW, 2020 WL 3490216, at \*5 (D. Idaho June 26, 2020) (citing

*Winter*, 555 U.S. at 20). The Court analyzes the *Winter* factors in turn.

## I. Likelihood of Success on the Merits

Plaintiffs bring an as-applied challenge to Oregon's initiative requirements. They argue

that the effect of COVID-19 and the Governor's Executive Orders in response to slowing the

spread of the virus has created a situation in which they cannot comply with the deadlines and

requirements of the initiative process. The public forums at which they reasonably anticipated

gathering signatures have for the most part disappeared; in part through the safety measures

taken by the Governor and in part from the very real fear people have of the pandemic around

them. As a result, they argue the signature requirements restrict their First Amendment right to

petition the government when applied to Plaintiffs in this unique set of circumstances. They ask

the Court to enjoin the Secretary of State from enforcing portions of the Oregon Constitution,

laws, and administrative rules "requiring the submission of at least 149,360 signatures by July 2,

2020 in order to place Plaintiffs' initiative on the 2020 general election ballot." Pl.'s Mot. for

Prelim. Inj. 2, ECF No. 2.

For their part, Defendant argues that the initiative requirements serve an important

government interest, that the virus and not the government is responsible for what has occurred

to Plaintiffs' initiative efforts, and, in hindsight, that Plaintiffs should have anticipated for

emergencies and started collecting signatures much earlier.[2] Perhaps more compelling, they

argue that Plaintiffs, by not suing sooner, have placed an undue burden on the government

regarding its ability to meet the timelines necessary to get the initiative properly verified,

submitted to the voter's pamphlet for comment, and placed on the November 2020 ballot.

---

[2] When considering whether Plaintiffs acted diligently, the Court considered evidence presented by *amici curiae* Becca Uherbelau and Our Oregon, which allegedly showed that even under the best of circumstances, Plaintiffs were never going to qualify their initiative for the November 2020 ballot.

A. Constitutional Framework

The right to petition the government is at the core of First Amendment protections and this includes the right to present initiatives. *City of Cuyahoga Falls Ohio v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 196 (2003); *see also Meyer v. Grant*, 486 U.S. 414, 421–22 (1988) (explaining that the circulation of ballot petitions is "core political speech"). "Courts generally apply the framework established in *Anderson v. Celebrezze*, as later refined in *Burdick v. Takushi* (the *Anderson-Burdick* framework) when considering the constitutionality of ballot access restrictions." *Reclaim Idaho*, 2020 WL 3490216, at *7 (citing *Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992)).

Plaintiffs argue that because they do not challenge the facial constitutionality of Oregon's initiative requirements, but only challenge them as applied during these unprecedented times, that the Court should instead apply the framework from *Angle v. Miller*, 373 F.3d 1122 (9th Cir. 2012). The Court follows other district courts in the Ninth Circuit in finding that analysis under the *Angle* framework is proper. *Reclaim Idaho*, 2020 WL 3490216, at *7; *Fair Maps Nevada v. Cegavske*, No. 3:20-cv-00271-MMD-WGC, 2020 WL 2798018, at *11 (D. Nev. May 29, 2020). In *Angle*, the Ninth Circuit explained that restrictions on the initiative process will burden core political speech if: (1) the regulations restrict one-on-one communication between petition circulators and voters; or (2) the regulations make it less likely that proponents can obtain the necessary signatures to place the initiative on the ballot. 673 F.3d at 1132. The Court analyzes each category in turn.

Even though Defendant claims otherwise, it is unquestionable that *Angle*'s first category applies. Def.'s Resp. to Pl's Mot. for Prelim. Inj. 19–20, ECF No. 18. The Governor's Executive Orders, issued to diminish the spread of coronavirus, also prevented any one-on-one

communication between petition circulators and Oregon voters. Defendant asks the Court to suspend belief in finding that because the Executive Orders did not explicitly ban petition gathering, Plaintiffs could somehow continue to solicit in-person signatures. Plaintiffs, like all Oregon citizens, were told to stay home and physically distance from others. By continuing to require Plaintiffs to meet a strict threshold and deadline in the middle of a pandemic, Plaintiffs' circulators were prevented from engaging in one-on-one communication with Oregon voters.

The Court now considers the second category and must decide whether Defendant's insistence on strictly applying the initiative requirements made it less likely that Plaintiffs could obtain the necessary signatures. Plaintiffs faced pandemic-related regulations that severely diminished their chances of collecting the necessary signatures by July 2, 2020. Defendant, even when requested, refused to lower the threshold or alter the turn-in deadline.[3] Pl.'s Mot. for Prelim. Inj. 14. "Therefore, the Court finds [that Defendant's] refusal to make reasonable accommodations during this time period made it less likely for [Plaintiffs] to get enough signatures to place [Plaintiffs'] initiative on the November 2020 ballot." *Reclaim Idaho*, 2020 WL 3490216, at *8. Plaintiffs, without an accommodation from Defendant, had an impossible task and can now only get their initiative on the November 2020 ballot with "an order of relief from this Court." *Id.*

Because the Court finds a burden on Plaintiffs core political speech, the Court must now decide what form of review to use when analyzing Defendant's conduct. *See Arizonans for Fair Elections v. Hobbs*, No. CV-20-00658-PHX-DWL, 2020 WL 1905747, at *8 (D. Ariz. Apr. 17, 2020). "Courts apply strict scrutiny when: (1) the proponents of the initiative have been

---

[3] This is even though the Secretary of State, in recognizing Governor Brown's Executive Orders and the health risks posed by coronavirus, suspended all in-person services normally offered by the Secretary of State. *See* Press Release, Oregon Secretary of State, News from the Secretary of State (Apr. 15, 2020), https://www.oregon.gov/newsroom/Pages/NewsDetail.aspx?newsid=36377.

'reasonably diligent' as compared to other initiative proponents; and (2) when the restrictions significantly inhibit the proponents' ability to place an initiative on the ballot." *Reclaim Idaho*, 2020 WL 3490216, at \*8 (quoting *Fair Maps Nevada*, 2020 WL 2798018, at \*11). But if Plaintiffs cannot meet either prong, then the Court will apply a lesser form of scrutiny. *See Angle*, 673 F.3d at 1133.

     *1. Reasonable Diligence*

     Beginning with the first prong, the Court first determines whether Plaintiffs acted "reasonably diligent" as compared to other initiative proponents. *Id.* ("We have held that the burden on plaintiffs' rights should be measured by whether, in light of the entire statutory scheme regulating ballot access, reasonably diligent candidates can normally gain a place on the ballot, or whether they will rarely succeed in doing so." (quotations and citation omitted)). While Plaintiffs argue that they were reasonably diligent, Defendant and *amici curiae* disagree.

     Defendant insists that Plaintiffs "bear the risk of their decision to wait to gather signatures." Def.'s Resp. to Pl's Mot. for Prelim. Inj. 19. Defendant notes that two measures qualified for the November 2020 ballot. Davis Decl. ¶ 6. Those two measures were approved for circulation in the fall of 2019, showing that they had begun the approval process earlier than Plaintiffs. *Id.* Defendants rely heavily on an Arizona District Court's decision to support their argument that Plaintiffs lacked diligence.

     But the decision in *Arizonans for Fair Elections* is distinguishable from the facts here. In *Arizonans for Fair Elections*, while the petitioners waited until late 2019 to file the requisite paperwork, they were able to collect signatures prior to the enactment of coronavirus related guidelines. 2020 WL 1905747, at \*2. Plaintiffs here were not so lucky. Instead, they had to gather signatures while Executive Orders specifically prohibited their ability to connect with

voters in person. Further, like petitioners in *Fair Maps Nevada*, Plaintiffs were delayed in their attempt to collect signatures by litigation brought by a third party. 2020 WL 2798018, at *12. Defendant asks the Court to find that Plaintiffs lacked diligence because they forgot to consult their crystal ball and predict a court challenge, a pandemic, and unprecedented societal upheaval.

The Court instead finds that Plaintiffs submitted considerable evidence reflecting that but-for the pandemic-related restrictions, they would have gathered the required signatures by the July 2 deadline. *See* Pl.'s Reply in Supp. of its Mot. for Prelim. Inj. 11–13, ECF No. 21 (detailing the organizational efforts undertaken by Plaintiffs). Plaintiffs also displayed considerable resilience in pivoting their initiative campaign to a process that still yielded over 60,000 signatures while adhering to Governor Brown's Executive Orders. This number carries additional significance because at oral argument Elizabeth Kauffman, campaign manager for one of the two qualified initiatives, testified that their campaign collected a similar number of signatures during the same time frame. [4]

To reiterate, Plaintiffs only needed to display reasonable diligence in comparison to other initiative proponents. *Angle*, 673 F.3d at 1133. The facts here indicate that Plaintiffs acted with reasonable diligence in their attempt to meet Oregon's initiative requirements.

### 2. *Significantly Inhibit*

Admittedly, the Court made clear at oral argument that only the first prong, whether Plaintiffs were reasonably diligent, was at issue. As explained earlier, Plaintiffs faced many restrictions that, when combined with Defendant's stringently applying the initiative requirements, "significantly inhibit[ed] [their] ability to place an initiative on the ballot."

---

[4] Ms. Kauffman's initiative, IP 44, had a lower signature threshold then Plaintiffs initiative because it proposes a statutory change, not a constitutional amendment. *See Detailed Information for Initiative Number 44*, Oregon Secretary of State: Elections Division, http://egov.sos.state.or.us/elec/web_irr_search.record_detail?p_reference=20200044..LSCYYYY. (last visited July 13, 2020).

*Reclaim Idaho*, 2020 WL 3490216, at *8. The Court does not question the significant regulatory interest Defendant has in maintaining adherence to the initiative requirements laid out in Oregon's constitution. *Id.* (citing *Angle*, 673 F.3d at 1135). But those interests must be considered against the First Amendment protections afforded to citizens petitioning their government. *City of Cuyahoga*, 538 U.S. at 196. "When an initiative fails to qualify for the ballot, it does not become 'the focus of statewide discussion.'" *Angle*, 673 F.3d at 1133 (quoting *Meyer*, 486 U.S. at 423). The Court adopts the reasoning in *Reclaim Idaho* in finding that Defendant's "refus[al] to make reasonable accommodation, during the unprecedented time of the pandemic, reduced the total quantum of speech on the public issue of [partisan gerrymandering]." 2020 WL 3490216, at *8 (quotation omitted).

B. Laches

Defendant also argues that Plaintiffs preliminary injunction request is barred by laches. Def.'s Resp. to Pl.'s Mot. for Prelim. Inj. 25–27. "Laches applies when there is both unreasonable delay and prejudice." *Arizona Libertarian Party v. Reagan*, 189 F. Supp. 3d 920, 922 (D. Ariz. 2016). "Laches . . . requires denial of injunctive relief, including preliminary relief." *Id.*

But as noted by Plaintiffs, "it would have been difficult to file this as-applied constitutional challenge earlier and still met [their] burden of proof." Pl.'s Reply in Supp. of its Mot. for Prelim. Inj. 16. The Court agrees with Plaintiffs and finds that Defendant has failed to "prove both an unreasonable delay by [Plaintiffs] and prejudice to itself." *Evergreen Safety Council v. RSA Newtwork Inc.*, 697 F.3d 1221, 1226 (9th Cir. 2012) (quoting *Couveau v. Am. Airlines, Inc.*, 218 F.3d 1078, 1083 (9th Cir. 2000)).

In sum, the Court finds that Plaintiffs are likely to succeed on the merits of their claim that Oregon's initiative requirements are unconstitutional as applied.

## II. Irreparable Harm

Without a preliminary injunction, Plaintiffs' initiative will not appear on the November 2020 ballot. The Court therefore finds that Plaintiffs are likely to suffer irreparable harm in the absence of injunctive relief.

## III. Balance of Equities

"The Court must also balance the relative hardships on the parties should it provide preliminary relief or decline the request." *Reclaim Idaho*, 2020 WL 3490216, at \*10 (citing *Winter*, 555 U.S. at 20; *Univ. of Hawaii Prof. Asm. v. Cayetano*, 183 F.3d 1096, 1108 (9th Cir. 1999)).

The Court recognizes Defendant's interest in "ensuring the efficient and orderly administration of its elections." Def.'s Resp. to Pl.'s Mot. for Prelim. Inj. 28. The Court also understands the strain that its decision may impose on Defendant's employees and staff as they verify additional signatures.[5] But this consideration must be balanced against the constitutional harm Plaintiffs confront.

When weighing the hardships each party faces, the First Amendment rights trump any concerns about the administration of the relief requested. *See Meyer*, 486 U.S. at 421–22 ("The circulation of a petition involves the type of interactive communication concerning political change that is appropriately describe as 'core political speech.'"). As a result, the balance of equities leans in Plaintiffs favor.

---

[5] Defendant also raised a concern that if the Court were to grant Plaintiffs' request, other initiatives would submit signatures in August. Def.'s Resp. to Pl.'s Mot. for Prelim. Inj. 30. For clarity, the Court's order today applies only to Plaintiffs' as-applied constitutional challenge. Further, the likely difference between Plaintiffs initiative campaign and others is the diligence showed by Plaintiffs here. If other initiatives seek to obtain similar relief, they will need to show the organizational wherewithal that Plaintiffs presented here.

12 – OPINION AND ORDER

## IV. Public Interest

As explained above, the public interest leans in favor of granting injunctive relieve because such a remedy protects Plaintiffs' ability to place their initiative on the November 2020 ballot. The Court finds it worth noting that Oregon's voters will be the ones who ultimately decide whether Plaintiffs initiative will be enacted. Simply put, "issuing a preliminary injunction requiring [Defendant's] to make reasonable accommodation to protect [Plaintffs'] core political speech rights in the initiative process is in the public's interest." *Reclaim Idaho v. Little*, 2020 WL 3490216, at *10.

## V. Remedy

There are considerable concerns raised when a federal court instructs a state on how to run their election process. *See Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) ("This Court has repeatedly emphasized that lower federal could should ordinarily not alter the election rules on the eve of an election." (citations omitted)). "However, as the analysis herein explains, the First and Fourteenth Amendments do place some restrictions on [Defendant's] authority through the preservation of constitutional rights." *Reclaim Idaho*, 2020 WL 3490216, at *11.

In recognizing the potential disruptions any remedy may pose, the Court offers two alternative remedies to Defendant. First, because Plaintiffs have shown a likelihood of success under normal circumstances, Defendant may simply allow Plaintiffs on the ballot. Alternatively, Defendant may choose to reduce the signature threshold by 50%, which would equal 58,789 signatures, and allow Plaintiffs an extension until August 17. Other courts have granted similar relief. *See SawariMedia LLC v. Whitmer*, No. 20-cv-11246, 2020 WL 3097266, at *12 (E.D. Mich. June 11, 2020) (finding that Michigan's signature threshold was not narrowly tailored to

the present circumstances); *Fair Maps Nevada*, 2020 WL 2798018, at *15–16 (finding that enforcement of Nevada's signature deadline was not narrowly tailored to the present circumstances). As detailed in Plaintiffs motion, Plaintiffs' requested accommodations rely on data from previous elections and considered logistical issues defendant could face. *See* Pl.'s Mot. for Prelim. Inj. 32–37.

At oral argument, the Court informed Defendant that they would have until 5:00 p.m. P.S.T. on July 13, 2020 to choose between the two alternative remedies.

## CONCLUSION

The Secretary of State has a vital interest in regulating the petition processes. *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). It is also important that the federal courts not take it upon themselves to rewrite state election rules, particularly on the eve of an election. *Republican Nat'l Comm.*, 140 S. Ct at 1207. But when these rules collide with unprecedented conditions that burden First Amendment access to the ballot box, their application must temper in favor of the Constitution. Because the right to petition the government is at the core of First Amendment protections, which includes the right of initiative, *City of Cuyahoga Falls*, 538 U.S. at 196, the current signature requirements in Oregon law are unconstitutional as applied to these specific Plaintiffs seeking to engage in direct democracy under these most unusual of times. The Court therefore GRANTS Plaintiffs' motion for emergency injunctive relief.


IT IS SO ORDERED.

DATED this 13th day of June, 2020.

_____/s/ Michael McShane_____
**Michael J. McShane**
**United States District Judge**