DANIEL MEEK
Oregon Bar No. 791242
10266 S.W. Lancaster Road
Portland, OR  97219
Telephone: 503-293-9021
dan@meek.net

Attorneys for Plaintiffs
PEOPLE NOT POLITICIANS OREGON,
COMMON CAUSE, LEAGUE OF
WOMEN VOTERS OF OREGON, NAACP
OF EUGENE/SPRINGFIELD,
INDEPENDENT PARTY OF OREGON,
and C. NORMAN TURRILL

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| PEOPLE NOT POLITICIANS OREGON; COMMON CAUSE; LEAGUE OF WOMEN VOTERS OF OREGON; NAACP OF EUGENE/SPRINGFIELD; INDEPENDENT PARTY OF OREGON; C. NORMAN TURRILL, | Case No. 6:20-cv-01053-MC |
| Plaintiffs, | |
| v. | |
| BEVERLY CLARNO, Oregon Secretary of State, | |
| Defendants. | |

# PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Request for Oral Argument by Telephone or Video Conference

# TABLE OF CONTENTS

**Page**

MOTION..................................................................................................................1

MEMORANDUM OF POINTS AND AUTHORITES ......................................2

I. INTRODUCTION ..............................................................................................2

II. STATEMENT OF FACTS................................................................................4

    A. PNP sought to place an initiative on the November 3, 2020 ballot. ..................4

    B. The COVID-19 pandemic radically altered all aspects of life. ..........................6

        1. The pandemic necessitated public health regulations and practices that are incompatible with in-person signature gathering......................6

        2. Oregon instituted wide-ranging public health restrictions and recommendations in response to the pandemic. ............................8

        3. The pandemic fundamentally disrupted PNP's in-person signature gathering. ......................................................................12

        4. Oregon took action to protect other forms of speech during the pandemic, but it did not mitigate the burdens on PNP's right to gather petition signatures. .............................................................15

        5. This Court granted PNP preliminary relief recognizing Defendant's unconstitutional restrictions on its First Amendment rights.........16

III. ARGUMENT ...................................................................................................21

    A. Oregon's signature-gathering requirements violate Plaintiffs' First Amendment rights. .........................................................................................22

        1. PNP was reasonably diligent compared to other initiative proponents. 25

        2. Oregon significantly inhibited PNP's ability to place an initiative on the ballot. ......................................................................31

        3. The burdens on PNP's First Amendment rights were not narrowly tailored. .....................................................................32

    B. Plaintiff's claims are not moot. .........................................................................33

IV. CONCLUSION.................................................................................................38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Celebrezze,*
460 U.S. 780 (1983) ...................................................... 16

*Angle v. Miller,*
673 F.3d 1122 (9th Cir. 2012)................................................*passim*

*Buckley v. Am. Const. L. Found.,*
525 U.S. 182 (1999) ...................................................... 16

*Burdick v. Takushi,*
504 U.S. 428 (1992) ...................................................... 16

*City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.,*
538 U.S. 188 (2003) ...................................................... 16

*Clarno v. People Not Politicians Or.,*
141 S. Ct. 206 (2020) .................................................... 15

*Couey v. Atkins,*
355 P.3d 866 (Or. 2015)............................................. 27, 28

*Eisenberg v. Ins. Co. of N. Am.,*
815 F.2d 1285 (9th Cir. 1987)....................................... 16

*Fair Maps Nevada v. Cegavske,*
463 F. Supp. 3d 1123 (D. Nev. 2020) ........................ 18, 19, 22, 24

*Geddry v. Richardson,*
437 P.3d 1163 (Or. Ct. App.), *review denied sub nom. Geddry v. Clarno*, 451 P.3d 983 (Or. 2019) .................................................. 27

*Hanon v. Dataproducts Corp.,*
976 F.2d 497 (9th Cir. 1992)................................................. 15, 16

*Harisay v. Atkins,*
    434 P.3d 442 (Or. Ct. App. 2018), *aff'd sub nom. Harisay v.*
    *Clarno*, 474 P.3d 378 (Or. 2020) .................................................. 27

*Meyer v. Grant,*
    486 U.S. 414 (1988) .................................................*passim*

*Penn v. Bd. of Parole & Post-prison Supervision,*
    451 P.3d 589 (Or. 2019)................................................. 27

*Rivera v. Phillip Morris, Inc.,*
    395 F.3d 1142 (9th Cir. 2005)...................................... 16

*Rubin v. City of Santa Monica,*
    308 F.3d 1008 (9th Cir. 2002)....................................... 24

*SawariMedia LLC v. Whitmer,*
    466 F. Supp. 3d 758 (E.D. Mich. 2020), *vacated*, No. 20-cv-11246,
    2020 WL 6580461 (E.D. Mich. Oct. 19, 2020) ..................... 22, 24

*SawariMedia LLC v. Whitmer,*
    No. 20-cv-11246, 2020 WL 6580461 (E.D. Mich. Oct. 19, 2020) 22

*State ex rel. Smith v. Hitt,*
    424 P.3d 749 (Or. Ct. App. 2018) ............................... 27

*Uherbelau v. Rosenblum,*
    No. S067451 (Or. Feb. 13, 2020)................................. 19

*Unger v. Rosenblum,*
    407 P.3d 817 (Or. 2017)................................................ 4

**Statutes**

Or. Rev. Stat. § 14.175 .................................................. 27

Or. Rev. Stat. § 249.875(1) ............................................ 21

Or. Rev. Stat. § 250.045 .............................................. 2, 3, 9

Or. Rev. Stat. § 250.045(1) ............................................ 19

Or. Rev. Stat. § 250.045(1)(b)(A) ................................... 26

Or. Rev. Stat. § 250.052(3)(b)-(4) ................................................. 19, 26

Or. Rev. Stat. § 250.065 .......................................................... 3

Or. Rev. Stat. § 250.067 .......................................................... 3

Or. Rev. Stat. § 250.105 .......................................................... 3

Or. Rev. Stat. § 401.021 .......................................................... 6

Or. Rev. Stat. § 401.165 .......................................................... 6

Or. Rev. Stat. § 401.990 .......................................................... 7

## Other Authorities

Fed. R. Civ. P. 56 .............................................................. 15

Or. Const. art IV, § 1, cl. 2(c) .................................................. 3

Or. Const. art IV, § 1, cl. 2(e) .................................................. 4

## **MOTION**

Plaintiffs move for summary judgment on Plaintiffs' Count I and a declaration that Defendants unduly burdened Plaintiffs' ballot access and rights to freedom of speech and association under the First and Fourteenth Amendments to the U.S Constitution.  Pursuant to Local Rule 7-1(a)1.A., undersigned counsel certifies that the parties made a good faith effort through telephone conference to resolve the dispute and have been unable to do so.

This motion is based on the following memorandum of points and authorities, the Declarations of Norman Turrill, Ted Blaszak, Candalynn Johnson, and Daniel Meek and attached exhibits, the arguments of counsel, and all other material which may properly come before the Court at or before the hearing on the motion.

## MEMORANDUM OF POINTS AND AUTHORITES

## I.    INTRODUCTION

Gerrymandering presents a uniquely insidious challenge to liberty.  It allows elected officials to entrench their own political power in perpetuity by shielding themselves from democratic accountability.  It is, therefore, unsurprising that reforms designed to curb gerrymandering by stripping elected officials of the power to manipulate voting districts have found their greatest success in states that allow citizen-initiated ballot measures.  The power to draw districts is one that elected officials guard jealously and rarely give up willingly.  Recognizing this important truth about democratic reforms, Oregonians from the left, right, and center of American politics formed People Not Politicians ("PNP") to gather signatures to place Initiative Petition 57 ("IP 57") on the 2020 general election ballot.  This citizen-initiated ballot measure would have created an independent citizens redistricting commission in Oregon to draw Legislative Assembly and U.S. House districts.  This new commission would have balanced partisanship, strict conflict of interest provisions prohibiting political insiders from drawing voting districts, and nonpartisan guidelines.

Citizen-initiated ballot measures allow Americans to protect fundamental rights through direct democracy, when legislators have no incentive to do so.  In all ballot initiative states, including Oregon, winning the opportunity to place an

initiative before the voters requires the collection of signatures.  Although these
signature requirements are designed to show some threshold level of support for an
idea that justifies placing that idea before the entire electorate for consideration, the
state is not free to enforce these requirements without limitations.

As this Court previously recognized when granting PNP injunctive relief in
July 2020, the State "will burden core political speech if: (1) the regulations restrict
one-on-one communication between petition circulators and voters; or (2) the
regulations make it less likely that proponents can obtain the necessary signatures
to place the initiative on the ballot."  Prelim. Inj. Order at 7, ECF No. 23.  In the
midst of the global COVID-19 pandemic, which triggered public health measures
rendering in-person signature gathering effectively impossible, Oregon refused to
acknowledge the burden faced by PNP.  The State failed to make any adjustments
to allow its residents to make a threshold showing of support for ballot measures
consistent with profound changes to daily life.

Plaintiffs now ask this Court to affirm what it has already recognized: that
Oregon's failure to make any changes to its 2020 ballot initiative process in
response to the COVID-19 pandemic violated PNP's First Amendment rights.

## II.    STATEMENT OF FACTS

### A.    PNP sought to place an initiative on the November 3, 2020 ballot.

PNP is a nonpartisan coalition of good government and civic participation groups dedicated to creating a more transparent, participatory and inclusive redistricting process in the state of Oregon.  Second Decl. of C. Norman Turrill ("Second Turrill Decl."), ⁋ 1.  On November 12, 2019, PNP filed a prospective initiative petition pursuant to Or. Rev. Stat. § 250.045.  Decl. of C. Norman Turrill in Supp. of Pls.' Mot. for TRO ("Turrill Decl."), ⁋ 2.  If enacted, the initiative, later designated IP 57, would have amended the Oregon Constitution to provide for an independent citizens redistricting commission to draw electoral districts for the Oregon House and Senate and U.S. House of Representatives.  Turrill Decl., ⁋ 2. The commission would be composed of twelve Oregonians who are free from conflicts of interest and represent the diversity of the state.  *See* Ex. A (IP 57), at 4-5.[1]  They would be charged with holding public hearings and providing for public input and be required to draw maps in compliance with strict mapping criteria.  *See id.* at 9-11.

On December 5, 2019, sponsorship signatures were submitted for verification pursuant to Or. Rev. Stat. § 250.045.  Turrill Decl., ⁋ 3.  These signatures were collected over a 10-day period from November 25 through

---

[1] All exhibit citations are to the Declaration of Daniel W. Meek.

December 4, 2019, which included the Thanksgiving holiday, through a signature-gathering firm that used in-person, on-the-street petition circulators.  Turrill Decl., ⁋ 3.  Pursuant to Or. Rev. Stat. § 250.045, no more than 2,000 sponsorship signatures could be collected.  On December 20, 2019, the Secretary of State verified 1,656 signatures submitted by PNP and began the ballot title draft process pursuant to Or. Rev. Stat. § 250.065 and Or. Rev. Stat. § 250.067.  Second Turrill Decl., ⁋ 3.  On March 26, 2020, the Oregon Supreme Court approved the final ballot title for IP 57.  Turrill Decl., ⁋ 16.

On April 9, 2020, the Secretary of State approved IP 57 for circulation. Turrill Decl., ⁋ 19.  PNP promptly began the process of gathering signatures electronically but did not begin in-person signature gathering because of the pandemic stay-at-home orders in place in Oregon, and the need to protect voters, volunteers, and paid signature gatherers from potentially contracting the virus. Turrill Decl., ⁋ 22.

To be placed on the ballot, a constitutional amendment initiative typically requires the collection of signatures equivalent to eight percent of the total number of votes cast for candidates for Governor in the most recent election in the state. Or. Const. art IV, § 1, cl. 2(c).  For the 2020 election cycle, this required a petition to collect 149,360 signatures from qualified voters to get on the ballot.  Turrill

Decl., ¶ 4.  The Secretary of State is responsible for receiving the petitions and

verifying the signatures of voters on the petition.  Or. Rev. Stat. § 250.105.

A petition, with sufficient valid signatures, must be filed at least four months

in advance of the election the initiative is meant to be considered.  Or. Const. art

IV, § 1, cl. 2(e).  For the November 3, 2020, election, the deadline was July 2,

2020.  *See id.*  If a petition fails to gather the adequate number of signatures to be

placed on the ballot in the current election cycle, proponents of the initiative are

required to start the signature process again from the beginning for the next

election cycle.  *See Unger v. Rosenblum*, 407 P.3d 817, 824 (Or. 2017).

B.    **The COVID-19 pandemic radically altered all aspects of life.**

The pandemic has resulted in a significant reduction of public activity in

Oregon.  Prelim. Inj. Order at 4.  This necessary public health action is the result of

the adoption of guidance by the federal government, adherence to legal directives

issued by the Governor of the State of Oregon, as well as general public attitudes in

response to an unprecedented global pandemic.

1.    **The pandemic necessitated public health regulations and practices that are incompatible with in-person signature gathering.**

On January 30, 2020, the World Health Organization declared that COVID-

19 constitutes a Public Health Emergency of International Concern.  Ex. B

(reporting WHO's decision).  Over the next two months, President Donald Trump,

Congress, and the Centers for Disease Control (CDC) implemented various emergency declarations and public health guidance, including suggested restrictions for communities on the size of social gatherings, social distancing guidelines intended to reduce interpersonal contact, suggested guidelines on how to protect oneself from contracting COVID-19 and how to protect others if one became infected, and clear guidance to listen and follow the instructions of state and local officials.

Based on a rapidly developing understanding by the scientific community of how COVID-19 was spreading, the CDC recommended that individuals avoid close contact with people outside a person's home: "Outside your home: Put 6 feet of distance between yourself and people who don't live in your household." Ex. C (listing CDC's COVID-19 prevention recommendations).

Additionally, the CDC has warned that "[c]urrent evidence suggests that SARS-CoV-2 may remain viable for hours to days on surfaces made from a variety of materials. Cleaning of visibly dirty surfaces followed by disinfection is a best practice measure for prevention of COVID-19 and other viral respiratory illnesses in community settings." Ex. D (describing CDC's recommended cleaning protocols).

The CDC has consistently recommended disinfection of high touch surfaces and hand washing before and after touching common surfaces: "Clean AND

disinfect frequently touched surfaces daily.  This includes tables, doorknobs, light switches, countertops, handles, desks, phones, keyboards, toilets, faucets, and sinks. . . . If surfaces are dirty, clean them.  Use detergent or soap and water prior to disinfection."  Ex. C (listing CDC's COVID-19 prevention recommendations).

As explained below, the entire enterprise of gathering signatures to qualify a ballot initiative depends on signature gatherers placing themselves in high traffic areas with large numbers of strangers, talking with people in close physical proximity, and handing interested individuals a clipboard with a petition, and a pen, to ready and sign the petition.  The practices recommended by the CDC and responsible government officials are fundamentally incompatible with the traditional in-person signature gathering that the State of Oregon requires.

> **2.    Oregon instituted wide-ranging public health restrictions and recommendations in response to the pandemic.**

Nearly simultaneously with the federal government, Oregon Governor Kate Brown issued an escalating series of Executive Orders aimed at protecting public health through the curtailing of public activities and in-person gatherings of unrelated individuals.  These Executive Orders, while necessary for public health purposes, severely limited public gatherings, person-to-person conversations, and physical contact with petitions that play a central role in signature-gathering efforts.

On March 7, 2020, Governor Brown issued Executive Order No. 20-03,

declaring a state of emergency pursuant to Or. Rev. Stat. §§ 401.165 et seq.,

finding "that the novel infectious coronavirus has created a threat to public health

and safety, and constitutes a statewide emergency under [Or. Rev. Stat. §]

401.021(1)."  The Executive Order established that the state of emergency would

"exist for sixty days . . . unless extended or terminated earlier by the Governor."

Or. Exec. Order No. 20-03 (Mar. 7, 2020).  On March 12, 2020, Governor Brown

issued Executive Order No. 20-05: Prohibiting Large Gatherings Due to

Coronavirus (COVID-19) Outbreak in Oregon.  The Executive Order banned

gatherings larger than 250 people and ordered the statewide closure of K-12

schools.  Or. Exec. Order No. 20-05 (Mar. 12, 2020).  The Executive Order applied

to "community, civic, public, leisure, faith-based, and sporting events, concerts,

conventions, fundraisers, and any similar events or activities," if a minimum of

three feet of space could not be maintained between participants.  *Id.*

On March 17, 2020, Governor Brown issued Executive Order No. 20-07:

Prohibiting On-Premises Consumption of Food or Drink and Gatherings of More

Than 25 People.  This Executive Order further restricted public movement,

required additional social distancing measures, and banned all public gatherings of

25 or more people.  Or. Exec. Order No. 20-07 (Mar. 17, 2020).  On March 23,

2020, Governor Brown issued Executive Order No. 20-12:  Stay Home, Save

Lives: Ordering Oregonians to Stay at Home, Closing Specified Retail Businesses,

Requiring Social Distancing Measures for Other Public and Private Facilities, and

Imposing Requirements for Outdoor Areas and Licensed Childcare Facilities.  This

Executive Order established mandatory social distancing requirements of at least

six feet from any person who does not live in the same household, with violations

subject to penalties described in Or. Rev. Stat. § 401.990.  Or. Exec. Order No. 20-

12 (Mar. 23, 2020).  The order includes no end date, stating that it will remain in

effect "until terminated by the governor."  *Id.*

As an extension of the Governor's order, multiple additional agencies have

issued similar guidance.  The Oregon Occupational Safety and Health Division

issued rules for employers to require masks and physical distancing of employees.

Ex. E (Temporary Rule Addressing COVID-19 Workplace Risks, Oregon

Occupational Safety and Health Division (Nov. 6, 2020)), § 3(a)-(b).  OSHA also

issued cleaning and sanitation rules: "The employer must regularly clean or

sanitize all common areas, shared equipment, and high-touch surfaces as defined

by this rule that are under its control and that are used by employees or the public."

*Id.* § 3(c).

On May 1, 2020, when COVID-19 cases continued to climb, Governor

Brown signed Executive Order No. 20-24, extending the state of emergency in

response to COVID-19 for an additional 60 days through July 6, 2020.  Or. Exec.

Order No. 20-24 (May 1, 2020). On May 14, 2020, Governor Brown issued

Executive Order No. 20-25: A Safe and Strong Oregon: Maintaining Essential

Health Directives in Response to COVID-19, and Implementing a Phased

Approach for Reopening Oregon's Economy. This order established criteria

counties would have to meet before being allowed to move to a phased reopening

of businesses and other facilities and permit gatherings of gradually increasing

number of individuals in those counties. Or. Exec. Order No. 20-25 (May 14,

2020).

Phases I and II of Oregon's gradual reopening still mandate physical

distancing of at least six feet and significant restrictions on large gatherings. Or.

Exec. Order No. 20-27 (June 5, 2020).

In total, Governor Brown has extended Executive Order No. 20-03 five

times: on May 1, 2020, with Executive Order No. 20-24; on June 30, 2020, with

Executive Order No. 20-30; on September 1, 2020, issuing Executive Order No.

20-38; on October 27, 2020, issuing Executive Order No. 20-59; and on December

17, 2020, issuing Executive Order 20-67. Each extended the state of emergency in

response to COVID-19 for an additional 60 days.

The fifth and most recent extension of the State of Emergency, Executive

Order 20-67, extended restrictions through March 3, 2021, noting:

> The ongoing threat of COVID-19, the dramatic surge in cases and
> deaths in Oregon and nationwide, and our state's emergency response

efforts require us to stay the course, for now.  The difficult work of controlling the statewide spread of this virus must continue, and must continue to evolve as we learn more and conditions change.  This emergency is not over, and neither is our emergency response.

### 3.    The pandemic fundamentally disrupted PNP's in-person signature gathering.

Following the emergence of the COVID-19 pandemic, state and local public health restrictions have largely barred the conduct and strategies on which pre-COVID-19 signature collection typically relied.  Under normal circumstances, signatures are gathered through a variety of methods, which rely on extensive in-person contact.  Decl. of Ted Blaszak in Supp. of Pls.' Mot. For TRO ("Blaszak Decl."), ¶ 4.  Signature gatherers go out into public spaces, such as markets, public transportation nexuses, and other highly-trafficked areas.  Blaszak Decl., ¶ 4.  Signature gatherers approach strangers with a clipboard, petitions, pens, and campaign paraphernalia.  Blaszak Decl., ¶ 4.  The signature-collection process typically requires signature gatherers to speak one-to-one with potential voters in close physical proximity.  Blaszak Decl., ¶ 4.  If a registered voter agrees to sign the petition form, the volunteer hands them the clipboard, the petition form, and a pen.  Blaszak Decl., ¶ 4.  The signature gatherer may also give the voter campaign literature and paraphernalia.  Naturally, this interaction involves passing items back and forth between the volunteer and voter.  Blaszak Decl., ¶ 4.  Volunteers repeat this type of interaction—in spaces far closer than six feet apart—with at least tens of voters in a typical canvassing "shift."  These kind of close interactions between

strangers of different households are exactly the type of activity COVID-19 public health restrictions have prohibited.  Blaszak Decl., ₱ 5.

Oregon laws are built around the model of in-person signature gathering where the circulator is trained to communicate with voters and witness voters affixing their signatures to a petition, and to ultimately attest to this practice on each signature page by signing the petition.  Blaszak Decl., ₱ 4; *see also Meyer v. Grant*, 486 U.S. 414, 416, 424 (1988) (striking down a prohibition against the use of paid petition circulators and calling direct one-on-one communication "the most effective, fundamental, and perhaps economical avenue of political discourse").  Oregon laws around signature-gathering requirements are built on an assumption of close interpersonal conversation and contact between the signature gatherer and voter.  The circulator must swear that she believes that the signer is "an elector" (which means an Oregon registered voter).  Creating that belief requires the circulator to ask, "Are you a registered Oregon voter?"  The circulator must also swear that she "witnessed the signing of the signature sheet by each individual." Or. Rev. Stat. § 250.045.  Compliance with social distancing requirements directly interferes with the close contact necessary to make these attestations.

The disruption of normal signature-collecting methods extends beyond social distancing restrictions.  Through shelter-in-place orders, Oregonians were ordered under penalty of law to stay at home.  Restaurants, government buildings,

schools, and other establishments where Plaintiffs would traditionally have been able to gather signatures have been closed or access has been sharply limited. Turrill Decl., ⁋ 10.  Even if traditional signature-gathering methods had been legally permissible, they would have run counter to public health concerns and posed risks to PNP's signature gatherers and potential voters.  Turrill Decl., ⁋ 11.

While the laws may allow for voters at home to print petitions and sign them, the very specific requirements – such as printing the petitions on uncoated, white 20-lb paper, printing on both sides of each pages, and requiring each page of voter signatures to be signed and dated by a witness – are *not* designed for, and in fact are counter-productive – to at-home petition circulation by people within a household.  Ex. F (State Initiative and Referendum Manual), at 23.

Even after the Nov. 3, 2020, elections, no abatement of COVID-19 is in sight, with caseloads surging, and new severe restrictions.  *See, e.g.*, Or. Exec. Order No. 20-67 (December 17, 2020) (extending state of emergency into March 2021).  The severe limitations, while necessary for public health, continue to limit PNP from safely gathering signatures in public, finding high-traffic areas or public events to collect signatures, or engaging in any in-person contact between signature gatherers on the street and members of the public.

**4.    Oregon took action to protect other forms of speech during the pandemic, but it did not mitigate the burdens on PNP's right to gather petition signatures.**

Oregon recognized the pandemic's extraordinarily disruptive effect on normal life and took affirmative steps to adjust regulations and procedures to help protect and ensure continued political participation.  For example, Oregonians typically can participate in public meetings in a variety of ways, including by attending meetings in person and providing in-person testimony.  Due to the pandemic, on April 15, 2020, Governor Brown issued an Executive Order requiring that public meetings in the state make available a method for the public to attend the meeting at the same time that it occurs, whether by telephone, video, or other electronic means.  Or. Exec. Order No. 20-16 (Apr. 15, 2020).

Oregon election officials similarly made pandemic-related changes to the state's voting process.  The Multnomah County Elections Division coordinated closely with the Multnomah County Library to expand ballot drop-off access at all 19 of the County's library locations.  Ex. G (reporting on Multnomah library ballot drop box program).  Voters normally can drop off ballots inside a library during its hours of operation, but to protect public health, the County's libraries were closed during the May 19, 2020, primaries.  *See id.*  To accommodate voters, the County converted exterior book-drop slots at the libraries into 24-hour locations to drop off ballots.  *Id.*  This new drop-off method was heavily used in the May 19, 2020

primaries: 36,438 (13%) of Multnomah County's total 279,738 mail-in ballots were dropped off through the exterior slots.  *Id*.  The expanded library drop-off access continued for the general election.  *See id.*

PNP sought analogous protections for its First Amendment rights given the exceptional challenges it faced because of the application of pre-pandemic referenda requirements to the dramatically changed pandemic environment. Specifically, PNP requested that Oregon's signature submission deadline during this unique time be extended until August 17 and the 2018 threshold for referenda (58,789) be adopted as the most appropriate basis of demonstrating sufficient support in light of the pandemic-related orders prohibiting in-person signature gathering.  Ex. H (Email from Stephen Elzinga), at 2.

The Secretary of State confirmed receipt of PNP's request, but made no adjustment to its pre-pandemic requirements to account for the current exceptional circumstances and burdens on PNP's signature-gathering activities.  Second Turrill Decl., ¶ 4.

### 5.    This Court granted PNP preliminary relief recognizing Defendant's unconstitutional restrictions on its First Amendment rights.

On June 13, 2020, this District Court granted PNP a preliminary injunction, finding that PNP was likely to succeed on its as-applied First Amendment claim and giving the Secretary of State's office the option of either allowing IP 57 on the

ballot or reducing the signature threshold by 50%, which would equal 58,789 signatures, and allowing Plaintiffs an extension until August 17. Prelim. Inj. Order at 2; Min. Order, ECF No. 25 (clarifying signature threshold).

Specifically, this Court found that PNP had timely filed with the Oregon Secretary of State prospective petitions for what was later designated IP 57; had collected the prerequisite 1,000 signatures to receive ballot title and summary in a timely manner; and even after several months of court battles over title and summary, had been cleared for signature gathering March 27, 2020. Prelim. Inj. Order at 3-4. This would have been a sufficient amount of time to gather the requisite signatures in time to qualify for the November 2020 ballot, in normal times. Prelim. Inj. Order at 10.

But this election cycle was anything but typical. By the time the Oregon Supreme Court certified IP 57's ballot title, a global pandemic was underway. Prelim. Inj. Order at 4. Just four days earlier, Oregon Governor Kate Brown issued the Stay Home, Save Lives Order, Executive Order 20-12, which, among other things, required individuals to remain at their places of residence to the maximum extent possible and prohibited any gathering where a distance of at least six feet between individuals could not be maintained. Prelim. Inj. Order at 4; Or. Exec. Order 20-12 (Mar. 23, 2020).

Given the Executive Orders in place, Oregon had effectively prohibited the solicitation of in-person signatures, and PNP was left with "an impossible task" late in the initiative petition cycle when the Secretary of State required PNP to meet a signature threshold and deadline premised on the availability of in-person signature gathering.  Prelim. Inj. Order at 8.  These insurmountable challenges were uniquely applied to PNP's initiative.  No other still-active initiative faced this perfect storm of challenges in qualifying for the ballot—the burden of pre-pandemic qualification requirements combined with a signature-collection period that fell entirely during the pandemic's public health restrictions.  Blaszak Decl., ¶ 5.

Despite these sudden and mid-election-cycle changes, PNP quickly adapted and launched a new method of signature gathering that would comport with Governor Brown's orders.  Prelim. Inj. Order at 10.  In a matter of weeks, PNP built from scratch a signature-gathering campaign that relied exclusively on downloadable and mail petition signature-gathering methods.  Decl. of Candalynn Johnson in Supp. of Pls.' Mot. for TRO, ¶ 7.  These methods are permissible under Oregon state law but have not been used as the primary infrastructure in Oregon's initiative campaigns because of additional requirements that make these strategies cumbersome and far less likely to succeed.  For example, "most homes do not have the capacity to print documents, double-sided where necessary, on the required 20-

pound paper, and any printed petition [must] still . . . be addressed and mailed by the signing party, creating additional barriers to participation."  Turrill Decl., ⁋ 15. Unsurprisingly, in-person signature gathering is a far more efficient and effective means of gathering signatures.  Blaszak Decl., ⁋⁋ 3–5.

Nonetheless, PNP built an infrastructure for collecting petitions in a world where traditional "street" soliciting was not possible.  PNP "launched an online portal for Oregonians to view, download, and print the IP 57 petition and signature page."  Turrill Decl., ⁋ 22.  PNP also mailed over 500,000 packets to households, reaching over 1.1 million Oregon voters.  Turrill Decl., ⁋⁋ 25, 29.  One of PNP's coalition members, Common Cause, organized an effort to send texts to over 25,000 Oregon voters with a link allowing them to print the petition, which they could sign and mail in.  Turrill Decl., ¶ 25.

This Court found that PNP likely would prevail in demonstrating that, but-for the pandemic-related restrictions, PNP would have gathered the required signatures by the deadline.  Prelim. Inj. Order at 10.  Based on this burden on PNP's First Amendment rights, the court ordered the Oregon Secretary of State to provide relief.  Prelim. Inj. Order at 13-14.  The Secretary of State chose to allow PNP to meet a lower threshold of signatures with more time to collect and began verifying the petition signatures that had been submitted.  Ex. I (Def.'s Notice in Resp. to Prelim. Inj. Order), at 2.

Following the District Court's Preliminary Injunction, PNP continued to diligently collect signatures by mail and email.  An additional 200,000 petition packets were mailed to Oregon households, to ensure that there would be a sufficient number of valid signatures after the Oregon Secretary of State discarded petitions that were not printed on 20-pound paper, were printed single-sided, or were not returned with an additional witness signature that was dated after the signatures of the petition signers.  Second Turrill Decl., ¶ 5.

PNP is one of the few campaigns that has ever attempted a mail-based signature-gathering strategy for an initiative in Oregon, and such a strategy "has never succeeded in Oregon political history" for qualifying a statewide initiative onto the ballot.  Blaszak Decl., ¶ 6.  In the face of a worldwide pandemic, PNP built an entire mail and online infrastructure from the ground up in just months; mobilized volunteers to process petitions in a socially distant and safe manner; and ultimately submitted over 60,000 signatures in an effort that, in this Court's words, showed "considerable resilience."  Prelim. Inj. Order at 10.  By July 30, 2020, well ahead of the District Court's extended deadline, the Secretary of State's office verified that PNP had met the court's threshold of 58,789 signatures to qualify for the November 2020 ballot.  *See* Ex. J (Secretary of State's online record for IP 57).

Further, using the mail to distribute signature sheets did not remove the requirement that each voter signature be "witnessed" by a circulator who also

signed and dated the sheet and provided her printed name and address. Oregon law allows a registered voter to "witness" her own signature. But, if others also signed the mailed signature sheet, the circulator of that sheet was required to actually "witness" the signatures of the others.

Despite the Secretary of State's actions, the Oregon Attorney General pursued an emergency stay, first from the Ninth Circuit, and when that was denied, from the Supreme Court. *See Clarno v. People Not Politicians Or.*, 141 S. Ct. 206 (2020). The Supreme Court granted a stay of the injunction through the date of the election. *Id.* Having successfully run out the clock on injunctive relief, Oregon blocked PNP's redistricting reform initiative from being considered by voters in November.

Following the November 3, 2020, elections, several of the non-profit groups anchoring PNP have convened to restart the petition process to place an initiative petition on the 2022 ballot. Second Turrill Decl., ¶ 6. PNP hereby seeks summary adjudication of its declaratory relief claim, recognizing that Defendant violated its First Amendment rights.

## III.    ARGUMENT

Under Rule 56 of the Federal Rules of Civil Procedure, this Court may issue an order of summary judgment. Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "This

rule does not require that there be no factual dispute." *Hanon v. Dataproducts

Corp.*, 976 F.2d 497, 500 (9th Cir. 1992). "[T]he mere existence of some alleged

factual dispute between the parties will not defeat an otherwise properly supported

motion for summary judgment; the requirement is that there be no *genuine* issue of

*material* fact." *Id*. (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48

(1986)). A fact is "material" if it could affect the outcome of the case. *Rivera v.

Phillip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005). "If the evidence is

merely colorable, . . . or is not significantly probative, summary judgment may be

granted." *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1288 (9th Cir. 1987)

(omission in original) (quoting *Anderson*, 477 U.S. at 249-50).

### A.    Oregon's signature-gathering requirements violate Plaintiffs' First Amendment rights.

No genuine dispute of material fact remains as to whether Oregon's

signature-gathering requirements violate Plaintiffs' First Amendment rights. The

right to petition the government is at the core of First Amendment protections,

which include the right of initiative. *City of Cuyahoga Falls v. Buckeye Cmty.

Hope Found.*, 538 U.S. 188, 196 (2003). As such, the circulation of ballot

petitions is "core political speech" where First Amendment protection is at its

"zenith." *Meyer v. Grant*, 486 U.S. 414, 421-22, 425 (1988). Courts assess

regulations of and restrictions on the right to engage in political expression under

the sliding-scale standards established by *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992).  Regulations that are overly burdensome to the initiative process—let alone regulations that would make participation in the initiative process effectively impossible—are met with strict scrutiny.  *See Buckley v. Am. Const. L. Found.*, 525 U.S. 182, 192, 197 (1999) (blocking requirement that petition circulators be registered voters).

The Ninth Circuit has found two categories of restrictions on initiatives that create a "severe burden" on core political speech: those (1) "restrict[ing] one-on-one communication between petition circulators and voters" or (2) "mak[ing] it less likely that proponents will be able to garner the signatures necessary to place an initiative on the ballot."  *Angle v. Miller*, 673 F.3d 1122, 1132 (9th Cir. 2012). As the Court properly held in considering PNP's motion for a preliminary injunction, the evidence supports the presence of both types of severe burdens on PNP's rights.  *See* Prelim. Inj. Order at 7-8.  For purposes of summary judgment, however, PNP need only establish the presence of one type of restrictions.

PNP undisputedly suffered from the second type of *Angle* restrictions: "Defendant's insistence on strictly applying the initiative requirements made it less likely that Plaintiffs could obtain the necessary signatures."  Prelim. Inj. Order at 8. Tellingly, Defendant has never argued anything to the contrary—that COVID-19-related restrictions had no impact (or a positive impact) on PNP's ability to obtain

necessary signatures—nor could it do so credibly.  As the Court properly

recognized, there is ample undisputed evidence that "Plaintiffs faced pandemic-

related regulations that severely diminished their chances of collecting the

necessary signatures by July 2, 2020."  Prelim. Inj. Order at 8.  For example,

starting on March 7, 2020, Governor Brown has issued a series of executive orders

that prohibited large gatherings of people and mandated physical distancing.

Turrill Decl., ¶¶ 10, 14.  These orders limited precisely the type of gatherings that

are crucial to efficient collection of signatures for Oregonians seeking the

placement of an initiative on the ballot.  Blaszak Decl., ¶¶ 4-5.  Executive Order

20-12 (Stay Home, Save Lives) required individuals "to the maximum extent

possible . . . [to] stay at home or at their place of residence," and prohibited any

nonessential gatherings "if a distance of at least six feet between individuals cannot

be maintained."  Turrill Decl., ¶ 14.  In order to abide by the governor's executive

orders and ensure the safety of campaign personnel, the campaign immediately

halted all in-person efforts to gather signatures.  Turrill Decl., ¶ 15.  Although the

Secretary of State adjusted other policies in response to these orders, it refused to

make any accommodation for PNP to mitigate the undisputed obstacles to

collecting the required number of signatures.  Prelim. Inj. Order at 8 & n.3.

     Thus, given the undisputed burden of the restrictions on PNP's rights, the

Court will review the constitutionality of the restrictions using strict scrutiny if "(1)

the proponents of the initiative have been 'reasonably diligent' as compared to other initiative proponents; and (2) when the restrictions significantly inhibit the proponents' ability to place an initiative on the ballot." *Fair Maps Nevada v. Cegavske*, 463 F. Supp. 3d 1123, 1142 (D. Nev. 2020) (quoting *Angle*, 673 F.3d at 1133). Here, as the Court previously found, Prelim. Inj. Order at 9-11, evidence supports both PNP's reasonable diligence and the restrictions' significant inhibition of PNP's rights.

**1.    PNP was reasonably diligent compared to other initiative proponents.**

Plaintiffs' efforts to collect signatures in the midst of a global pandemic meet the first *Angle* requirement for application of strict scrutiny to Oregon's ballot initiative signature requirements. Plaintiffs only need to display reasonable diligence in comparison to other initiative proponents. *Angle*, 673 F.3d at 1133.

In *Fair Maps Nevada*, the federal court found reasonable diligence when petitioners pushed forward with organizing their campaign infrastructure during pre-circulation legal challenges, began gathering signatures as soon as the main legal challenges were resolved, and continued working on their campaign infrastructure when COVID-19-related government orders effectively prevented circulation. 463 F. Supp. 3d at 1143-44. This was despite the facts that petitioners (1) did not file their initiative until November 4, 2019; (2) had collected roughly 10% of required signatures—only about 10,000 out of the 97,598 needed; (3) did

not even attempt to collect any signatures after the stay-at-home order went into effect; and (4) had not presented any evidence about comparable initiative campaigns. *Id.* Since this fact pattern showed reasonable diligence, Plaintiffs in this case satisfy this requirement easily.

First, PNP initiated its signature-gathering efforts at a reasonable time. PNP filed the initiative petition at issue here on November 12, 2019. Turrill Decl., ℙ 2. Nine of the over 60 other initiatives this cycle were filed at later dates. *See* Ex. K (showing filing dates for 2020 initiative petitions). Oregon law requires that any prospective ballot initiative effort collect and submit to the Secretary of State's office an initial set of between 1,000 and 2,000 signatures. Or. Rev. Stat. § 250.045(1). PNP demonstrated its initial diligence by collecting the requisite signatures quickly over the Thanksgiving weekend in 2019. Turrill Decl., ℙ 3.

After collecting the initial set of signatures in the traditional in-person manner, PNP timely submitted the sponsorship signatures to the Elections Division. Turrill Decl., ℙ 3. Opponents of IP 57 quickly launched a legal challenge to the initiative's draft ballot title. *See* Ex L ([Amended] Petition to Review Ballot Title Certified by the Attorney General for Initiative Petition 57 (2020), *Uherbelau v. Rosenblum*, No. S067451 (Or. Feb. 13, 2020)). Under Oregon law, petitioners cannot collect more than the first 2,000 signatures until the ballot title is finalized. See Or. Rev. Stat. § 250.052(3)(b)-(4). The Oregon

Supreme Court did not certify the final ballot title needed to begin signature

collection until March 26, 2020.  Turrill Decl., ⁋ 16.

Yet even with litigation-related delays, PNP's efforts still fell within the

range of reasonable diligence given historical practice.  In every election cycle this

decade, initiatives that have received final ballot title approval to begin circulating

around the same time, or even much later, have qualified for the ballot—2018 (IP

37, March), 2016 (IP 65, March), 2014 (IP 55, May; IP 44, May; IP 53, March),

2012 (IP 21, April; IP 35, April), and 2010 (IP 77, March).  *See* Ex. M (showing

approval dates for past qualified initiatives).  In fact, these similarly timed

initiatives represent just over one-third (8/23) of the initiatives that have qualified

for the ballot this decade—2018 (1/4); 2016 (1/4); 2014 (3/4); 2012 (2/7); 2010

(1/4).  *See* Ex. N (showing qualified initiatives for each year).  As such, ballot title

approval in March is consistent with reasonable diligence.

Second, PNP's signature-gathering efforts—conducted entirely after the

onset of the pandemic—easily demonstrated reasonable diligence.  On April 9,

2020, the Secretary of State cleared PNP to gather petition signatures.  Turrill

Decl., ⁋ 19.  By that time, Oregon Governor Brown's first Stay Home, Save Lives

orders had been in place for weeks.  Turrill Decl., ⁋ 14.  No other still-active

initiative faced this perfect storm of challenges in qualifying for the ballot: the

burden of pre-pandemic qualification requirements combined with a signature-

collection period that fell during the height of the pandemic's public health restrictions. All three other initiatives that faced the same situation (2020 IPs 45, 46, and 60) gave up. Ex. O (providing Secretary of State's online records for abandoned initiatives).

During PNP's signature-collection period, state and local regulations banned gatherings of more than 25 persons and shut all businesses except those providing essential services. Or. Exec. Order No. 20-07 (Mar. 17, 2020). With no "return to normal" in sight, PNP devised an alternative plan to contact voters through email, mail, phone, and texts. Turrill Decl., ¶ 22. But the cascading closures or disruptions of support organizations, vendors, and government offices as a result of the pandemic-related orders frustrated even these alternative efforts. Turrill Decl., ¶ 23. On May 1, 2020, Governor Brown issued an Executive Order extending the state of emergency in response to COVID-19 to July 6, 2020. Or. Exec. Order No. 20-24 (May 1, 2020).

To push forward despite the extended emergency orders, PNP activated a website portal to allow Oregonians to download petition and signature pages at home, print them, and return the signatures by mail. Turrill Decl., ¶ 22. Additionally, because most households do not have the capacity to print documents on 20-pound paper at home, PNP printed and mailed petition packets to 500,000 households with a total of over 1.1 million Oregon voters. Turrill Decl., ¶ 29.

These packets provided the petition, signature page, instructions, and return envelope that would allow every eligible person in the household to sign a petition and mail it back.  Turrill Decl., ℙ 29.  Coalition member Common Cause organized an effort to send texts to 25,220 Oregon voters with a link allowing them to print, sign, and mail one or more petitions.  Turrill Decl., ℙ 25.  These efforts yielded impressive results, particularly given that the mail and internet outreach required a significant infrastructural shift to largely untested methods of signature gathering. Turrill Decl., ℙ 30.

Comparisons to parallel signature-gathering efforts demonstrate PNP's undisputed diligence.  During the same time period, one recall petition campaign was active in State Senate District 26.  Recalls have 90 days to gather signatures. Or. Rev. Stat. § 249.875(1).  After the first few weeks of circulation before COVID-19 orders, the recall campaign was on track to gather the 9,025 needed signatures well before the June 2 deadline.  Ex. P (reporting on failed recall effort). However, the campaign said that "because of the restrictions required to keep Oregonians safe during the COVID-19 crisis, in-person signature gathering had to stop abruptly, and it became impossible to maintain our pace."  *Id.*  Only a few hundred signatures were gathered from voters who were able to "locat[e] the petition online, print[] it, and mail[] in their signatures."  *Id.*  Despite facing similar difficulties, PNP has been far more diligent.

PNP gathered over 60,000 signatures—an average of just over 20,000 per month in April, May, and June.  Turrill Decl., ⁋ 30.  This was well ahead of the pace of signature gathering for the two other initiatives that were still active at that point in the election cycle.[2]  IP 34 managed to gather and submit 8,609 signatures from April 1 to May 22—a pace around 76% lower than PNP.  *See* Ex. Q (Secretary of State's online record for IP 34).  IP 44 managed to gather and submit 21,134 signatures from April 1 to June 19—a pace around 57% lower than PNP.  *See* Ex. R (Secretary of State's online record for IP 44).  Thus, PNP gathered signatures at a far higher rate during the pandemic restrictions—more than demonstrating that PNP was "reasonably diligent."

Ultimately, PNP collected over 40% of the normal signature threshold despite pandemic-related restrictions.  This is far above the 10% found sufficient in *Fair Maps Nevada* and close to the 60% found sufficient in *SawariMedia*.  *See Fair Maps Nev.*, 463 F. Supp. at 1144; *SawariMedia LLC v. Whitmer*, 466 F. Supp. 3d 758, 772 (E.D. Mich. 2020), *vacated*, No. 20-cv-11246, 2020 WL 6580461 (E.D. Mich. Oct. 19, 2020).[3]  In short, PNP has engaged in a creative and energetic

---

[2] Both of those initiatives received ballot title clearance earlier, *see* Ex. Q; Ex. R (providing title-clearance dates for IPs 34 and 44), but they continued collection efforts to offset likely invalid signatures.

[3] The Eastern District of Michigan later vacated its judgment in *SawariMedia* after a declarant "retracted several factual assertions on which the injunction was based" and the plaintiffs voluntarily dismissed the case.  *SawariMedia LLC v. Whitmer*, No. 20-cv-11246, 2020 WL 6580461 (E.D. Mich. Oct. 19, 2020).  The court did not question the reasoning of its original decision.  *See id.*

effort to meet pre-pandemic signature requirements that have not been appropriately adjusted to meet the current unprecedented emergency circumstances. PNP's efforts go beyond reasonable diligence. *See* Prelim. Inj. Order at 10 ("The facts here indicate that Plaintiffs acted with reasonable diligence in their attempt to meet Oregon's initiative requirements.").

> ### 2.    Oregon significantly inhibited PNP's ability to place an initiative on the ballot.

Oregon's signature-gathering requirements—and the Secretary of State's refusal to grant PNP relief from them—satisfy the second *Angle* requirement for strict scrutiny because they significantly inhibited PNP's ability to place IP 57 on the ballot. The Supreme Court has identified ways in which regulations on the initiative process may burden "core political speech." *Meyer*, 486 U.S. at 422. Regulations may make it less likely that proponents will be able to gather the necessary signatures to get their initiative on the ballot, "thus limiting their ability to make the matter the focus of statewide discussion." *Id.* at 423. In *Meyer*, the unconstitutional restriction was a ban on paid signature gathering, which is the most efficient subset of in-person petitioning. *Id.* at 424. Such ballot initiative regulations trigger strict scrutiny when they "significantly inhibit the ability of initiative proponents to place initiatives on the ballot." *Angle*, 673 F.3d at 1133.

Here, as the Court properly held before, "Defendant's 'refus[al] to make reasonable accommodation, during the unprecedented time of the pandemic,

reduced the total quantum of speech on the public issue.'"  Prelim. Inj. Order at 11

(alterations in original).  "As explained earlier, Plaintiffs faced many restrictions

that, when combined with Defendant's stringently applying the initiative

requirements, significantly inhibit[ed] [their] ability to place an initiative on the

ballot."  *Id.* at 10 (alterations in original) (internal quotations omitted); *see also*

*supra* section II.B.  As such, PNP satisfies the second requirement under *Angle* for

strict scrutiny.

### 3.    The burdens on PNP's First Amendment rights were not narrowly tailored.

In order to defeat strict scrutiny, Defendant's severe restrictions on PNP's

ability to place an initiative on the ballot "must be narrowly tailored and advance a

compelling state interest."  *Angle*, 673 F.3d at 1132 (quoting *Prete v. Bradbury*,

438 F.3d 949, 961 (9th Cir. 2006)).  Defendant does not dispute her office's

unwillingness to reduce the number of signatures required to be gathered for

placement on the 2020 ballot or to grant Plaintiffs additional time to gather

signatures in light of an unprecedented global pandemic.  As this Court previously

recognized, Prelim. Inj. Order at 13-14, and as federal courts in Michigan and

Nevada similarly found, the strict enforcement of pre-pandemic ballot initiative

signature requirements is not narrowly tailed to account for present pandemic-era

circumstances.  *SawariMedia,* 466 F. Supp. 3d at 774-76*; Fair Maps Nev.*, 463 F.

Supp. 3d at 1146-47.

Defendants' unwillingness to make reasonable accommodations to the signature threshold or deadline in light of the severe restrictions placed on PNP's ability to gather signatures safely and in compliance with Governor Brown's pandemic-related executive orders prevents Defendants from defeating strict scrutiny. The Court's determination that strict scrutiny applies in this case and the undisputed unwillingness of Defendant to narrowly tailor signature thresholds or deadlines in light of the pandemic allows this Court to declare a violation of Plaintiffs' First Amendment rights on this record.

### B. Plaintiff's claims are not moot.

Plaintiffs' claims in this case are not moot. "A court is not precluded from exercising jurisdiction over an otherwise moot case where . . . the case is 'capable of repetition, yet evading review.'" *Rubin v. City of Santa Monica*, 308 F.3d 1008, 1013 (9th Cir. 2002) (quoting *Schaefer v. Townsend*, 215 F.3d 1031, 1033 (9th Cir. 2000)). Courts "may exercise jurisdiction over [a challenge to an electoral restriction] if '(1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again.'" *Meyer*, 486 U.S. at 417 n.2 (second and third alterations in original) (quoting *Murphy v. Hunt*, 455 U.S. 478, 482 (1982) (per curiam)).

In *Meyer*, the Supreme Court applied the "capable of repetition, yet evading review" doctrine after the election at issue. *Meyer*, 486 U.S. at 417 n.2. The Court found there that it was unlikely that an initiative proponent could both obtain a favorable ruling within the six-month window available to the proponents to gather signatures to place their initiative on the ballot and gather the requisite number of signatures. *Id*. Furthermore, as the proponents "continue[d] to advocate" for the adoption of their initiative "and plan[ned] future attempts to obtain the signatures necessary to place the issue on the ballot," the Court found that it was reasonable that this same controversy could recur and that the matter was therefore not moot. *Id*.

Plaintiffs here faced an even shorter window to fully litigate this issue before the deadline to submit the requisite number of signatures to get IP 57 on the ballot. The Secretary of State did not clear PNP to gather petition signatures until April 9, 2020. Turrill Decl., ¶ 19. By that time, Governor Brown's Stay Home, Save Lives orders had already been in effect for weeks, and PNP had only three months to gather the necessary signatures to get IP 57 on the ballot with the burden of pre-pandemic qualification requirements combined with the height of the pandemic's public health restrictions. *See* Turrill Decl., ¶ 19. Like in *Meyer*, it was not possible for PNP to obtain a final ruling within this period, nor was it possible to act upon any ruling in time to obtain the signatures needed.

Additionally, despite the ongoing pandemic, PNP continues to advocate for the adoption of an independent citizens redistricting commission and is working towards another attempt to place this issue on the November 2022 ballot.  Second Turrill Decl., ¶ 7.  The period for initiating this process has already begun, as Oregon law allows petitioners to gather up to 2,000 signatures for the November 2022 ballot beginning in July 2020.  Ex. F (State Initiative and Referendum Manual), at 3.  Under Oregon law, initiative proponents must first file a prospective petition with at least 1,000 valid signatures. Or. Rev. Stat. § 250.045(1)(b)(A).  That successful filing triggers the start of the ballot title process.  The Oregon Attorney General drafts a ballot title, receives comments, and adopts a final "certified" ballot title.  *See id.* §§ 250.065, 250.067.  That process lasts one month.  *See id.*  But then any commenter can appeal the certified ballot title to the Oregon Supreme Court.  *See id.* § 250.085.  There is no deadline for the court to review the certified ballot title.  *See id.*  The court generally takes three months to complete its review, although it can take much longer, in particular if the court finds any deficiency in the certified ballot title.  *See, e.g.*, Ex. S (providing examples of initiative efforts with long delays during judicial review).  The process can last many additional months.  Only after it is concluded can the proponents begin to gather signatures that exceed 2,000 on the proposed initiative.  *See* Or. Rev. Stat. § 250.052(3)(b)-(4).

However, Plaintiffs continue to face the same challenges to ballot access with the COVID-19 pandemic in this upcoming election cycle. On November 17, 2020, the Governor issued Executive Order 20-65, establishing a two-week statewide freeze that again limited gatherings, required eating establishments to be take-out or delivery only, and mandated work-from-home policies. Or. Exec. Order No. 20-65 (Nov. 17, 2020). Governor Brown has continued to extend the state of emergency order regarding COVID-19, most recently for the fifth time on December 17, 2020. Or. Exec. Order No. 20-67 (Dec. 17, 2020). As COVID-19 continues to threaten public health and safety in Oregon, initiative proponents still face the same restrictions on signature collection as they have throughout the pandemic. There is no clear end in sight for this pandemic, and as the election cycle for November 2022 has already begun, it is clear that the burdens of pre-pandemic signature requirements continue to deny Plaintiffs access to the 2022 ballot.

Under Oregon law, Plaintiffs' claims are even stronger. Where an act of a public body is unconstitutional or contrary to law, a party may continue in its action if the act challenged is capable of repetition, yet evading review. Or. Rev. Stat. § 14.175. The party seeking relief must simply "establish that it is reasonable to believe that the person or entity whose act is being challenged will repeat the act or continue it in a way that will similarly affect someone." *Penn v. Bd. of Parole*

*& Post-prison Supervision*, 451 P.3d 589, 597 (Or. 2019).  There must only be

"reasonable potential that the act will recur to a similar effect."  *Id.*  Oregon courts

have frequently invoked Or. Rev. Stat. § 14.175 to adjudicate to finality claims in

election law cases that extend past the election at issue because these cases are

likely to evade review due to the short duration of any given election cycle.  *See*

*Geddry v. Richardson*, 437 P.3d 1163, 1168 (Or. Ct. App.), *review denied sub*

*nom. Geddry v. Clarno*, 451 P.3d 983 (Or. 2019); *Harisay v. Atkins*, 434 P.3d 442,

445 (Or. Ct. App. 2018), *aff'd sub nom. Harisay v. Clarno*, 474 P.3d 378 (Or.

2020); *State ex rel. Smith v. Hitt*, 424 P.3d 749, 751 (Or. Ct. App. 2018).

  In *Couey v. Atkins*, the Oregon Supreme Court held that even if a judgment

would have no "practical effect" on the party, "the court is nevertheless authorized

to issue such a judgment" where the issue is capable of repetition, yet likely to

evade review.  *Couey v. Atkins*, 355 P.3d 866, 877 (Or. 2015).  *Couey* concluded

that cases involving election law are inherently "likely to evade judicial review in

the future" due to the "short, two-year election cycle."  *Id.* at 877-78, 880.  In this

case, the current exponential climb in COVID-19 cases throughout the state and

the Governor's strengthened orders in November have yet again substantially

restricted the ability of petitioners to collect signatures with strict social distancing

requirements.  As these COVID-19 restrictions continue and no effort is made to

adjust the initiative process, these cumbersome requirements are continuing to

burden Plaintiffs in this new election cycle. Therefore, this case, like *Couey*, is likely to evade judicial review due to the short nature of the election cycle.

## IV.    CONCLUSION

For the foregoing reasons, the Court should grant summary judgment in Plaintiffs' favor and issue a declaratory judgment that Defendant violated the First Amendment rights of Plaintiffs.

Respectfully submitted,

Dated:  February 24, 2021                  /s/ *Daniel Meek*

By:    _____
Daniel Meek

Attorneys for Plaintiffs
PEOPLE NOT POLITICIANS
OREGON;
COMMON CAUSE; LEAGUE OF
WOMEN VOTERS OF OREGON;
NAACP OF
EUGENE/SPRINGFIELD;
INDEPENDENT PARTY OF
OREGON; C. NORMAN TURRILL

# CERTIFICATE OF COMPLIANCE

This brief complies with the applicable word-count limitation under LR 7-2(b),  because it contains 8586 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

Dated: February 24, 2021

/s/ *Daniel Meek*
DANIEL W. MEEK
OSB No. 79124
10266 SW Lancaster Road
Portland, OR 97219
503-293-9021 voice
855-280-0488 fax
dan@meek.net

Attorney for Plaintiffs:
PEOPLE NOT POLITICIANS
OREGON, COMMON CAUSE,
LEAGUE OF WOMEN VOTERS OF
OREGON, NAACP OF
EUGENE/SPRINGFIELD,
INDEPENDENT PARTY OF
OREGON, and C. NORMAN
TURRILL

## CERTIFICATE OF SERVICE

I hereby certify that on February 24, 2021, I electronically led the foregoing

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND**

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY**

**JUDGMENT** with the Clerk of the Court for the U.S. District Court of Oregon by

using the CM-ECF system.

I certify that all participants in the case are registered CM-ECF users and

that services will be accomplished by the CM-ECF system.

Dated: February 24, 2021

/s/ *Daniel Meek*
DANIEL W. MEEK
OSB No. 79124
10266 SW Lancaster Road
Portland, OR 97219
503-293-9021 voice
855-280-0488 fax
dan@meek.net

Attorney for Plaintiffs:
PEOPLE NOT POLITICIANS
OREGON, COMMON CAUSE,
LEAGUE OF WOMEN VOTERS OF
OREGON, NAACP OF
EUGENE/SPRINGFIELD,
INDEPENDENT PARTY OF
OREGON, and C. NORMAN
TURRILL